### UNITED STATES v. ALUMINUM CO. OF AMERICA et al.

United States District Court
S. D. New York.
June 2, 1950.

336

338

Leonard J. Emmerglick, Special Assistant to the Attorney General, (J. Fergus Belanger, Norman J. Futor, Walter D. Murphy, all of Washington, D.C.,) for plaintiff.

Smith, Buchanan & Ingersoll, Pittsburgh, Pa., (William Watson Smith, Frank B. Ingersoll, Leon E. Hickman, William K. Unverzagt, all of Pittsburgh 19, Pa., of counsel), Hughes, Hubbard & Ewing, New York City (Charles E. Hughes, Jr., L. Homer Surbeck, New York City, of counsel), for defendants.

KNOX, Chief Judge.

## Procedural History and Applicable Law

The procedural history of this litigation —spreading as it does over a period of thirteen years—is such as to entitle it to be designated as a *res nova* in anti-trust law enforcement. Notwithstanding the antiquity of the action, the issues involved must be determined in accordance with the more recently established anti-trust principles, and not by those that were well recognized in an earlier day. In order to find solutions to the novel questions presented, my first effort must be directed to the ascertainment of the current interpretations of the anti-trust statutes as they apply to the facts revealed by this record.

The start of the action was on April 23, 1937, when the Government filed a petition charging defendant, Aluminum Company of America, hereinafter referred to as Alcoa, with monopolizing interstate and foreign commerce, particularly in the manufacture and sale of "virgin" aluminum ingot.

The trial got under way on June 1, 1938, and continued without much interruption until August 14, 1940. Thereafter, on September 30, October 1, 2, 3, 4, 6, 7, 8, 9 and 10, 1941, Judge Caffey delivered his opinion from the bench, finding in all respects for the defendant, 44 F.Supp. 97. On July 23, 1942, he entered judgment, dismissing the complaint on the merits.

The Government appealed to the Supreme Court of the United States but, due to the absence of a qualified quorum in that Court, the case was certified to the Court of Appeals for the Second Circuit, 1944, 322 U.S. 716, 64 S.Ct. 1281, 88 L.Ed. 1557, in which tribunal full appellate review was vested by Act of Congress 58 Stat. 272, Act June 9, 1944, 15 U.S.C.A. § 29.

The Court of Appeals rendered its opinion on March 12, 1945, 2 Cir., 148 F.2d 416. The result below was affirmed in part, and in part reversed. Alcoa, the court held, had exercised an unlawful price "squeeze" in aluminum sheet, 148 F.2d at pages 437–438—a matter not presently of concern—and also had illegally monopolized the aluminum ingot market within the stricture of Section 2 of the Sherman Act, 15 U.S.

C.A. § 2. However, no relief against the latter offense was then decreed.

This was prompted by the uncertainties that then surrounded the post-war aluminum industry, and which were occasioned by the existence of large and important aluminum facilities that had been constructed to meet metal emergencies of the late war, and which were in the ownership of the United States. The Surplus Property Act of 1944, 58 Stat. 765, 50 U.S.C.A.Appendix, § 1611 et seq., directed that these facilities be disposed of in such manner, and with such purpose, as would foster competitive conditions in the aluminum industry of the nation.

Inasmuch as the disposal program, at the time of the decision of the appellate court had not yet been undertaken, the court took the view that the pronouncement of remedial measures should be withheld until such time as would enable this Court to evaluate the effects of the disposal program of the War Assets Administration. In this connection, the court said:

"It is as idle for the plaintiff to assume that dissolution will be proper, as it is for 'Alcoa' to assume that it will not be; and it would be particularly fatuous to prepare a plan now, even if we could be sure that eventually some form of dissolution will be proper. Dissolution is not a penalty but a remedy; *if the industry will not need it for its protection, it will be a disservice to break up an aggregation which has for so long demonstrated its efficiency.* The *need* for such a remedy will be for the district court in the first instance, and there is a peculiar propriety in our saying nothing to control its decision, because the appeal from any judgment which it may enter, will perhaps be justiciable only by the Supreme Court, if there are then six justices qualified to sit." 148 F.2d at page 446 (emphasis added).

Thereafter, the Court of Appeals expressed itself more specifically. This occurred when a mandamus proceeding instituted by the Government challenged the conformity of the judgment entered by the District Court to the mandate issued by the appellate tribunal. United States v.

District Court for S.D.N.Y., 2 Cir., 1948, 171 F.2d 285. The appellate court then spoke as follows:

"* * * the article as a whole conforms with our mandate, in which we tried to make it plain that the final judgment must secure the establishment of those *'competitive conditions'* which the Anti-Trust Acts, 15 U.S.C.A. § 1 et seq., demand. Dissolution is one remedy which may be necessary to that end; and in any event it will not depend upon the single issue whether 'Alcoa' at the time of the judgment shall have a monopoly of the ingot market. On the contrary, *it will depend upon what is* 'Alcoa's' position in the industry at that time: i. e., whether it must be divided into competing units in order to conform with the law. The continuance of the monopoly in ingot aluminum may in the court's judgment be enough to justify dissolution; but its absence will forbid neither dissolution, nor any other remedy." 171 F.2d at 286 (Emphasis supplied).

Thus, the crucial issue before me is the *need* for a remedy in terms of the existence of *competitive conditions* conforming to law. In determining the specific criteria applicable to ascertaining this need, one possible standard is whether Alcoa's present situation, notwithstanding all that has happened since 1945, is still violative of the Sherman Act, 15 U.S.C.A. §§ 1-7, 15 note. Another is that *competitive conditions*, i. e. "effective competition" may not exist even though the Sherman Act were not violated, because of Alcoa's stronger market position in relation to its competitors.

A third alternative rests on the proposition that dissolution decrees, in order to prevent the recurrence of condemned conditions, have reduced offenders to market positions quite below those which might be considered violative of the anti-trust laws. Accordingly, if Alcoa now occupies a market position substantially stronger than that which the largest fraction of the company would have been assigned if dissolution had been ordered immediately following the trial, it would mean that "effective competition" does not presently exist.

It is difficult fully to reconcile the third alternative with the language of the Court of Appeals in 1945. The court then said that dissolution may not be necessary to protect the industry, not that the protection of the industry is only accomplished by the equivalent of dissolution having occurred. Nor does the 1948 opinion suggest that Alcoa must still be in violation of the Sherman Act in order that remedial action be taken against it. The court observed that the absence of monopoly will not necessarily forbid dissolution. Neither of the previous two alternatives are necessarily compatible with Section 4 of the Sherman Act, the purpose of which is to require the district courts to "prevent and restrain such violations" of the Act. Rather, they are simply *ad hoc* criteria for determining the sole issue which is the existence of "effective competition," which will insure lawful market conditions throughout the foreseeable future.

The precise ingredients of "effective competition" cannot be said to have been a static concept under the Sherman Act. Their applications, as well as their implications, have varied with changes in judicial thought with respect to economic and legal philosophies. Recent precedents, unfortunately, *but as is usual, have fallen short of* definite specifications as to the requirements of "effective competition." But, by examining the prior law and theory which have evolved in relation to both substantive violations, and the purposes of the remedy under the Sherman Act, it is perhaps possible to formulate a more or less concrete *delineation of the standards that should be* met in seeking a just decision upon the complicated facts of this case.

■ In considering the substantive offense of monopolization under Section 2 of the Sherman Act, a marked development in the application of the anti-trust laws has been the diminishing significance attributable to the presence of actually abusive practices in the exercise of a corporation's market power. Courts formerly looked to an overt misuse of a defendant's dominant competitive position as a *sine qua non* of

illegality. But this is no longer true. The more recent authoritative precedents indicate that the mere existence of what is denominated "monopoly power," irrespective of its exercise, may be the focal element that will resolve the outcome of a particular suit.

Thirty years ago, Justice McKenna, in United States v. U. S. Steel Corp., 1920, 251 U.S. 417, 40 S.Ct. 293, 64 L.Ed. 343, 8 A.L.R. 1121, took occasion to say:—"The corporation is undoubtedly of impressive size, and it takes an effort of resolution not to be affected by it or to exaggerate its influence. But we must adhere to the law, and the law does not make mere size an offense, or the *existence of unexerted power an offense. It, we repeat, requires overt acts, and trusts to its prohibition of them and its power to repress or punish them.* It does not compel competition, nor require all that is possible." 251 U.S. at page 451, 40 S.Ct. at page 299, 64 L.Ed. 343, 8 A.L.R. 1121, (emphasis added).

■ The changing attitude of judicial opinion was reflected by Justice Cardozo in United States v. Swift & Co., 1932, 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999. He took note of the potential for abuse which underlies the possession of sizeable market power. "Mere size, according to the holding of this court, is not an offense against the Sherman Act unless magnified to the point at which it amounts to a monopoly, * * * but size carries with it an opportunity for abuse that is not to be ignored when the opportunity is proved to have been utilized in the past." 286 U.S. at page 116, 52 S.Ct. at page 463, 76 L.Ed. 999.

In this present suit, Judge Learned Hand demonstrated that the requirement of abusive practices in addition to that of monopoly power is inconsistent with the long established rule declaring that price fixing agreements are illegal *per se.* United States v. Trenton Potteries Co., 1927, 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700, 50 A.L.R. 989; United States v. Socony-Vacuum Oil Co., 1940, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129. From his reasoning, as quoted with approval in American Tobacco Co. v. United States, 1946, 328 U.S. 781,

813, 66 S.Ct. 1125, 90 L.Ed. 1575, an incident of monopoly is the power, necessarily exercised, to fix prices.

"Starting, however, with the authoritative premise that all contracts fixing prices are unconditionally prohibited, the only possible difference between them and a monopoly is that while a monopoly necessarily involves an equal, or even greater, power to fix prices, its mere existence might be thought not to constitute an exercise of that power. That distinction is nevertheless purely formal; it would be valid only so long as the monopoly remained wholly inert; it would disappear as soon as the monopoly began to operate; for, when it did—that is, as soon as it began to sell at all—it must sell at some price and the only price at which it could sell is a price which it itself fixed. Thereafter the power and its exercise must needs coalesce. Indeed it would be absurd to condemn such contracts unconditionally, and not to extend the condemnation to monopolies; for the contracts are only steps toward that entire control which monopoly confers: they are really partial monopolies." United States v. Aluminum Co. of America, 2 Cir., 1945, 148 F.2d 416, 427–28.

Moreover, Judge Hand declared that another indicium of the monopolization of an industry, is the power to exclude competitors. He answered the question left undecided in United States v. Pullman Co., D.C. E.D.Pa. 1943, 50 F.Supp. 123, 126, viz., "* * * whether a violation of the Sherman Act is involved where a business enterprise * * * has acquired the sole possession of the field by absorption, in nonpredatory fashion, of all of its competitors."

Judge Hand's point of view was approved by the Supreme Court when it quoted him as follows: "* * * we can think of no more effective exclusion than progressively to embrace each new opportunity as it opened, and to face every newcomer with new capacity already geared into a great organization, having the advantage of experience, trade connections and the elite of personnel. Only in case we interpret 'exclusion' as limited to manoeuvres not honestly industrial, but actuated solely by a de-

sire to prevent competition, can such a course, indefatigably pursued, be deemed not 'exclusionary.' So to limit it would in our judgment emasculate the Act; would permit just such consolidations as it was designed to prevent." American Tobacco Co. v. U. S., 1946, 328 U.S. 781, 814, 66 S. Ct. 1125, 1141, 90 L.Ed. 1575; U. S. v. Aluminum Co. of America, 2 Cir., 1945, 148 F.2d 416, 431.

█ The American Tobacco case summarized the currently controlling principles of monopoly litigation: "The authorities support the view that the material consideration in determining whether a monopoly exists is not that prices are raised and that competition actually is excluded but that *power exists to raise prices or to exclude competition* when it is desired to do so." 328 U.S. at page 811, 66 S.Ct. at page 1139, 90 L.Ed. 1575. (Emphasis added).

█ As I understand the foregoing language, it means that the mere existence of monopoly power, though not exercised abusively, is some indication of illegality. A violation of the statute will come to completion if the defendant has nothing more than a purpose or intent to exercise the power, American Tobacco Co. v. United States, 1946, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575; United States v. Griffith, 1948, 334 U.S. 100, 68 S.Ct. 941, 92 L.Ed. 1236, but as the cases show, a "purpose or intent" is present if the acquisition or retention of the power comes about as a consequence of defendant's conduct or business arrangements. United States v. Griffith, 1948, 334 U.S. 100, 105–107, 68 S.Ct. 941, 945, 92 L.Ed. 1236; United States v. Aluminum Co. of America, 2 Cir., 1945, 148 F.2d 416. In considering the matter of monopoly power, two ingredients are of outstanding significance: viz., the power to fix prices and the power to exclude competitors.

Concurrent with this modification regarding the substantive law, a reinterpretation of Section 4 of the Sherman Act has amplified the purpose of the remedy. When the offense consisted of the unlawful exercise of power, the purpose of the remedy was to inhibit the potential for abuse, and the need for a remedy was determined by the likelihood of recurrence of abusive practices. In the situation where monopoly power had been unlawfully acquired, followed by a substantial period of voluntary forbearance from abuse of power, remedial measures were held inappropriate. The abandonment of abuse was a sufficient indication of future lawful behavior to permit unlawfully acquired power to remain unmolested. United States v. American Can Co., D.C.D.Md.1916, 230 F. 859; United States v. U. S. Steel Corp., 1920, 251 U.S. 417, 40 S.Ct. 293, 64 L.Ed. 343, 8 A.L.R. 1121; Contra: United States v. International Harvester Co., D.C.D.Minn.1914, 214 F. 987.

The culmination of this view was reached in United States v. International Harvester Co., 1927, 274 U.S. 693, 47 S.Ct. 748, 71 L. Ed. 1302. With a procedural setting closely approximating that involved in the instant case, the Court found the existence of "effective competition" notwithstanding that defendant enjoyed 64 per cent of the trade in harvesting machines, and had capital and resources in excess of the aggregate of its competitors. Nor did it matter that the competitors of Harvester were accustomed to follow the prices set by the latter. The factor of significance was that defendant had not engaged in price cutting or other abuses of its power, and upon this rested the refusal to enlarge the remedies applied to Harvester.

When the change in substantive emphasis from "abuse" to "power" is coupled with the new doctrine presently governing the application of the remedy, it will be seen that the International Harvester case of 1927 must be relegated to a now discarded stage of legal development.

The opinion of Judge Learned Hand in the case of United States v. Corn Products Refining Co., D.C.S.D.N.Y.1916, 234 F. 964, clearly indicated that if the mere existence of monopoly power were the prime factor for inquiry, such criterion would necessarily affect the choice of remedy to be applied. He there spoke as follows:

"* * * if power alone be forbidden by the statute, it can make no difference

whether its results are beneficent or sinister, whether a dissolution will affect the industry to its prejudice or to its advantage, whether it will promote or depress foreign trade. * * * Such questions concern the wisdom of the act, and with it I have nothing to do if once its purpose be authoritatively declared.

"If, on the other hand, the exercise of the power is what the statute touches, then the question arises What is practically necessary to prevent the repetition of those unfair means?" 234 F. at page 1015.

Recent precedents do not present a factual parallel to the abandonment of an abuse situation. The latest authoritative statements regarding remedies appear in contexts wherein abusive and predatory practices continued up to the time of litigation. Nevertheless, the expansion of remedies which can be observed in these cases is general evidence that the court's functions under Section 4 should be more vigorous, more searching, and even more drastic, than those which have heretofore been applied.

The latest remedy cases indicate two modifications of earlier judicial pronouncements, one practical, the other theoretical. On the practical side they show that courts are less likely than formerly to be impressed by evidence which tends to establish that defendants who have violated the Sherman Act in the past will not do so in the future. On the theoretical side, a rule has been formulated which, when applied, will serve to deprive defendants of the fruits of their wrongdoing. This, no doubt, is an outgrowth of an awareness that strong measures are required to restrain a tendency to recidivism.

The first reflection of a closer scrutiny to restrain any such tendency appears in United States v. Swift & Co., 1932, 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999. In that case, the defendant sought to be relieved of a consent decree provision entered against it in 1920 which forbade it from engaging in the wholesale or retail grocery business. In denying the relief Justice Cardozo said:

"Size and past aggressions induced the fear in 1920 that the defendants, if permitted to deal in groceries, would drive their rivals to the wall. Size and past aggressions leave the fear unmoved today." 286 U.S. at page 117, 52 S.Ct. at page 463, 76 L.Ed. 999.

■ The opinion in United States v. Crescent Amusement Co., 1944, 323 U.S. 173, 65 S.Ct. 254, 89 L.Ed. 160, further emphasized the need of a practical approach towards the possibility of the return to improper conduct on the part of a monopolist. It also enunciated the "fruits" doctrine. Defendant having been found in that case to have conspired to restrain and monopolize trade in the exhibition of motion pictures, was prohibited from acquiring additional theatres without a showing that competition would not thereby be unreasonably restrained, and was ordered to divest itself of the stock of certain affiliated corporations. The Court said:

"The pattern of past conduct is not easily forsaken. Where the proclivity for unlawful activity has been as manifest as here, the decree should operate as an effective deterrent to a repetition of the unlawful conduct and yet not stand as a barrier to healthy growth on a competitive basis." 323 U.S. at page 186, 65 S.Ct. at page 261, 89 L.Ed. 160.

"Those who violate the Act may not reap the benefits of their violations and avoid an undoing of their unlawful project on the plea of hardship or inconvenience. That principle is adequate here to justify divestiture of all interest in some of the affiliates *since their acquisition was part of the fruits of the conspiracy.*" 323 U.S. at page 189, 65 S.Ct. at page 262, 89 L.Ed. 160 (Emphasis added).

At first glance, United States v. National Lead Co., 1947, 332 U.S. 319, 67 S.Ct. 1634, 91 L.Ed. 2077, appears as a step that backs away from the Crescent case. The Court held that the National Lead Co. and the du Pont Co. were acting in unlawful restraint of trade by virtue of a patent pool and related agreements. The Court refused to order divestiture of any of defendant's

plants even though they may have been acquired or used incidentally or relative to the agreements. The Court said:

"It is not for the courts to realign and redirect effective and lawful competition where it already exists and needs only to be released from restraints that violate the antitrust laws. To separate the operating units of going concerns without more supporting evidence than has been presented here to establish either the need for, or the feasibility of, such separation would amount to an abuse of discretion." 332 U. S. at page 353, 67 S.Ct. at page 1650, 91 L. Ed. 2077.

In the following year, however, the Supreme Court made a clear declaration as to the purpose to be served by an anti-trust remedy. In Schine Theatres v. United States, 1948, 334 U.S. 110, 68 S.Ct. 947, 92 L.Ed. 1245, after finding that defendants had conspired to restrain and monopolize trade in the exhibition of motion pictures, the Court held that an injunction against future violations was an insufficient remedy. Without divestiture the defendants "could *retain the full dividends* of their monopolistic practices and profit from the unlawful restraints of trade which they had inflicted on competitors." 334 U.S. at page 128, 68 S.Ct. at page 957, 92 L.Ed. 1245.

(Emphasis added).

Divestiture, like restitution, had the purpose of depriving a defendant of the gains of his wrongful conduct. The National Lead case was distinguished on the ground that " * * * there was no showing that the plants sought to be divested were either unlawfully acquired or used in a manner violative of the antitrust laws." 334 U.S. at page 128, 68 S.Ct. at page 957, 92 L.Ed. 1245.

In United States v. Paramount Pictures, 1948, 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260, the Court indicated that divestiture is warranted where the acquisitions were the fruits of monopolistic practices or restraints of trade, or if lawfully acquired, they were utilized as part of a conspiracy to eliminate or suppress competition in furtherance of the ends of the conspiracy. The propriety of divestiture, it seems, is to be determined by the relationship of the unreasonable restraints of trade to the position of the defendant in the market.

■ That a new principle has been injected into the interpretation of Section 4 of the Sherman Act is amply demonstrated by the following comparison. The purpose of the remedy in an anti-trust suit was initially defined in Standard Oil Co. of New Jersey v. United States, 1911, 221 U. S. 1, 78, 31 S.Ct. 502, 523, 55 L.Ed. 619, 34 L.R.A.,N.S., 834, Ann.Cas.1912D, 734

"1st. To forbid the doing in the future of acts like those which we have found to have been done in the past which would be violative of the statute. 2d. The exertion of such measure of relief as will effectually dissolve the combination found to exist in violation of the statute, and thus neutralize the extension and continually operating force which the possession of the power unlawfully obtained has brought and will continue to bring about."

The same thoughts were expressed in the Schine case, but the "fruits" theory was added. Divestiture or dissolution, it was said, serves several functions:

"(1) It puts an end to the combination or conspiracy when that is itself the violation. (2) *It deprives the antitrust defendants of the benefits of their conspiracy.* (3) It is designed to break up or render impotent the monopoly power which violates the Act." Schine Chain Theatres v. United States, 1948, 334 U.S. 110, 128-129, 68 S.Ct. 947, 957, 92 L.Ed. 1245.

■ It is clear from the last function enumerated in the Schine case and, as heretofore suggested, that a satisfactory starting point in this remedy phase is an inquiry into the existence of monopoly power Such power, if found to exist, must be reduced to impotence. To further the detection of monopoly power, attention must also be given to recent cases which discuss the facts that indicate its presence. These cases must be understood as defining monopoly power for purposes of finding violations of the Sherman Act in the first instance.

■ Two basic signs of monopoly power are size and vertical integration. In

a short-hand summary of the law, Judge Hand, in this case, said: "That percentage (90%) is enough to constitute a monopoly; it is doubtful whether sixty or sixty-four percent would be enough; and certainly thirty-three per cent is not." United States v. Aluminum Co. of America, 2 Cir., 1945, 148 F.2d 416, 424.

The most recent and authoritative statement as to what constitutes unlawful size and market domination is contained in the opinion which decided United States v. Columbia Steel Co., 1948, 334 U. S. 495, 68 S.Ct. 1107, 92 L.Ed. 1533. The issue involved therein was the propriety under the Sherman Act of the acquisition by the United States Steel Corporation of the Consolidated Steel Corporation. The latter company was a fabricator of rolled steel. The merger was opposed on two grounds: 1) that it unlawfully reduced competition by diminishing the market of those competitors of United States Steel who produced rolled steel, and 2) that it unlawfully reduced United States Steel's competition in the fabricated steel market. The Court found against the government on both grounds. In what was designated as the Consolidated Steel market area, the acquisition by United States Steel was said to reduce demand for rolled steel from United States Steel's competitors by only three per cent. In the same market, but considering fabricated steel production, the acquisition by United States Steel would increase the latter's percentage control from 13 to 24 per cent. The Court set out the following guide for determining the propriety of the merger:—

"In determining what constitutes unreasonable restraint, we do not think the dollar volume is in itself of compelling significance; we look rather to the percentage of business controlled, the strength of the remaining competition, whether the action springs from business requirements or purpose to monopolize, the probable development of the industry, consumer demands, and other characteristics of the market. We do not undertake to prescribe any set of percentage figures by which to measure the reasonableness of a corporation's enlargement of its activities by the purchase of the assets of a competitor. * * * The relative effect of percentage command of a market varies with the setting in which that factor is placed." 334 U. S. at pages 527–528, 68 S.Ct. at page 1124, 92 L.Ed. 1533.

But, in the background of the Columbia Steel case lurks the fact that United States Steel controlled 51 per cent of the rolled steel and ingot capacity in the market therein considered. Moreover, Columbia Steel was a case presenting the issue of permissibility of merger. It is not unreasonable to suggest that a court may act more readily to keep apart what has never been joined together, than to dismember an existing entity which, in general, has well served the public.

If a percentage control of the market is viewed, not as a short cut to decision, but rather as a short-hand expression of power when evaluating resources, trade, and the nature of the market, it can be said that Columbia Steel is not inconsistent with the summary guide announced by Judge Hand.

Vertical integration is simply a particular of size. As viewed in United States v. Paramount Pictures, Inc., 1948, 334 U. S. 131, 68 S.Ct. 915, 92 L.Ed. 1260, it is a relevant consideration in ascertaining monopoly power.

"Likewise bearing on the question whether monopoly power is created by the vertical integration, is the nature of the market to be served * * *, and the leverage on the market which the particular vertical integration creates or makes possible." 334 U. S. at page 174, 68 S.Ct. at page 937, 92 L.Ed. 1260.

But it was left to the Supreme Court in the Columbia Steel case to reassure that the Sherman Act took cognizance of the economic needs and organization of American industry. The fact that a subsidiary will in all probability deal only with the parent for goods the parent can furnish does not make the acquisition of such subsidiary unlawful. But,

"* * * When other elements of Sherman Act violations are present, the fact of corporate relationship is material and can be considered in the determination

of whether restraint or attempt to restrain exists." United States v. Columbia Steel Co., 1948, 334 U.S. 495, 523, 68 S.Ct. at page 1122, 92 L.Ed. 1533.

"* * * vertical integration as such without more, cannot be held violative of the Sherman Act. * * * the extent of permissible integration must be governed, as other factors in Sherman Act violations, by the other circumstances of individual cases. Technological advances may easily require a basic industry plant to expand its processes into semi-finished or finished goods so as to produce desired articles in greater volume and with less expense.

"* * * no direction has appeared of a public policy that forbids, *per se,* an expansion of facilities of an existing company to meet the needs of new markets of a community, whether that community is nation-wide or county-wide. * * * If businesses are to be forbidden from entering into different stages of production that order must come from Congress, not the courts." 334 U.S. at page 525–526, 68 S.Ct. at page 1123, 92 L.Ed. 1533.

The conclusion is inescapable, from the Columbia Steel decision, that the possession of monopoly power is something other than the status in a market of a dominant firm. The dominant firm may have neither the power to exclude competitors, nor the power to fix prices.

If Alcoa should be found, in this proceeding, to possess monopoly power, as above defined, it is not necessary that a purpose or intent to exercise such power also be found to exist in order to justify this Court in granting relief to the Government. In this respect, the doctrine now governing the application of remedies imposes a different standard than would be requisite in determining illegality in the first instance. On the practical side, the mere existence of monopoly power is instinct with the threat of future violations. On the theoretical side, it seems proper to consider monopoly power the fruit of an unlawful monopolization and, as such, provide that it be rendered impotent. However, when dealing with an integrated monopolizer, the "fruits" rule cannot literally be applied. A court cannot blindly divest particular ill-gotten gains without viewing constructively the creation of competitive units. Therefore, the power itself, and not the specific elements thereof, must sometimes be viewed as the "fruit."

Nevertheless, reliance upon the existence of monopoly power, as defined by Sherman Act violations, even without the requirement of purpose or intent to exercise that power does not permit as searching an inquiry as the remedy phase demands. This Court must provide against the reasonable expectation of the resumption of future unlawful conditions. United States v. United States Alkali Export Ass'n, D.C. S. D. N. Y. 1949, 86 F.Supp. 59, 81; United States v. Standard Register Co., D. C. D. C. 1947, 7 F. R. D. 287. To a certain extent, this function is accomplished by the rule which requires all doubts regarding remedies to be resolved in favor of the Government, and against an adjudged monopolist. Hartford Empire Co. v. United States, 1945, 323 U. S. 286, 409, 65 S.Ct. 373, 89 L.Ed. 322; United States v. Bausch & Lomb Co., 1944, 321 U. S. 707, 726, 64 S.Ct. 805, 88 L.Ed. 1024. But, it is not fully satisfied unless this Court investigates present power potentials with a view to their propensities under reasonably foreseeable market conditions. The existence of monopoly power in a *de novo* proceeding contemplates only the present power to fix prices or exclude competitors. But in a remedy proceeding, it is enough to justify relief that this Court can reasonably predict that monopoly power will probably arise in a discernable future market. As an example, if it can now be said that Alcoa shall have monopoly thrust upon it under reasonably predictable market developments because of the economic collapse of a competitor or competitors, remedial action is appropriate.

The criteria applicable to this case as above described necessitate two basic inquiries: (1) whether competitors flourish, and the extent to which they flourish, and whether they do so at the sufferance of Alcoa; (2) whether a foreseeable change in market conditions can secure an altera-

tion in Alcoa's present condition, either by expansion where any competitor can not, or by perseverance where any competitor would fail.

■ In determining the extent of permissible power that is consistent with the anti-trust laws in a particular industry, the following factors are relevant: the number and strength of the firms in the market; their effective size from the standpoint of technological development, and from the standpoint of competition with substitute materials and foreign trade; national security interests in the maintenance of strong productive facilities, and maximum scientific research and development; together with the public interest in lowered costs and uninterrupted production.

■ The inquiry into power, however, does not wholly resolve the issues. An examination into the intent of defendant is an equally apt indicium to predict consequences. See Appalachian Coals, Inc. v. United States, 1933, 288 U. S. 344, 372, 53 S.Ct. 471, 77 L.Ed. 825. Thus, when results fall short of a violation of the Sherman Act, a finding as to the specific intent of the defendant may convert the conduct into a violation. United States v. Columbia Steel Co., 1948, 334 U. S. 495, 525, 68 S.Ct. 1107, 92 L.Ed. 1533; United States v. Griffith, 1948, 334 U. S. 100, 105, 68 S.Ct. 941, 92 L.Ed. 1236; Swift & Co. v. United States, 1905, 196 U. S. 375, 396, 25 S.Ct. 276, 49 L.Ed. 518. But here, no specific intent need be shown. It is for Alcoa to dispel any inference of "innate proclivity" for unlawfulness arising from its past adjudication of monopoly. Relevant thereto is the extent to which Alcoa achieved its past monopoly not so much by predatory, unfair, or vicious trade practices, in knowing violation of the law, but by the more restrained expedient of preempting business opportunities in advance of potential competitors, formerly of much more doubtful illegality. Alcoa must convince, as evidenced by the developments during the period now under review, not only that its ability to monopolize has been dissipated, but its intent to do so similarly abated. For only in such event

can the duty to safeguard against future violations be discharged.

■ Even yet, there remains a further inquiry. Remedial action is justified even though defendant retains no vestige of power, or intent, to obtain monopoly, where a relationship exists between defendant and any one or more of its competitors which materially inhibits free competition. Thus, any agreement, conspiracy, or understanding which in any way retards the restoration of competitive conditions to this market must be carefully scrutinized by this Court, and, if its effects be found to prejudice the public interest, undone.

Issue has been joined upon two petitions presently before me. The first, filed by Alcoa on March 31, 1947, (and subsequently amended and supplemented) asks for a decree that the company has ceased to monopolize the aluminum ingot market and that, in consequence, in such market, effective competitive conditions now prevail. The Government filed its petition on September 24, 1948. It avers that Alcoa continues its monopolization of the market and that, in order to restore competitive conditions, Alcoa should be divested of such of its properties as will accomplish this purpose; and that the United States may have such other relief as they are entitled to receive.

Trial of the issue was begun on March 28, 1949, and continued through April 28th of that year. The trial was resumed on October 4, and proceeded to November 9, 1949. Additional proof was taken on January 16, 1950.

The discussion that follows, unless otherwise indicated therein, is an attempt to reflect the situation in the aluminum industry as it existed as of September 30, 1949. Little data of probative force was thereafter available. After oral argument in early February of this year, the case was submitted for decision.

### Description of the Stages of Production in the Aluminum Industry

In any effort to describe Alcoa's present competitive position, attention must be given to the entire structure of the aluminum industry. Essentially, there are four

principal stages of production, (1) mining the ore known as bauxite; (2) the separation therefrom of its aluminum oxide content; (3) the removal of oxygen from the aluminum oxide, which results in a residue of virgin aluminum; and (4) the fabrication therefrom, with, in some cases, certain alloys, of useful products.

(1) In addition to aluminum oxide, bauxite contains quantities of silica and iron. In some places, the ore is found on the earth's surface; at others, it is underground and must there be mined. While it is possible to manufacture aluminum from certain other materials, present day commercial manufacture is limited exclusively to the use of bauxite. High-grade bauxite contains at least 55% aluminum oxide, and no more than 7% of silica. Low-grade bauxite contains more silica and less aluminum oxide. The less silica, or the more aluminum oxide, the more desirable is the ore.

(2) Aluminum oxide is also known as alumina. A process, called Bayer, is employed in the extraction of alumina from bauxite. This process consists of grinding ore into relatively small particles and then dissolving them by the application of a caustic, whereupon the alumina settles out and is dried. The patent on the Bayer process expired in 1903.

In order to separate alumina from low-grade bauxite at commercially practicable costs, it is also necessary to employ the so-called lime-soda-sinter process, on which Alcoa holds patents presently in force. This process recovers the alumina out of the "red mud" which is a waste product of the Bayer process. By the use of these patents, alumina can be economically produced from ores containing as high as 20% silica.

For both high and low grade bauxites, one pound of dried ore produces approximately .45 pounds of alumina. If the ore is undried, one pound yields approximately .39 pounds of alumina. The factories in which these operations are conducted are called alumina plants.

(3) The next step in production is to separate oxygen from alumina. This is accomplished by means of the well-known Hall process, the patent on which expired in 1906. Judge Caffey described that process as follows:

"The Hall process may be described briefly as the electrolytic decomposition of alumina in a fused bath. Its essential feature is putting oxide (alumina) into solution in a fused bath and passing an electric current through the mixture. The bath consists of melted cryolite, which is more resistant to decomposition by electrolysis than is alumina. Cryolite is also lighter than aluminum so that when the aluminum and oxygen of the alumina are separated by the electrolytic action the aluminum sinks to the bottom of the crucible or reduction pot, where it may be tapped off." (Finding of Fact No. 27).

The electrolysis is performed in large pots, arranged in rows, called "potlines". The structures that house the potlines are known as reduction plants.

In the process of reduction, the pots consume enormous quantities of electricity, and also, large amounts of carbon. Roughly, 10 kilowatt hours of electricity, 2 pounds of alumina, and three-quarters of a pound of carbon are required to produce one pound of aluminum.

A further feature of aluminum production is that the pots must be operated continuously, 24 hours a day. If the power be shut off, the cryolite freezes into a soft rock. It is a difficult and expensive operation to rehabilitate a pot that becomes frozen. However, it is necessary, every one or two years, to close down a pot in order to replace its carbon lining, the partial consumption of which gradually occurs in the reduction operation.

(4) Aluminum products are fabricated out of either "pig" or "ingot". Unfortunately, the terms "pig" and "ingot" do not have a single connotation within the industry, though these names are widely used. I shall denote as pig—and also as primary aluminum—the aluminum which issues from the reduction pot. Almost invariably, this is "virgin pig", that is, pig to which no alloys have been added. Virgin pig contains impurities, inasmuch as any impuri-

ties in the reduction pot, whether from alumina, cryolite, or carbon, will appear in the pig. Sometimes, alloying materials are added to the reduction pot, the resulting aluminum being known as alloy pig. The development of aluminum alloys has greatly extended the uses for which the metal is suitable. Virgin ingot is virgin pig either remelted and poured, or carried directly from the reduction pot to a large holding furnace, from which it is subsequently withdrawn. These operations give ingot a greater uniformity of composition than pig. Alloy ingot is frequently produced by remelting virgin pig along with alloying ingredients. Alloys are of two sorts—ordinary and hard—the latter being subjected to a special heat treatment.

There are only a few basic mill products from which the ultimate fully fabricated articles are derived. Various mills employ different processes and, accordingly, utilize ingots of sizes and forms best suited to the treatment to be received.

Aluminum sheet and plate are produced by rolling processes which operate on the metal both when it is heated and when it is cold. Additional rolling of sheet produces foil, which is actually a very thin sheet.

Rod, bar, and structural shapes also evolve from a rolling process, but the rolls have grooves which impart a particular shape to the ingot. Wire is made by drawing cold rod through dies of smaller diameter, and the stranding of the wire, sometimes around a reinforcing core, results in cable.

The extrusion process permits the manufacture of shapes not possible by other operations. Extrusions are made by placing heated ingot in an enclosed cylinder of a powerful press and forcing the metal under high pressure through a die opening at the end of the cylinder. Tubing is produced by this process.

Numerous kinds of closed-end containers are made by a process called impact extrusion. The essence of the operation is to strike an aluminum slug, located in a cup-shaped die, with a sufficiently powerful single blow that will force the metal up between the punch and the die to form the desired article.

Aluminum is forged by two processes. Either the heated metal is hammered into shape, or, in press forging, by squeezing it into appropriate contours.

The casting of aluminum is accomplished in three ways. The metal may be poured into sand molds. This is used when large and intricate products are desired, but in relatively small quantities. The permanent mold method employs metal molds in which the aluminum is poured. It yields an unusually sound and strong product, and is widely used. In die casting, the metal is forced into the die under pressure. This gives a high degree of dimensional accuracy to the product, as well as an excellent finish which requires little or no further processing. This method is used for small articles that are desired in considerable numbers.

From the products of these basic mill operations, articles intended for ultimate consumer use may have to be fashioned by additional manufacturing steps. A conservative estimate indicates that there are today at least four thousand end uses for aluminum.

Factual Review<br>Alcoa's Position in 1940

Prior to a consideration of facts which bear on the position of Alcoa in today's aluminum market, it is appropriate to give a brief description of the industry as it was constituted on August 14, 1940, at the close of the testimony before Judge Caffey; and again, as it was after war constructions were completed, but before the Government disposal program was formulated. It was in the latter period that the Court of Appeals handed down its decision.

The facts as of August 14, 1940, appear in Judge Caffey's opinion 44 F.Supp. 97 in his Findings of Fact, dated July 14, 1942, as amended April 23, 1946, and in the Court of Appeals decision, 2 Cir., 1945, 148 F.2d 416. They will be summarized under five headings: (1) bauxite; (2) alumina; (3) virgin aluminum (primary); (4) fabrications; and (5) Aluminium Limited.

*(1) Bauxite:* Alcoa possessed about 48% of the known domestic deposits of high-grade bauxite, being 4,898,703 long tons, which quantity "would be exhausted within far less than eight years" at Alcoa's then rate of consumption. No estimate of the reserve of low-grade bauxite was made. Bauxite was said to have been found outside the United States in "practically inexhaustible quantities", no estimate being made of the absolute amount, or of the percentage of Alcoa's holdings of such bauxite. Judge Caffey also found that Alcoa's bauxite holdings were not in excess of its reasonable requirements, and that Alcoa sold bauxite to all who wished to purchase it.

*(2) Alumina:* Judge Caffey made no statements or findings bearing on the period 1938–1940. However, the record before him indicated that over the period from 1928 to 1937, Alcoa had produced 4,319,785,-649 pounds, while within the same time, the Pennsylvania Salt Manufacturing Co.—apparently the only other domestic producer—had manufactured 86,936,884 pounds. Alcoa itself consumed during this period 3,-375,474,576 pounds, and sold 778,302,127 pounds to other aluminum producers. These customers were foreign companies.

*(3) Virgin aluminum (primary):* From 1909 to the date on which the evidence closed, Alcoa was the sole producer of primary aluminum in the United States. Alcoa's output was in part consumed in its own fabrications, and, in part, sold to independent fabricators. Quantitatively, the year of highest output was 1939, when production reached 327 million pounds. Percentage-wise, as against the competition offered by imports from foreign producers, Alcoa's share was reported in amended Finding of Fact 154 to be as follows:

"The percentage of this total [Alcoa's production and imports] which was both produced and imported by Aluminum Company of America during the period from February 2, 1909, to August 14, 1940, * * * varied from a low of 67.90% in 1921 to a high of 99.99% in 1918. Except for the year 1921 and the years 1910, 1913 and 1922, when its percentage was 74.08%, 72.74% and 72.09%, respectively, its per-centage was always over 80%, and, from 1934 to 1938, it averaged a trifle over 90%."

In addition, there was produced in the United States in the years 1935 through 1938 an annual average of 102 million pounds of secondary aluminum; that is, aluminum ingot produced by remelting scrap aluminum. The Court of Appeals held that secondary was not to be included in the base against which Alcoa's percentage of the market should be computed.

*(4) Fabrications:* Judge Caffey's opinion and findings contain an extensive examination of Alcoa's position in the fabricating field. Briefly, his conclusions were to this effect: In all classes of fabrications, except aluminum cable and large rolled aluminum structural shapes, of which Alcoa was the sole fabricator, Alcoa was subject to vigorous competition from other aluminum fabricators, and it was the company's policy to encourage such competition. Aluminum cable and large structural shapes were subject to extensive competition from other metals. Alcoa was not the largest producer of any of the three types of castings, that is, sand castings, die castings, or permanent and semi-permanent mold castings, although it apparently was the largest producer of cast products as a class. There were approximately 2000 foundries engaged in the manufacture and sale of aluminum castings. In the cooking utensils line, there were 28 competitors, Alcoa's sales being considerably less than half of the total.

The Aluminum Goods Manufacturing Co., in which Alcoa held a 26% interest, and its officers, and members of their families, held an additional 5%, and for whose Board Alcoa selected two of the six directors, was found not to have been dominated or controlled by Alcoa. This company was a large seller of cooking utensils, probably next in amount to Alcoa. As for extruded shapes, Alcoa's production averaged 84% of the domestic total in the years 1934 through 1938.

In the field of aluminum foil, Reynolds Metals Company was the largest domestic producer. For the period 1933–1939, Alcoa averaged 47% of the United States' output, and for 1937 produced 35% of the entire United States' supply, including im-

ported foil. As to sheet, there were seven other producers, three of whom consumed their own output, while four sold sheet on the open market. In the year 1939, the proportion of unalloyed sheet supplied by Alcoa to the market was 72%. No figures or percentages were given which indicate Alcoa's production of sheet for its own fabrication.

(5) *Aluminium Limited:* In this brief description of Alcoa's position as of 1940 mention should be made of Aluminium Limited whose status has been much controverted in both the past and present proceedings. Limited is a Canadian corporation organized by Alcoa in 1928 to take over almost all of the numerous foreign properties then belonging to the latter concern. In exchange for these properties Limited issued all of its stock to Alcoa, which company distributed it to its own shareholders. Judge Caffey found that Limited was not organized with the intention that it would be controlled by Alcoa; that Limited was not dominated or controlled by Alcoa, and that no agreement or conspiracy existed between the two companies to restrain trade or fix prices, and particularly, that there was no agreement that each would not compete in the other's market. He also found that no stockholder of Alcoa ever influenced the policies or activities of Limited in favor of Alcoa, and vice versa, even though the Mellon and Davis families, if not owning between them a majority of the voting stock of both corporations, owned stock very closely approaching such a proportionate interest, and notwithstanding also, that two brothers, Arthur V. Davis and Edward K. Davis, were the Presidents of Alcoa and Limited, respectively.

### Aluminum Industry at the End of the War

The important and resultant change in the aluminum industry, and which came about in the American war effort, was the erection of a number of aluminum plants that were built for the United States during the emergency period. The Government, in its petition, does not tabulate certain scrambled facilities, that is, Government-owned equipment built into privately-owned plants, certain miscellaneous establishments, including housing and power projects, and also four plants built to produce alumina from ores other than bauxite, an operation which is possible but not at competitive costs. Following the Government's example in ignoring facilities such as these, the nationally-owned aluminum establishment after the completion of war constructions was as reported in Table I.

Table I—Government Owned Aluminum Plants After the War

| Plant Location and Function | | | Reported Original Cost (First Supplementary Report of WAA— Feb. 12, 1947) (thousands of dollars) | | Government Rated Annual Productive Capacity (millions of pounds) | |
|---|---|---|---|---|---|---|
| *Alumina* | | | | | | |
| *Hurricane Creek, Ark. | (1) | | 39,349 | | 1,555.0 | |
| *Baton Rouge, La. | (1) | | 26,363 | | 1,000.0 | |
| | | | | 65,712 | | 2,555.0 |
| *Aluminum Reduction* | | | | | | |
| *Jones Mills, Ark. | (1) | | 29,353 | | 144.0 | |
| *Troutdale, Ore. | (1) | | 19,387 | | 144.0 | |
| *Spokane, Wash. (Mead) | (1) | | 23,202 | | 216.0 | |
| Tacoma, Wash. | (1) | | 6,290 | | 41.5 | |
| *Maspeth, N. Y. | (2) | (Navy) | 32,863 | | 288.0 | |
| *Riverbank, Cal. | (2) | (FWA) | 11,826 | | 108.0 | |
| *Burlington, N. J. | (3) | | 16,716 | | | |
| *Los Angeles, Cal. | (2) | | 24,493 | | 108.0 | |
| *Massena, N. Y. | | | | | 180.0 | |
| (St. Lawrence) | (3) | | 19,953 | | | |
| | | | | | 108.0 | 1,337.5 |
| | | | 184,083 | | | |

*Aluminum Sheet*

| | | | | | |
|---|---|---|---|---|---|
| Spokane, Wash. (Trentwood) | (1) | 48,376 | | 288.0 | |
| *Chicago, Ill. (McCook) | (1) | 43,546 | | 288.0 | |
| Listerhill, Ala. | (1) | 20,767 | | 78.0 | |
| | | | 112,689 | | 654.0 |

*Aluminum Foundries*

| | | | | | |
|---|---|---|---|---|---|
| Cleveland, Ohio | (1) | 1,938 | | 13.2 | |
| Vernon, Cal. | (1) | 168 | | 1.8 | |
| Bedford, Ind. | (2) | 2,766 | | 10.2 | |
| Springfield, Mass. | (2) | 3,112 | | 6.0 | |
| Dearborn, Mich. | (2) | 7,924 | | 30.1 | |
| Cleveland, Ohio | (2) | 4,369 | | 14.4 | |
| *Kansas City, Mo. | (2) | 6,270 | | 42.0 | |
| Flint, Mich. | (2) | 9,017 | | 43.2 | |
| Chicago, Ill. | (2) | 7,478 | | 24.0 | |
| Lockland, Ohio | (2) War Dep't) | 6,416 | | 46.3 | |
| | | | 49,458 | | 231.2 |

*Aluminum Forgings*

| | | | | | |
|---|---|---|---|---|---|
| Louisville, Ky. | (1) | 2,137 | | 2.4 | |
| Massilon, Ohio | (1) | 794 | | Never Completed | |
| *Monroe, Mich. | (2) | 13,875 | | 42.0 | |
| *Cannonsburg, Pa. | (2) | 26,648 | | 74.9 | |
| Saginaw, Mich. | (2) | 8,703 | | 84.0 | |
| *New Castle, Pa. | (2) | 8,960 | | 21.2 | |
| Anderson, Ind. | (2) | 4,295 | | 37.5 | |
| Erie, Pa. | (2) (FWA) | 9,526 | | 15.6 | |
| | | | 74,938 | | 277.6 |

*Aluminum Extrusions*

| | | | | | |
|---|---|---|---|---|---|
| Grand Rapids, Mich. | (1) | 6,730 | | 10.8 | |
| *Phoenix, Ariz. | (1) | 35,363 | | 60.7 | |
| *Cressona, Pa. | (1) | 26,026 | | 55.7 | |
| Los Angeles, Cal. | (1) | 8,258 | | 11.7 | |
| Adrian, Mich. | (2) | 16,623 | | 36.0 | |
| Halethorpe, Md. | (3) | 7,612 | | 14.9 | |
| Louisville, Ky. | (3) | 6,235 | | 45.5 | |
| | | | 106,847 | | 235.3 |

*Aluminum Rivets*

| | | | | | |
|---|---|---|---|---|---|
| Detroit, Mich. | (1) | | 780 | | .8 |

*Aluminum Powder*

| | | | | | |
|---|---|---|---|---|---|
| Rochester, Mich. | (2) | 353 | | 27.1 | |
| Webster Grove, Mich. | (2) (Vet. Adm.) | 379 | | 35.3 | |
| Cleveland, Ohio | (2) | 1,026 | | 37.2 | |
| *Glassmere, Pa. | (3) | 1,066 | | 33.3 | |
| | | | 2,824 | | 132.9 |

*Aluminum Rod and Bar*

| | | | |
|---|---|---|---|
| *Newark, Ohio | (1) | 23,181 | 300.0 |
| | *Total* | $620,512 | 5,724.3 |

* Built and operated by Alcoa during the war.
(1) Disposition made to the aluminum industry.
(2) Disposition made outside the aluminum industry.
(3) No disposition made.

The record shows that between August, 1940, and early 1945, Alcoa spent slightly over 225 million dollars for additions and improvements to its own facilities. Table II is taken from Alcoa's answer to the Government's petition, and compares the company's capacity in 1940 and 1947. While the figures therein contained may not be precisely accurate, and do not necessarily reflect the present situation, the Table as a whole is a fair indication of Alcoa's wartime expansion.

### Table II—Comparison of Alcoa's Capacity (in pounds) 1940 and 1947

| | Dec. 31, 1940 (A) | Dec. 31, 1947 (B) | % of Change 1947/1940 (C) |
|---|---|---|---|
| Alumina | 1,126,000,000 | 1,940,000,000 | + 72.3 |
| Pig | 490,000,000 | 650,000,000 | + 32.7 |
| Sheet | 192,031,000 | 465,361,000 | +142.3 |
| Sand Castings | 35,856,000 | 35,580,000 | — .8 |
| Permanent Mold Castings | 47,976,000 | 41,100,000 | — 14.3 |
| Die Castings | 10,142,000 | 12,943,000 | + 27.6 |
| Extruded Shapes | 35,590,000 | 92,730,000 | +176.1 |
| Foil | 14,052,000 | 22,800,000 | + 62.3 |
| Electrical Conductor Cable | 63,600,000 | 69,600,000 | + 9.4 |
| Cable Accessories | 1,956,000 | 4,200,000 | +114.7 |
| Wire, Rod, Bar and Rolled Structural Shapes | 29,885,000 | 114,913,000 | +284.5 |
| Tubing | 8,773,000 | 51,185,000 | +483.4 |
| Forgings | 35,214,000 | 39,003,000 | + 10.8 |
| Powder and Paste | 7,688,000 | 7,560,000 | — 1.4 |
| Rivets | 3,291,000 | 4,780,000 | + 45.2 |
| Screw Machine Products | 816,000 | 1,080,000 | + 32.4 |
| Collapsible Tubes | 1,512,000 | 1,320,000 | — 12.7 |
| Impact Extrusions and Customers Blanks | 2,880,000 | 11,040,000 | +283.3 |
| Cooking Utensils | 12,000,000 | 16,800,000 | + 40.0 |
| Jobbing | 5,500,000 | 7,400,000 | + 34.5 |

In addition to the Government's construction of aluminum facilities, and the expansion of Alcoa's plants, the period between the close of evidence before Judge Caffey, and the end of the war, saw the entry into the industry of a new domestic producer of alumina and primary aluminum, namely, the Reynolds Metals Company.

This organization, hereinafter referred to as Reynolds, built at Listerhill, Alabama, an alumina plant with a rated capacity of 200,000,000 pounds per year, and a reduction plant having a rated capacity of 99,750,000 pounds per annum. These plants, which went into operation in May, 1941, had a combined cost of $15,883,000. In September, 1941, Reynolds put into operation a reduction plant that it built at Longview, Washington, which had a rated annual capacity of 61,980,000 pounds of aluminum.

This was done at a cost of $6,500,000. These three constructions were financed by a loan from the Reconstruction Finance Corporation, but, because of special wartime amortization privileges, they are not subjected to depreciation or amortization charges with respect to present production costs.

## Disposal Program

At this point, it is well to pause a moment to comment upon the program for disposal of the Government aluminum properties.

In the opinion of the Court of Appeals of March, 1945, it was stated that the Government disposal agency might believe that it could not perform its duties "without some plan or design for the industry as a whole, some comprehensive model which shall, so far as practicable, re-establish 'free independent private enterprise,' 'discourage' monopoly, 'strengthen' small competitors, 'foster' independents and not foster 'monopoly or restraint of trade.' "

Furthermore, the court said that "if the 'agency' does form a plan, it will have been an attempt to realize the same 'objectives' for which the court itself must strive; and the court may well feel that it should accord to the 'agency's' plan that presumptive validity which courts are properly coming more and more to recognize in the decisions of specialized tribunals."

The court, however, advised also that "We do not of course mean that in deciding whether to dissolve 'Alcoa,' or how to do it, that court must be governed by any plan which the 'agency' may have devised, if it does devise one." 148 F.2d 416, 446-447.

Alcoa contends that the disposal program, as formulated and executed, was the kind of plan Judge Hand had in mind. The Government argues to the contrary.

The program adopted contemplated that disposals were to be made to prospective competitors of Alcoa in a manner best suited to establish them in the industry. Ultimately, this involved the creation of integrated producers; the lease or sale of the available plants on terms not necessarily reflecting original cost or replacement value; undertaking alterations and other expensive engineering tasks and, in general, using the Government aluminum facilities as an instrument to create competition rather than primarily attempting to recover the Government's investment.

The program, however, was not a plan for the industry as a whole, but merely a set of guiding principles for the disposal of the Government plants. The Surplus Property Board itself stated in its September, 1945, Report to Congress, "Even if the Board is successful in selling some of the plants to competitors of Alcoa, this fact by itself may not satisfy the requirements of the Sherman law. It is not the province of the Board to work out a plan for the reorganization of the properties presently owned by Alcoa or to express any views on the question whether, after the completion of the Board's disposal program, Alcoa's operations will be lawful under the Sherman Act. That is a question which must be determined for the executive branch of the Government by the Attorney General and a question that will presumably be decided ultimately by the courts." Id. at p. 28.

Thus, my conclusion must be that the disposal agency, though deserving high praise for its accomplishments, did not formulate and pursue a plan to which this Court must or should attach "presumptive validity." For this reason, I shall not detail in any one portion of this discussion, what has been done by the disposal agency. But such facts will incidentally appear as I review the presently existing competitive situation in the industry, and the conduct of Alcoa in regard to the formulation and execution of the Government program. The disposal agency will hereinafter be referred to as the War Assets Administration, though both before and after it was so named, it has had other appellations. See, e. g., 50 U.S.C.A.Appendix §§ 1614a, 1614b.

## The Industry Today

Aside from Alcoa and Reynolds, there now exists a third producer of primary aluminum in the United States. This firm is the Kaiser Aluminum and Chemical Corporation, formerly called Permanente Metals Corporation, and hereinafter referred

to as Kaiser. Kaiser, along with Reynolds, has been a substantial beneficiary of the surplus property disposal program. The competitive abilities of these two firms, when compared to Alcoa, will largely determine the issues involved herein.

It is necessary to note that the domestic aluminum industry is broader than the composite of these three integrated producers. There are thousands of firms which fabricate aluminum products in either finished or semi-finished forms. A number of these concerns can produce mill products such as sheet, foil, forgings, extrusions, wire and cable.

Furthermore, some fifty firms are engaged in the production of secondary aluminum out of aluminum scrap.

Moreover, to fully understand the operation of the present aluminum industry, recognition must be had of the multitude of substitute materials with which aluminum products compete. The alert adaptation of aluminum to particular uses has displaced other substances which had previously long occupied these fields. The continued growth and expansion of this industry depends on this ever widening area in which aluminum can advantageously be employed. Today, articles made from this metal compete against substitutes made from steel, copper, zinc, lead, tin, wood, textiles, plastics, paper, clay, glass, leather and cork.

## Market Position

Commercial competition, theoretically, is the independent endeavor of two or more persons or organizations within the realm of a chosen market place, to obtain the business patronage of others by means of various appeals, including the offer of more attractive terms or superior merchandise. Practically, the conditions produced by this endeavor do not form a fixed pattern. In other words, the respective shares of a particular market that the competitors who trade therein are able to obtain do not conclusively establish the effectiveness of the competition in which they engage. The absence therefrom of a wholly dominant market operator is a fair indication that the competition between the rival concerns is a reasonable actuality. This is especially true, if the firm having the largest share of the market is losing its prime position, or is not, at least, unduly enlarging it.

In the aluminum industry, the observable data bearing on the conditions of the postwar aluminum market are so scant, covering as they do a relatively short period of time, that they cannot be regarded as a wholly reliable basis upon which accurately to forecast the possible outcome of future competitive efforts on the parts of Alcoa, Reynolds and Kaiser.

The year 1946 must be recognized as the period within which the industry was returned to peacetime activity. Although Reynolds first began the production of primary aluminum in 1941, the Government facilities acquired by that company, and by Kaiser, were not put into normal operation until 1946 was well under way. Until that time, Alcoa retained unquestioned dominance. Consequently, conditions prevailing in 1946 can be of but slight aid in reaching a conclusion as to what competitive factors will determine the market design of the future.

The operations of Reynolds and Kaiser in the years 1947 and 1948, and the first nine months of 1949, for which some statistical information is at hand, provide the more valuable guides for appraising the competitive strength which Reynolds and Kaiser will hereafter be able to exert against the present power of Alcoa. These statistics, nevertheless, do not fully reveal the situation in which the three companies now find themselves. And, in order to prognosticate future conditions, inferences must be drawn from the resources available to the respective producers, rather than from their presently known operations in the market.

In ascertaining market position three fundamental inquiries arise: 1) what constitutes the market; 2) what are the competitive elements in that market; 3) what aspect of the market, when measured, most precisely indicates the relative position of the competitors.

1) *The market:* A delimitation of the market, in and of itself, may sometimes de-

termine the outcome of anti-trust litigation. The reversal by the Court of Appeals of Judge Caffey's decree in this case is illustrative. The present structure of the aluminum industry—three primary producers with twice as much fabricating capacity as reduction resources, plus a multitude of independent non-integrated fabricators, plus numerous independent secondary smelters —makes it difficult to fix the actual boundaries of the market.

Logically, it may appear that in a case in which monopolization of the primary aluminum market has been adjudicated, the market in that commodity should be taken as the focal point. But, for the most part, primary aluminum is handled in two ways —much of it is utilized by the producer in his own fabrications; the remainder, to a large extent, is sold to non-integrated manufacturers. Sales for export, or to the United States for stockpiling, comprise but a small fraction of production, and will hereafter be discussed. Thus, the market price of primary is determined, in the main, by such sales of primary as are made to non-integrated fabricators. The evidence shows that Alcoa supplies these fabricators with 82% of the domestic primary. (See Table III.)

Table III

Supplying the Non-Intergrated Fabricators: Sales of Primary Aluminum of the Domestic Integrated Producers*

| | Alcoa | | | | Reynolds | | | | Kaiser | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | /000 lbs. | % | $/000 | % | /000 lbs. | % | $/000 | % | /000 lbs. | % | $/000 | % |
| 1947 | 171,934 | 88 | 25,519 | 90 | 16,754 | 9 | 2,009 | 7 | 5,823 | 3 | 815 | 3 |
| 1948 | 185,650 | 85 | 28,899 | 86 | 22,268 | 10 | 3,030 | 9 | 11,009 | 5 | 1,618 | 5 |
| 1949 (first nine months) | 92,926 | 82 | 16,205 | 84 | 16,799 | 15 | 2,400 | 13 | 4,046 | 3 | 663 | 3 |

* The above figures exclude sales for export, sales to the War Assets Administration, and sales among the companies listed.

It appears, nevertheless, that the relative insignificance of the contributions of Kaiser and Reynolds to the supply of this market is one more of choice than disability.

In fabricating aluminum of their own production, Reynolds and Kaiser are able to secure additional profits that arise in pursuing these later stages of production. Alcoa estimates that in the sellers' market of 1948, its allocation of primary to the non-integrated fabricators reduced its profits by $5,000,000. When, in 1949, there were signs that a buyers' market was about to ensue, Reynolds and Kaiser showed more concern than theretofore with the disposal of primary as compared to fabricating. Their success in so doing is not yet determinable. Having large investments and excess capacity in fabrication facilities, it is probable that Reynolds and Kaiser will continue to devote the major part of their production to supplying their own needs. To the extent that they remain intermittent sellers to the non-integrated fabricators, their success with these buyers can not be expected to be of an outstanding character. It must be concluded, therefore, that while their efforts to supply the demands of the non-integrated fabricators provide the major visible market for primary, the intramural consumption by the three integrated producers of their own primary—though a captive market—cannot be disregarded.

Pig or ingot aluminum has little significant consumer demand until the metal is converted into a further product. It is in the market of these products—fabricated or semi-fabricated articles—that the impact of Reynolds and Kaiser is felt. Supplying the demand of the fabricating facilities of Alcoa, Reynolds and Kaiser is as much a part of the market as supplying the demand of the non-integrated fabricators. Thus,

in the aluminum industry, competition manifests itself in the market for fabricated aluminum products rather than in that for pig and ingot. In determining the relative shares of the market among Alcoa, Reynolds and Kaiser, the integration of these producers requires "market" to be a broad concept, unrelated to any particular aluminum product. Aluminum can be sold in the form of pig or ingot, or as a semi-fabricated or fully fabricated article. It is with reference to the totality of the markets for these products that the relative shares of the three integrated producers must be considered. This market in aluminum products is of nation-wide breadth.

2) *The competitive elements:* From the evidence before me, it appears that, in the United States, there are but three basic sources of aluminum. The first is the primary production of the three integrated producers; the second is the secondary metal recovered from old scrap; the third is the imports of primary and secondary. Secondary aluminum is that metal which is recovered from scrap. Scrap is divisible into two components, market scrap and process scrap. Process scrap consists of trimmings, etc. which arise as an incident of the fabrication operations of the integrated producers, all of which have facilities for reclaiming the metal, and of the non-integrated producers who have similar facilities. This scrap is melted, and reused by these producers.

Market scrap, on the other hand, consists of two kinds—new and old scrap. New scrap is the equivalent of process scrap except that many fabricators are without furnaces for remelting the metal, and they dispose of the same to a secondary smelter, or to other fabricators with smelting facilities. These smelters convert the scrap into secondary pig or ingot or otherwise use it in fabricating operations.

Old scrap consists of junked aluminum products. Such products usually begin to return to the market after five or more years of use. They are collected by junkmen and converted into secondary by smelters.

It is seen that process scrap and new scrap are not a source of aluminum exclusive of a particular year's production. They are just fractions of the pig, ingot, or semi-fabricated production which are reused instead of being wasted. If Alcoa sells 100 pounds of primary or sheet, 25 pounds of which are recovered as new scrap, the market does not consist of 100 pounds of aluminum products supplied by Alcoa in competition with 25 pounds of secondary, but simply of 100 pounds of aluminum all of which had its source in Alcoa.

In the Court of Appeals decision of 1945, old scrap was also excluded as a source of aluminum. The court reasoned that since Alcoa had long been the sole domestic producer of primary, all secondary was attributable to Alcoa, and not as being in competition with it. This was so because Alcoa always had the power to adjust its production to account for the return of secondary.

In my opinion, the recent history of the aluminum industry requires a distinct change in this point of view. During the war period, due to Alcoa's obligation to meet the needs of the Government, it had no control of its own production. Much of the old scrap recovered in 1947 and 1948 was the return of metal from aircraft construction. With the exhaustion of scrap from this source, the scrap arising from aluminum products of the post-war period must be taken into account. During these years, Alcoa was forced to share this market with both Reynolds and Kaiser. In other words, Alcoa was no longer in exclusive control of the production which, in 1945, justified the Court of Appeals in disregarding the old scrap situation.

Now, all three producers contribute to the production of aluminum for fabricated articles which, in due time, will return to the market as old scrap. There is no evidence that Alcoa controlled the production of Reynolds and Kaiser during the period now under review. Alcoa's loss of exclusive control of production during the war and post-war period warrants the inclusion of secondary recovered from old scrap as an independent source of aluminum. Such secondary has been shown to be competitive with primary metal.

The Government contends that the differences between primary aluminum and secondary are similar to those between first and second run exhibitions in the motion picture industry. Inasmuch as the Supreme Court considered first-run exhibitions as the "core" of the case, and that a separate examination of them was appropriate, United States v. Paramount Pictures Inc., 1948, 334 U.S. 131, 172-73, 68 S.Ct. 915, 92 L.Ed. 1260, argument is made that this Court should do likewise in regard to primary aluminum. The question as to whether secondary aluminum should be treated as a competitive element in the market for primary is one of fact, and not of law.

The factual bases for distinguishing first-run exhibitions from second-run are inapposite to the aluminum industry. The evidence is unconvincing that the psychological influences, viz., publicity pressures, price patterns, together with equipment and location advantages, which make first-run exhibitions the "cream" of the motion picture field, apply with equal force to primary aluminum. It may be true that, generally, first-run exhibitions and primary aluminum will sell at higher prices than second-run and secondary. But, the competitive factors and cost differentials which influence the price of secondary aluminum are distinguishable from those governing second-run pictures. In fact, for much of 1948, the price of secondary aluminum was higher than that of primary. These reasons compel me to reject the analogy drawn from the motion picture exhibition field.

There is a possibility that some of the secondary appearing in imports may be market scrap derived in the further foreign processing of exported American aluminum products. It is at least as likely that the secondary is recovered from old scrap, or is new scrap recovered from aluminum of foreign production, both of which would be independent sources. The components of this secondary are not knowable, but the amounts of aluminum involved, even if not an independent source, would not appreciably affect the ultimate result.

The fact that there are three independent and competitive sources of aluminum does not necessarily mean that they are co-extensive with the competitive elements in the market. It can be argued, of course, that Alcoa is responsible for only part of one of the sources—that is, for its production of primary aluminum. But, in my estimation, the actual aluminum market should include the entire range of the aluminum products. It follows, therefrom, that the competitive elements in the market are not solely the three sources of aluminum because such sources measure competition only at the pig and ingot stage. Instead, the competitors are the users of aluminum pig, both the integrated producers and the non-integrated fabricators. The measure of their share of the market, accordingly, is not their contribution as a source of aluminum, but the extent to which they control a source and secure possession of aluminum from uncontrolled sources.

The non-integrated fabricators are independent of the integrated producers only to the extent that they can buy aluminum from the other sources—imports and secondary. The amount of aluminum which the integrated producers obtain from these two sources reduces pro tanto the independent supply available to the non-integrated fabricators. Since the major market competition takes place at the fabrication stage, the actual share held by the competitors—Alcoa, Reynolds, Kaiser, and the non-integrated fabricators—is measured by the amount of metal which they can command in the fabrication stage as a result of their production or acquisitions.

The use of the fabrication stage as an influential determinant of market position is but superficially inconsistent with the adjudication that Alcoa had monopolized the ingot stage and not fabrications. Reynolds and Kaiser are the present major instruments of market competition. But, by consuming the lion's share of their own primary production, their effectiveness as competitors at the ingot stage cannot be accurately measured. It is only at the fabrications stage that they appreciably enter the market as sellers, and, because of the integrated structure of their operations,

it is here that they must survive as sellers. If their shares of this market, when compared to that of Alcoa, suggest their impotency, the need for a remedy of such situation is reasonably apparent. If such be not the case, then the amounts of metal controlled at the source by the three producers is highly significant in that it measures leverage on the market, and indicates potential power.

3) *The most accurate indicator:* Accordingly, any market tabulation of the production of primary, sales and consumption of primary of own production, or production of primary and secondary and imports, reflects only sources of aluminum, and does not accurately report the actual market shares of the competitors.

The actual market position can be measured either as a matter of input or outgo. The input method (Table IV), which was the one adopted by Judge Caffey in amending his Findings of Fact (No. 154) after reversal by the Court of Appeals, gives credit to each integrated producer for its production of primary; its purchases of primary exclusive of such metal acquired from another domestic integrated producer; and the estimated recoverable aluminum content of its scrap purchases, as well as secondary purchases, attributable to old or imported scrap. The non-integrated fabricators are credited with the amount of imports of primary and secondary not purchased by the integrated producers, plus the amount of secondary recovered from old scrap not acquired by the integrated producers. It is believed this tabulation

accurately depicts the relative market position of the competitors on the basis of metal controlled or acquired.

The figures show a drop from 51.1% for Alcoa in 1947 to 46.8% for 1948. The difference was absorbed approximately three-fourths by Kaiser and one-fourth by Reynolds. The year 1948 was one of short supply of metal. The strong showing of Kaiser and Reynolds indicates their active efforts to take profitable advantage of the sellers' market that then prevailed.

Such estimates as can be made for the first nine months of 1949 show that small gains were made by both Reynolds and Kaiser, and this, notwithstanding that there was a transition from a sellers' to a buyers' market. The continuing gains of Reynolds and Kaiser indicate growing strength. Nevertheless, the overall advantage of Alcoa cannot be denied. Its trade position, alone, is just under one-half the market; it is two times in excess of Reynolds', and three times larger than Kaiser's, and immeasurably greater than that of any of the countless non-integrated fabricators.

The other approach, the outgo method (Table V), though more complicated to calculate, is even more instructive of the market. This method measures sales, and in doing so, throws light on the marketing practices and customer relationships which may favor a particular competitor. Whereas production and acquisition put a ceiling on successful market operations, profitable disposal of the metal actually measures the degree of success achieved by the competitor.

Table IV—Market Position—Production and Purchases of Primary and Secondary Aluminum in the United States

| | Alcoa | | Reynolds | | Kaiser | | Imports of Primary and Secondary (3) | | Secondary (4) | |
|---|---|---|---|---|---|---|---|---|---|---|
| | /000 lbs. | % | /000 lbs. | % | /000 lbs. | % | /000 lbs. | % | /000 lbs. | % |
| *1947* | | | | | | | | | | |
| Production ............ | 637,951 | 55.8 | 320,480 | 28.0 | 184,979 | 16.2 | | | | |
| Purchased Primary (1)..... | 114,468 | 85.7 | 5,152 | 3.9 | 13,949 | 10.4 | (5) | | | |
| Purchased Secondary (2)... | 91,431 | 79.3 | 19,581 | 17.0 | 4,265 | 3.7 | | | | |
| TOTAL ............ | 843,850 | 60.6 | 345,213 | 24.8 | 203,193 | 14.6 | 35,137 | 2.2 | 223,065 | 13.5 |
| | | 51.1 | | 20.9 | | 12.3 | | | | |
| *1948* | | | | | | | | | | |
| Production ............ | 652,309 | 52.3 | 338,313 | 27.1 | 256,289 | 20.6 | | | | |
| Purchased Primary (1)..... | 146,806 | 77.7 | 28,837 | 15.3 | 13,154 | 7.0 | (5) | | | |
| Purchased Secondary (2)... | 37,915 | 56.3 | 25,883 | 38.5 | 3,487 | 5.2 | | | | |
| TOTAL ............ | 837,030 | 55.7 | 393,033 | 26.1 | 272,930 | 18.2 | 160,018 | 8.9 | 125,016 | 7.0 |
| | | 46.8 | | 22.0 | | 15.3 | | | | |
| *1949* (first nine months) | | | | | | | | | | |
| Production ............ | 492,196 | 51.2 | 272,897 | 28.4 | 196,681 | 20.4 | | | | |
| Purchased Primary (1)..... | 76,223 | 89.0 | 4,924 | 5.8 | 4,490 | 5.2 | | | | |
| Purchased Secondary (2)... | 23,103 | 61.2 | 11,565 | 30.6 | 3,096 | 8.2 | | | | |
| TOTAL ............ | 591,522 | 54.5 | 289,386 | 26.7 | 204,267 | 18.8 | 77,354(6) | 6.1 | 93,762(7) | 7.5 |
| | | 47.1 | | 23.0 | | 16.3 | | | | |

## Table IV—Market Position—Production and Purchases of Primary and Secondary Aluminum in the United States (Continued)

1. These figures are exclusive of the intercompany sales among Alcoa, Reynolds, and Kaiser.

2. The secondary or scrap here referred to relates only to old scrap as explained in the text. The figures have been estimated, in part, by applying the proportion which reclaimed metal from old scrap bears to total market scrap, to the purchases of scrap and secondary by each producer. However, the figures for Alcoa include secondary purchased from Canada whether this is old or new scrap. Reynolds and Kaiser did not purchase any secondary from Canada.

3. For Reynolds and Kaiser, the purchases only of imported primary are deducted. For Alcoa, its purchases of imported primary are deducted, as well as its purchase of secondary from Canada. Reynolds and Kaiser imported no secondary from Canada. About one-half to two-thirds of imported scrap comes from Canada, the rest from United Kingdom.

4. If Alcoa, Reynolds, or Kaiser purchased any imported secondary from a source other than Canada it is accounted for in these figures which are computed by deducting from the total production in the United States of secondary from old scrap the estimated amount of secondary attributable to old scrap which the three producers purchased from all sources. However, for Alcoa, since the Canadian purchases were deducted under imports, they are not again deducted here. These calculations were necessary because outside of the purchases of secondary from Canada of the three companies, purchases of imported secondary by these companies from other countries do not appear in evidence.

5. No primary aluminum was sold to the non-integrated fabricators from the United States' stockpile.

6. The imports of secondary into the United States for September, 1949, do not appear in evidence. This figure has been estimated on the basis of the trend in prior months.

7. No figures are in evidence showing 1949 production of secondary. This figure represents three-quarters of the 1948 figure. (See footnote 5, Table V.)

## Table V—Market Position—*Sales* (All Stages of Production)

| | Alcoa | | Reynolds | | Kaiser | | Imports (1) | | Secondary (2) | |
|---|---|---|---|---|---|---|---|---|---|---|
| | /000 lbs. | % | /000 lbs. | % | /000 lbs. | % | /000 lbs. | % | /000 lbs. | % |
| *1947* | | | | | | | | | | |
| Pig and Ingot | 172,090 | 76.8 | 23,351 | 10.4 | 28,762 | 12.8 | | | | |
| Sheet | 459,589 | 48.2 | 308,408 | 32.3 | 185,471 | 19.5 | | | | |
| Other Fabrications | 297,863 | 83.0 | 60,900 | 17.0 | 0 | 0 | | | | |
| Total | 929,542 | 60.5 / 51.5 | 392,659 | 25.6 / 21.8 | 214,233 | 13.9 / 11.9 | 42,923 | 2.4 | 223,065 | 12.4 |
| *1948* | | | | | | | | | | |
| Pig and Ingot | 185,678 | 84.7 | 22,288 | 10.2 | 11,009 | 5.1 | | | | |
| Sheet | 491,010 | 45.8 | 319,082 | 29.7 | 262,966 | 24.5 | | | | |
| Other Fabrications | 354,264 | 79.7 | 85,284 | 20.1 | 786 | .2 | | | | |
| Total | 1,030,952 | 59.5 / 50.4 | 426,654 | 24.6 / 20.9 | 274,851 | 15.9 / 13.4 | 186,976 | 9.2 | 125,016 | 6.1 |
| *1949* (first nine months) | | | | | | | | | | |
| Pig and Ingot | 92,983 | 72.5 | 28,899 (3) | 22.6 | 6,289 (3) | 4.9 | | | | |
| Sheet | 201,817 | 40.6 | 166,921 | 33.6 | 127,863 | 25.8 | | | | |
| Other Fabrications | 250,233 | 76.0 | 75,456 | 22.9 | 3,440 | 1.1 | | | | |
| Total | 545,033 | 57.1 / 47.8 | 271,276 | 28.5 / 23.8 | 137,592 | 14.4 / 12.0 | 93,354 (4) | 8.2 | 93,762 (5) | 8.2 |

1. Includes all aluminum products imported whether primary, secondary or fabrications.

2. These are the same figures which appear in Table IV.

3. These figures exclude sales to the War Assets Administration for stockpiling purposes.

4. Figures for September, 1949, do not appear in evidence. They have been estimated on the basis of the trend in prior months.

5. No figures for the production of secondary in the United States in 1949 are in evidence. An amount representing three-fourths of the 1948 figure has been used. It is probable that recovery from old scrap declined in 1949 and will continue to do so. In 1948, the supply of scrapped military aircraft was finally exhausted. The construction industry is currently the largest consumer of aluminum; the metal going for this purpose cannot be expected to return as old scrap for a considerable period of time.

However, in the case of the non-integrated fabricators, sales figures cannot be used because of a lack of comparability to the sales figures of the integrated producers. Transfers of products in the transition from semi-fabricated to finished form within an integrated producer's operations are not reflected in ultimate sales figures. But any compilation of the non-integrated fabricators' sales will include intermediate transfers because they involve separate establishments, and will include metal procured from the integrated producers—the sales of which already appeared in the figures for sales of those integrated producers.

Since the integrated producers must be credited with all metal sold by them, and since they have it within their power to decide whether to release control of this metal to the non-integrated fabricators, this latter group can only be credited with the metal which was secured by them from the independent sources—imports and secondary. This total represents the maximum volume of metal which the non-integrated fabricators can possess and sell without relying on metal dispensed to them by the integrated producers. This is the best evidence available of the share occupied by the independent operations of the non-integrated fabricators. Any other aluminum product which they acquired must have come from the integrated producers who, having control of its disposition, must be credited exclusively for it. Thus, the share of the non-integrated fabricators is composed of the same ingredients as appeared in the comparison based on production and acquisitions. (Table IV.)

However, since the sales comparison reflects, *inter alia*, market conditions at the fabrications stage, competition of imported fabricated products must be included. This figure was omitted from the production and acquisitions tabulation which dealt solely with the dispositions made from the sources of pig and ingot.

The special treatment required of the non-integrated fabricators' share renders impossible the use of figures representing dollar volume of sales because the value of the products made from their independent sources of aluminum is unknown. However, the use of poundage as a measure provides certain advantages. Firstly, it facilitates analysis by permitting comparison with the production and acquisition figures. Secondly, it avoids inflation or deflation of the figures depending upon whether metal is sold as a finished product, or in pig form, the former commanding a much higher price than the latter. By categorizing the sales of the integrated producers into those of pig and ingot, sheet, and fabricated products other than sheet, additional market advantages are made apparent.

*Conclusions:* Significantly, Alcoa's total sales in 1948 did not decline in proportion to its production and acquisitions. This was accomplished largely by purchasing new scrap (see Table VI) and by consuming, undoubtedly, either pig or fabrication inventories which were accumulated during the high input year of 1947. Some semi-fabricated products may also have been purchased. Whatever the means, Alcoa maintained its share consisting of half the market regardless of the difficulty of securing metal during the period of short supply. The figures for nine months of 1949 suggest that Kaiser and Reynolds are still gaining; even without including ingot sales to the United States for stockpiling. The importance of the latter sales will be elaborated upon in the section describing financial resources.

Table VI—Income of Metal (integrated producers)

| 1947 | Alcoa /000 lbs. | % | Reynolds /000 lbs. | % | Kaiser /000 lbs. | % |
|---|---|---|---|---|---|---|
| Production ................... | 637,951 | 55.8 | 320,480 | 28.0 | 184,979 | 16.2 |
| Purchased Primary ............ | 114,468 | 85.7 | 5,152 | 3.9 | 13,949 | 10.4 |
| Purchased secondary from old scrap and imported secondary | 91,431 | 79.3 | 19,581 | 17.0 | 4,265 | 3.7 |
| Purchased secondary from new scrap ..................... | 99,439 | 86.9 | 10,300 | 9.0 | 4,733 | 4.1 |
| Total ...................... | 943,289 | 62.6 | 355,513 | 23.6 | 207,926 | 13.8 |
| 1948 | | | | | | |
| Production ................... | 652,309 | 52.3 | 338,313 | 27.1 | 256,289 | 20.6 |
| Purchased Primary ............ | 146,806 | 77.7 | 28,837 | 15.3 | 13,154 | 7.0 |
| Purchased secondary from old scrap and imported secondary | 37,915 | 56.3 | 25,883 | 38.5 | 3,487 | 5.2 |
| Purchased secondary from new scrap ..................... | 61,511 | 54.9 | 44,451 | 39.7 | 5,988 | 5.4 |
| Total ...................... | 898,541 | 55.6 | 437,484 | 27.1 | 278,918 | 17.3 |
| 1949 (first nine months) | | | | | | |
| Production ................... | 492,196 | 51.2 | 272,897 | 28.4 | 196,681 | 20.4 |
| Purchased Primary ............ | 76,223 | 89.0 | 4,924 | 5.8 | 4,490 | 5.2 |
| Purchased secondary from old scrap and imported secondary | 23,103 | 61.2 | 11,565 | 30.6 | 3,096 | 8.2 |
| Purchased secondary from new scrap ..................... | 36,484 | 59.2 | 19,862 | 32.2 | 5,317 | 8.6 |
| Total ...................... | 628,006 | 54.7 | 309,248 | 27.0 | 209,584 | 18.3 |

This Table adds to each producer's production and acquisitions as per Table IV, the recoverable portion of its purchases of new scrap, and its purchases of secondary derived from new scrap.

The breakdown of sales figures (Table V) shows that only in sheet sales does Alcoa face substantial competition from Reynolds and Kaiser. Alcoa's potential power is apparent from its commanding position in the pig and ingot trade and that of fabricated products other than sheet. Suffice it to say here that Alcoa's comparative advantages over Reynolds and Kaiser with regard to the diversification of the materials it sells permits it greater market stability in the face of fluctuating product demands.

The relative market positions for the period under review do not show prima facie monopoly power in Alcoa. But Alcoa's two major competitors—Reynolds and Kaiser—together have secured only 35% of a market in which Alcoa enjoys 50%. Nevertheless, Reynolds and Kaiser have consistently enlarged their shares. Their capacity to continue to do so can be inferred only from an examination of the resources of the three integrated producers. The evidence supports the conclusion that the future aluminum market will be an expanding one. The resources of the competitors will have much to do with their respective abilities to embrace these new opportunites and, thus, will influence the development of future market position.

### Price

Before entering upon a discussion of the resources of the three aluminum producers, attention should be paid to that aspect of past market operations reflected in price policy. The Government urges that Alcoa's monopolistic power is manifest in its control over the price of aluminum pig and ingot as reflected in price uniformity; in price leadership on the part of Alcoa; and in the inability of the other producers to deviate for a protracted period from the prices charged by Alcoa.

Assuming the truth of these assertions, the criteria advanced in describing the aluminum market suggest the fallacy in the

plaintiff's position. The reasons that convince me that the sales of primary pig and ingot do not measure market position, lead me to conclude that the price of pig and ingot is not the critical factor. This price is determined, in large part, by the quantities of primary sold to other fabricators of aluminum, and not by the amounts that are used by the integrated producers in their intramural operations.

As has previously been noted, Alcoa's percentage of primary sales to other fabricators completely overshadows its competitors, but, the limited quantities of pig and ingot that have been sold by Reynolds and Kaiser have been more a matter of choice than necessity. It is not surprising that Alcoa's commanding position in this phase of the market is accompanied by prime responsibility for prices. However, the extent to which prices can be raised is undoubtedly limited by the potential competition of the other two primary producers, a condition quite different from that existing when Alcoa, as the sole American producer, was adjudicated to be a monopoly.

Any price control presently exercised by Alcoa is merely a facet of its concededly dominant position in this phase of the aluminum market. But, the rejection of this aspect of the market as reflecting the true relative positions of the competitors, equally disqualifies the price leadership which may exist here as worthy of controlling significance. The propriety of relief in this proceeding cannot be decided by isolating for examination from the picture of the domestic aluminum industry which has been presented to me, a segment which portrays an utter distortion of the respective positions of the competitors in that industry, and deriving therefrom my conclusions. The Government has not demonstrated that Alcoa enjoys price leadership with regard to fabricated products, a matter which would have to be included if a true representation of the industry were sought. Nor has the United States established that post-war pig and ingot prices, when compared to costs, are so unreasonably low as to preclude Reynolds and Kaiser from this business. Accordingly, I hold that price domination on the part of Alcoa has not been established, and that the Gov-

ernment's assertions fail materially in offering grounds for remedial action against the defendant.

### Physical Resources

Reduction: The present reduction capacity of the three integrated producers determines their respective immediate abilities to expand output of primary in order to capture new markets. Unutilized capacity in substantial amount may also indicate that fluctuating demands are met by varying production rather than price—which may be an indicium of a non-competitive market. Moreover, excess capacity, due to carrying charges on unused facilities, tends towards higher costs, and therefore, higher prices.

The actual equipment capacity of a plant is not a true indication of its productive ability. The conversion of alumina into aluminum requires the use of large quantities of electrical energy. The availability of power to generate such energy determines, in the main, the productive utility of a plant. Not only must the power be available, but it must be obtainable at relatively low costs. Water is the chief source of such power, but in some localities natural gas has lately been employed. Expenditures for power are major components of the production cost of pig. To produce aluminum at costs competitive with present prices of pig, and assuming that all other cost factors are favorable, the overall average power rate should not exceed four mills per kilowatt hour of electrical energy. Thus, the following estimates of capacity will embody the above concept of "economic capacity", having reference to the availability and cost of electrical energy.

*Alcoa*: This company has four reduction plants now in operation. The largest is Alcoa's wholly owned plant at Alcoa, Tennessee. It was built in 1914, and improved during the last war. This plant is supplied by power from the Tennessee Valley Authority (TVA), part of which is purchased, and part of which is received in exchange for power contributed to the TVA system by Alcoa's own hydro-electric facilities in the vicinity. Alcoa has two contracts with TVA, one expiring in 1952, the other continuing through 1960. In 1948, the Tennes-

see plant produced some 273,960,000 pounds of pig. More power was purchased from TVA than was actually due Alcoa under its contracts, but the overall power costs at the plant did not exceed the competitive rate.

Alcoa's own generating facilities appear to have been operating at maximum productivity, but the water supply in the area was somewhat below normal. Because of this fact, and since the equipment in the plant is capable of producing more pig than was actually manufactured in 1948, I compute the capacity of the plant at 290,600,000 pounds which represents an addition to the 1948 production of a quantity reflecting the increased output possible in a normal water year. The expiration, in 1952, of one of the contracts, if the power is not replaced, will reduce the plant's capacity to about 232,200,000 pounds per year. However, the proof fails to establish that Alcoa will not be able to renew the contract, or otherwise obtain the power it requires. Accordingly, the annual capacity of Alcoa, Tenn., will be set at 290,600,000 pounds.

Alcoa owns another reduction plant, located at Badin, North Carolina. This plant was built in 1916 and improved during the last war. Power for the operation of these facilities is supplied entirely by Alcoa's own hydro-electric facilities. Alcoa sells a large part of the power so generated for other purposes. Production at Badin in 1948 was about 59,000,000 pounds with very low average power costs. For the first nine months of 1949 Badin produced about 52,000,000 pounds. The equipment in the plant is capable of producing some 80,000,000 pounds of pig. On the basis of the estimated output of Alcoa's hydro-electric establishment in periods of normal water supply, the capacity of the Badin plant will be set at 67,700,000 pounds per year.

Alcoa's second largest plant is located at Vancouver, Washington. It is owned by Alcoa, and was built in 1940. Power for the plant is obtained from the Bonneville Power Administration (BPA). The two contracts now in effect expire in 1959 and 1960, respectively. Besides firm commitments for power represented by these contracts, additional power is available during high water periods of the year. This pow-

er is known as "secondary," and is supplied on an "if and when" basis. However, the 1948-1949 experience shows that secondary has been available at least seven months of the year. With this in mind, although additional equipment is present at Vancouver, I will fix this plant's capacity at 152,200,000 pounds per year.

Alcoa's fourth plant, at Massena, New York, was built in 1900-1903. Power comes from three sources—Alcoa's own generating facilities located in the area; a contract with the Quebec Hydro-Electric Commission which expires at the end of 1999; and additional purchases exclusive of the contract. Though Alcoa sells power for other uses, no evidence warrants the conclusion that Alcoa is free to devote this power to the reduction of pig. Accordingly, though there is considerable excess equipment in the plant, the capacity will be fixed at 115,000,000 pounds per year.

Furthermore, at the conclusion of the trial, Alcoa was constructing a plant at Point Comfort, Texas, to be placed in operation early in 1950. The electric power to be used there will be generated from natural gas. The capacity anticipated for this plant is 114,000,000 pounds per year.

Alcoa also formerly operated a plant at Niagara Falls, New York. This plant, with a capacity of approximately 40,000,000 pounds per year, was abandoned and scrapped in February, 1949. In computing Alcoa's total, the reduction capacity of this plant will be omitted, and that of the Point Comfort plant included. On the above bases, Alcoa's total present capacity is about 739,500,000 pounds of pig aluminum per year.

*Reynolds:* This company owns and operates four reduction plants. Two were built by Reynolds itself, and two were purchased from the Government. The plant at Listerhill, Alabama, was constructed by Reynolds in 1941. Power is obtained from TVA under a contract which expires in 1960, providing for delivery of both firm and secondary power. The highest annual output of this plant was approximately 97,200,000 pounds, achieved in 1948. Power costs for that year were slightly in excess of 4 mills per kilowatt hour at the plant. This high figure results from the fact that for that

year, a sufficient quantity of secondary was unavailable to support such a high production rate. This required that power be purchased elsewhere at more than double the relatively inexpensive contract rates. However, the production figure for 1948 appears to be the capacity of the plant in normal water years. A higher production, with the attendant necessity of purchasing additional high priced power, would seem to raise power costs above the competitive range. Accordingly, I fix the capacity of this plant at 97,200,000 pounds per year.

Reynolds built its plant at Longview, Washington, in 1941. Power is purchased from the Bonneville Power Administration under two contracts, both of which expire early in 1961. BPA also makes available to Reynolds a small amount of power in addition to the total due under the contracts. The high production year was 1946 when the output was approximately 61,000,000 pounds. Although the power available to Reynolds at the plant would enable production to be somewhat higher than that figure, there is no showing that there is sufficient equipment to permit a greater output. For these reasons, the capacity of Longview will be set at 61,000,000 pounds per year.

Reynolds has operated another plant in the northwest at Troutdale, Oregon, since 1946. Alcoa built this plant for the Government in 1942. Reynolds leased the plant from the United States in 1946 and executed an agreement for its purchase on December 21, 1949. Power is obtained from BPA under a contract expiring in 1956. The record does not indicate whether secondary power is available at Troutdale. Reynolds rates the capacity of this plant at 144,000,000 pounds per year. Although production has never equalled this figure, and the power due under the contract could not support so great an output, in view of the absence of evidence regarding secondary, I must accept 144,000,000 pounds per year as the correct capacity of this plant.

On December 21, 1949, Reynolds purchased the reduction plant at Jones Mills, Arkansas, from the Government. This facility was built by Alcoa for the Government in 1942. Reynolds has leased and operated half the plant (two potlines) since

1946. The remainder was leased to Reynolds in 1949, but in that year, it operated but one of the two potlines, and then only for about four months. Power for the first two potlines comes from two sources. The major part is produced by Reynolds, itself, the energy being generated from purchased gas. This is supplemented by a contract operative until 1961 with the Arkansas Power and Light Co., a local utility, which provides for delivery of a small amount of additional power. High production for these two potlines occurred in 1948, when the output was about 75,700,000 pounds. The average power cost was under 4 mills. There is no evidence that these potlines are capable of producing more, and available power will not support an appreciably larger output. Accordingly, 75,700,000 pounds per year will be accepted as the capacity of these potlines.

Power for the remaining two potlines is supplied under a separate contract, having almost thirty years to run, with the Arkansas Power & Light Co. The energy is generated at the Lake Catherine Steam Plant. No annual production figures exist for these potlines for the post-war period, but their rated capacity is 72,000,000 pounds per year. Though the power due under its contract will support an output somewhat above this amount, there is no evidence to establish that the equipment is capable of additional productivity. Accordingly, I fix the capacity of these two potlines at 72,000,000 pounds per year.

The total capacity of the Reynolds' reduction plants is 449,900,000 pounds of aluminum pig per year.

*Kaiser:* This company owns and operates two aluminum reduction plants. The largest is the Mead plant at Spokane, Washington. It was built by Alcoa for the Government in 1942, leased to Kaiser in 1946, and purchased by Kaiser on July 29, 1949. The company has a contract with the Bonneville Power Administration, which expires in 1963, to supply the plant with firm and secondary power. Like Alcoa's Vancouver plant, it seems that secondary is available only about seven months of the year. At this rate, the available firm and secondary power would be insufficient to operate all the equipment for the entire year. I calcu-

late that power can be supplied at Mead to produce 216,250,000 pounds of aluminum per year, and this will be considered to be the capacity of the plant.

Kaiser's other plant is also in the northwest, situated at Tacoma, Washington. This plant was built for the Government by Olin Industries Inc., in 1942. It was purchased from War Assets Administration by Kaiser in 1947. Power is obtained from BPA also, under a contract which expires in 1967. In addition, a block of power originally due under the contract governing delivery at the Mead plant has been transferred to Tacoma. The Kaiser Company rates the capacity of this plant at 48,500,000 pounds per year, which figure seems accurately to reflect the power available at the plant. Accordingly, I accept 48,500,000 pounds per year as the capacity of Tacoma.

The total capacity of the Kaiser reduction plants is 264,750,000 pounds of aluminum pig per year.

*Conclusions:* The foregoing calculations disclose that Alcoa presently owns 51% of the primary aluminum productive capacity in the United States. Reynolds has 31% and Kaiser, 18%. A comparison with 1948 production figures (Table IV—Market Position) shows that there was very little unused capacity in that year. Reynolds operated at about 90% of its then capacity, and Alcoa and Kaiser utilized over 95% of their own. The margin of current capacity over 1948 production is due to expansion by Alcoa and Reynolds—the addition of the Point Comfort plant in the case of Alcoa, and the absorption of the other two potlines at Jones Mills by Reynolds. Kaiser, alone, shows no significant increase of capacity over 1948 production figures.

The near-capacity operations of the companies in 1948 are undoubtedly attributable to the sellers' market which prevailed at that time, and which influenced producers to expand output to secure the profits which were then afforded by favorable market conditions. It indicated a prosperous and competitive industry in that year—the market being sufficiently large as not to cause serious competitive friction among the three integrated producers. In 1949, these extremely favorable market conditions no longer prevailed, but the outlook of the in-

dustry leaders still contemplates expanding future markets. Kaiser's present facilities do not permit it appreciably to absorb additional market opportunities beyond those enjoyed in 1948. On the other hand, the combined capacities of Alcoa and Reynolds in excess of their 1948 production equal 75% of Kaiser's total capacity. Thus, should the market not expand, but contract or remain substantially unchanged, Alcoa and Reynolds, with no increase in facilities, have capacity to jeopardize, if they so desire, the share of production now held by Kaiser.

Alumina: Approximately two pounds of alumina are required to produce one pound of pig aluminum. Accordingly, production of pig will be limited to the extent that there is a deficiency in the supply of alumina. Any expansion of reduction capacity must be accompanied by a corresponding ratio increase of obtainable alumina.

Each of the three domestic producers of primary aluminum has its own alumina facilities. The capacity of these alumina plants is a factor to be taken into account in determining the respective abilities of the integrated producers to operate at present reduction capacity, and to meet alumina requirements if reduction capacity is to be further increased.

*Alcoa:* In order to produce pig at the maximum annual capacity of its present reduction facilities, Alcoa needs 1,479,000,-000 pounds of alumina per year. That company owns two alumina plants. The largest, located at Mobile, Alabama, was constructed during 1939 to 1942. The capacity of this plant is 1,200,000,000 pounds of alumina per year.

Alcoa's other plant is at East St. Louis, Illinois. It was built in 1904. Its efficiency is not as great as that of the Mobile establishment, production costs at East St. Louis being about 35% higher than at Mobile. The annual capacity of the last mentioned plant is at least 365,000,000 pounds of alumina. It also appears that by utilizing all of its equipment the plant may be capable of producing about two-thirds as much more.

Thus, Alcoa easily has alumina resources entirely sufficient to satisfy its present maximum needs. Beyond this, however, its

excess capacity is not without limitation. From the testimony taken at the trial, it seems that Alcoa is anxious to replace the relatively inefficient East St. Louis plant with a more modern factory to be located in the northwest. Such plans, nevertheless, are more or less contingent on the company's ability to develop a commercially feasible process for converting laterite, an aluminum ore found in that locality, into alumina. While the construction of such a plant is not yet under way, the length of time during which Alcoa has been considering the prospect suggests that definite action in that direction may not be long delayed.

*Reynolds:* To operate its reduction facilities at capacity this company needs 899,-800,000 pounds of alumina per year. Reynolds' major plant is located at Hurricane Creek, Arkansas. It was built for the Government by Alcoa in 1942, and leased to Reynolds from April, 1946 until December 21, 1949, when it was purchased by the company. This plant is unique in that it is provided with lime-soda-sinter facilities which enable Reynolds to process low-grade bauxite ores upon an economic basis. These ores contain about 15% silica. If high-grade ore be used, the plant is capable of an annual capacity of 1,555,000,000 pounds. But, if only low-grade ore be used, it is doubtful as to whether the sintering facilities are sufficient to maintain this level of economic production. On the whole, however, it would seem that Reynolds, even with the use of inferior grades of bauxite, can meet its present maximum needs of alumina. Indeed, if at some future time, Reynolds should wish to make use of the large amount of its existing excess capacity, I am unable to say that the company could not procure the grades of bauxite that are requisite for such an undertaking. The Hurricane Creek plant is so designed that it operates without loss of efficiency when producing, as it does now, only half as much alumina as its capacity would permit. As to this, however, it must be remembered that some expense is entailed in maintaining idle equipment.

Reynolds owns another alumina plant which it constructed in 1941. It is located at Listerhill, Alabama. This plant has never functioned since the company put Hurricane Creek into operation. This was because the lease of the Hurricane Creek plant required that Reynolds must supply its own alumina needs to the extent of the capacity of that plant. The Listerhill establishment has a rated capacity of 200,-000,000 pounds a year, but R. S. Reynolds, Jr., president of the company, testified that it "is about to fall apart from rust now."

*Kaiser:* This company needs 529,500,000 pounds of alumina per year to produce pig at full capacity. Its one alumina plant, at Baton Rouge, Louisiana, was built by Alcoa for the Government in 1942-3. Kaiser leased the plant in early 1946, and became its owner on July 29, 1949. The sintering facilities for utilizing low-grade bauxite which had been in the plant during the war were removed by War Assets Administration and, thus, not acquired by Kaiser. Baton Rouge has capacity to produce annually 1,500,000,000 pounds of alumina, a quantity greatly in excess of Kaiser's current requirements. The company improved its facilities at Baton Rouge by building a dock at a cost of $3,000,000, which makes possible direct shipments to the plant of imported bauxite by ocean-going vessels.

The National Security Clause of the purchase agreement for Baton Rouge obligates Kaiser, unless released by the Secretary of Defense, to maintain the present capacity of the plant until July 1, 1964. Presumably, a similar obligation accompanies Reynolds' purchase of Hurricane Creek, but the actual draft of a Security Clause for that plant is not before me. The cost of maintaining idle equipment, though in excess of $100,000 a year for both Reynolds and Kaiser, is not a serious handicap in their competition with Alcoa. In fact, in an expanding aluminum market the excess capacity may prove a highly favorable factor toward aiding the growth of these companies.

Bauxite: The most usual practice in handling bauxite is to dry the mined bauxite before shipping, thus reducing its weight. About 4.4 pounds of dried bauxite are required for each pound of aluminum pig eventually produced.

The reserves of bauxite controlled by the respective integrated producers constitute another basis of comparison in evaluating the competitive abilities of the three com-

panies. The present and future independence of each organization may be affected materially by its freedom of access to bauxite deposits.

*Alcoa:* To supply this company's maximum needs of bauxite, based on present reduction capacity, 1,407,946 gross tons of dry bauxite are required. The only considerable bauxite deposit within the United States is found in Arkansas. There, Alcoa owns about 83,000 gross tons of high-grade ore (not more than 7% silica and not less than 55% alumina), and considerable, but unspecified quantities, of lower grade ore. From the latter, in each of the years 1947 and 1948, Alcoa shipped in excess of 300,000 gross tons to its alumina plants. Alcoa also owns domestic bauxite deposits in Georgia, Alabama, and Illinois. Apparently, they are of such low-grade quality as not to be of immediate importance.

About 73% of the bauxite now used by Alcoa comes from its foreign holdings. The major deposit is in Dutch Guiana, South America, and is estimated to contain about 30,000,000 gross tons. The ore is of high grade, containing no more than 2½% of silica. The company has outright ownership of only a part of these ore fields. The remainder is held under a concession from the Dutch government. Originally, the grant was to expire in 1989, but due to political pressures, Alcoa was forced to revise its agreement in favor of the Dutch. The details of the revision are not in evidence.

Alcoa likewise enjoys a concession from the Dominican government on some 11,000,-000 gross tons of ore. While its precise grade was not made to appear at the trial, the average alumina content has been described as under 50%.

From the foregoing, it is obvious that Alcoa has vast resources of bauxite. They are of a character that make it presently unnecessary for Alcoa to adopt existing processes, or to develop new methods, for the economical utilization of low-grade ores.

*Reynolds:* This company requires a maximum of 883,732 gross tons of dry bauxite per year, based on the present capacity of its reduction facilities. Reynolds, up until the present, has supplied its needs almost exclusively from Arkansas ore, the deposits of which lie within a radius of 25 miles from the Hurricane Creek alumina plant. It has two sources of Arkansas ore, either its own holdings or the government stockpile upon which in September, 1949, it acquired a twenty year option to purchase. The stockpile contains some 3,000,-000 gross tons of bauxite. The precise amount of Arkansas bauxite actually owned by Reynolds is not in evidence, but if its option on the stockpile be taken into account, it would appear that the company's domestic bauxite resources are sufficient, at present rates of production, to supply Hurricane Creek for some ten to twenty years.

Recent developments indicate that within about two years, Reynolds will abandon the use of Arkansas ore in order to conserve dwindling domestic resources. The company owns about 40,000,000 gross tons of bauxite in Jamaica. In addition, approximately the same amount is available to the company under options it holds on deposits in Jamaica and Haiti. Moreover, Reynolds has a contract with the Billiton Company for Dutch Guiana ore.

Having spent $1,000,000 in acquiring these foreign reserves, the Reynolds Company was apprehensive of its ability to secure an additional $12,000,000 in order to develop the Jamaican properties. This difficulty has now been overcome by virtue of a financing agreement with ECA, as part of the Marshall plan, which is designed to improve English dollar balances, and preserve, at the same time, domestic bauxite reserves, in event of emergency, for an American producer of aluminum. In this contract, ECA undertakes to advance to the Reynolds Company not later than June 30, 1952, a total of $5,963,000, plus 1,800,000 pounds sterling, to foster the utilization of the Jamaican ore. Reynolds, itself, will contribute $1,500,000 to the project. The advances are to be repaid at 4% interest over a twenty year period in an equivalent quantity of aluminum pig or ingot based on then existing market prices. The aluminum so acquired by the Government is in furtherance of the present stockpiling program.

Jamaican bauxite has been described as high-grade ore, the silica content being no

more than 2½%. The use of imported ores, however, at Hurricane Creek will destroy one of the chief economies of that plant. Situated as it is, within short trucking distance of the Arkansas bauxite deposits, substantial savings in transportation costs are possible. Moreover, for the reception of imported ores, Alcoa's alumina plant at Mobile, and Kaiser's at Baton Rouge are more favorably located. These plants, one of which is situated on the Gulf of Mexico, and the other on the Mississippi River, enjoy close proximity to West Indian and South American sources of supply, and are directly accessible by ocean-going vessels. On the other hand, shipments of Jamaican ore to Reynolds' Hurricane Creek plant will require an overland railroad haul, in addition to ocean transport to a Gulf port.

The preceding recital clearly shows that Reynolds is in no foreseeable danger of losing access to adequate bauxite supplies. However, as stated above, in turning to foreign sources, it must relinquish some of the unique advantages which are now enjoyed at Hurricane Creek.

*Kaiser:* This company, alone among the domestic producers of primary, does not presently supply its bauxite needs from its own reserves. From October 1, 1946, to September 30, 1949, Kaiser purchased 92% of its bauxite from Alcoa, and the remainder from the Government stock-pile.

The present maximum bauxite requirements of Kaiser, based on the capacity of its reduction facilities, is 520,044 gross tons of dry ore per year. At present, Kaiser relies on a contract with Alcoa, extending until 1963, for its bauxite supplies. This contract calls for deliveries of a maximum of 500,000 gross tons per year. The contract price is subject to variation, depending on Alcoa's actual costs in Dutch Guiana, and its arrangements with the Dutch government. Kaiser is also entitled to enjoy whatever cheaper price is given to any other bauxite customer of Alcoa.

Kaiser officials have testified to their satisfaction with the Alcoa arrangement. The price is apparently the most reasonable one Kaiser could obtain, though the profit which Alcoa realizes on these bauxite sales

is not in evidence. The contract also provides for shipment of the ore by the Alcoa Steamship Company. Rates for transport are to be negotiated every six months, but so long as Alcoa meets the terms of rival shippers, Kaiser is obligated to retain Alcoa to transport at least 90% of the ore.

Kaiser reserves the right to cancel the whole contract, or parts thereof, to the extent that it supplies bauxite to itself either from Kaiser-owned properties, or from bauxite fields upon which it has a concession or lease of at least twenty years duration. Cancellations can be made in units of no more than 100,000 gross tons per year, on six months notice, requiring, according to the terms of the contract, three years from the date of the first notice to cancel the entire contract.

Kaiser has taken steps to secure an independent bauxite supply. Prospecting concessions were acquired, and explorations have taken place in both Dutch and British Guiana. These areas, however, did not appear as inviting as the prospects in Jamaica, where in 1948, Kaiser held options on some 4,640 acres of land. On July 8, 1949, the Board of Directors of Kaiser authorized the exercise of the Jamaican options and the construction, by the end of 1949, of a pilot plant at Baton Rouge to test the Jamaican ore. The company considers that conditions are very favorable in Jamaica for the inexpensive extraction and shipment of bauxite. Extensive deposits exist in Jamaica, and this ore is estimated to be lower in silica content than that found in Dutch Guiana.

The Government has strongly urged that Kaiser's present dependence on Alcoa for bauxite is a serious impediment to effective competition between these two companies. Alcoa, it is said, can offer sufficiently attractive prices to Kaiser which will induce the latter company not to undertake the expense of developing its own reserves. Thus, Kaiser may gain in the short-run, but at the long-run sacrifice of independent integration. In this state of affairs, Kaiser's interest may well favor a strong Alcoa as a protection to its own bauxite supplies.

Though the Government somewhat exaggerates the implications of this situation, it

is doubtless true that Kaiser is handicapped by its lack of developed bauxite reserves. The contract has the effect of profiting Kaiser's competitor, and at the same time, it raises Kaiser's own costs of production above that of its competitor. Kaiser's effort toward acquiring independent bauxite supplies shows that it appreciates the competitive value in possessing its own reserves. To be truly competitive, Kaiser must develop its own bauxite deposits, and this will require capital in amounts which Kaiser has not so far felt free to devote to this purpose. By contrast, Reynolds has undertaken the development of its reserves in anticipation of needs far in the future. Nothing now suggests that ECA will afford financing to Kaiser, as it did to Reynolds, to develop the Jamaican properties, especially since an impetus of the loan, the preservation of domestic bauxite resources, is lacking in the case of Kaiser.

Fabrications: The considerations which underlie an examination of this phase of the aluminum industry differ sharply from those having to do with the foregoing stages of the metal trade. The previous discussion had reference to the present and future capability of producers to supply the needs of the consumer of primary aluminum. Fabrication, on the other hand, relates primarily to the matter of supplying the thousand and one end products that are manufactured by the fabricators of aluminum to meet the demands of the public. Inasmuch as the demand for particular products tends to fluctuate, diversification of equipment and output permits of greater stability in market operations.

Moreover, fabrication capacity cannot be mathematically measured. It will depend upon the types of articles being produced, and the sizes of the orders therefor. For example, large orders of similar items of common alloy composition will permit capacity in some cases to be greater than if a variety of different products are to be made of hard alloys. However, even this is not an invariable result. Indeed, during the war some of the mills were so equipped that they could attain, when fabricating hard as compared to soft alloys, a higher degree of efficiency.

Each of the three integrated producers has fabrication facilities with a capacity that is at least double that of their reduction establishments. This insures that, among them, the bulk of sales, and therefore, the major competition, will take place in the sale and distribution of fabricated products. But, inasmuch as the monopoly of Alcoa, heretofore adjudicated, was in relation to aluminum in its pig and ingot stage, the fabrications picture was not fully developed at the time of trial. Nevertheless, any advantage held by a competitor in the fabrication stage of the industry will play an important part in permitting that company to hold or enlarge its share of the market. Thus, it is necessary to scrutinize such evidence in the record as bears upon fabrication resources, and, from this, seek to place an evaluation upon the comparative positions of the integrated producers in the fabricating field.

*Alcoa:* This record does not reveal a full and accurate presentation of this company's fabrication capacity. Its answer to the Government's petition lists capacity at 999,495,000 pounds per year as of 1947. But this, I think, is an understatement, and for this reason: the above figures exclude metal which, when fabricated into a semifinished form, is further worked by Alcoa into another product. Actually, aluminum articles are sold at various stages of manufacture, depending upon the needs and facilities of the purchasers. Thus, Alcoa's figures are based on the estimated amount of metal which travels through its fabrication establishments, rather than the actual capacity of the equipment.

Mr. Wilson, Alcoa's Senior Vice President, testified that the company's fabricating capacity is at least double its reduction capacity, which, based on his estimate of reduction facilities, would be in excess of 1,175,786,000 pounds. The precise total is unknown, and varies, no doubt, with the nature and size of the articles being produced.

Production of sheet and related products (hereinafter referred to as "sheet"), for 1948, indicates that about half of Alcoa's total fabrication capacity is designed to produce these forms of aluminum products.

Though Alcoa's petition states its sheet capacity to be 756,000,000 pounds per year, it is said that this figure is now unreliable because it represents wartime capacity based on standardized orders, on seven-day-a-week production, and on equipment since retired. In 1948, Alcoa's major sheet establishment was at Alcoa, Tennessee; and additional facilities existed at Edgewater, New Jersey. In addition, a new sheet plant at Davenport, Iowa, was nearing completion in 1948. Its capacity is estimated at 120,000,000 pounds per year, and the equipment will be capable of rolling the largest sheet in the world.

The remainder of the capacity is divided among several other types of products. The evidence is insufficient to support anything but very rough estimates as to the proportion each category bears to Alcoa's total fabrication capacity.

About 15% of the total is devoted to the production of extrusions and tubing. Alcoa built the plant at Cressona, Pennsylvania, for the Government, in the course of the last war, and it acquired title thereto in 1946. Cressona's product is limited to extrusions. Alcoa's plants at Lafayette, Indiana; New Kensington, Pennsylvania; and Vernon, California; produce both extrusions and tubing.

Some 17% of capacity is devoted to production of rod, bar, shapes, wire and cable. These facilities are mainly located at Massena, New York, but some cable equipment exists at the Lafayette, Indiana, plant. Rod capacity will probably be somewhat increased when a new plant at Vancouver, Washington, under construction in 1949, is completed.

Casting equipment accounts for some 9% of capacity. These facilities are found in a number of plants among which are those at Bridgeport, Connecticut; Chicago, Illinois; Cleveland, Ohio; Detroit, Michigan; Garwood, New Jersey; and Vernon, California.

Forging facilities represent an additional 4% of capacity. Forgings are produced at the Cleveland, Ohio, and Vernon, California, mills.

Alcoa's aluminum foil capacity is about 3% of its total. The foil facilities are located at Edgewater, New Jersey; New Kensington, Pennsylvania; and Alcoa, Tennessee.

The remaining 2% is largely devoted to the manufacture of aluminum utensils, though some powder and paste are also produced. This equipment is in plants at New Kensington, Pennsylvania; Chillicothe, Ohio; and Alcoa, Tennessee.

*Reynolds:* From the evidence, it can be estimated that this company's fabricating facilities have a total capacity of some 760,000,000 pounds per year, or about 1.7 times its reduction capacity.

About 65% of the total is utilized for the production of sheet. Reynolds' largest sheet mill is located at McCook, Illinois. Alcoa built the plant for the government during the war, and Reynolds operated it under lease from War Assets Administration since June, 1946. It was purchased by Reynolds on December 21, 1949. The company also owns a sheet mill at Listerhill, Alabama. It was built for the Government, and was operated by Reynolds since 1941. In 1946, Reynolds purchased the plant from War Assets Administration. Another mill at LaGrange, Illinois, seems never to have been operated by Reynolds. It is too small to be useful, and the company is attempting to sell it.

Extrusions and tubing represent 12% of Reynolds' total fabricating capacity. Reynolds has operated the Government built extrusion plant at Phœnix, Arizona, since 1947, and on December 29, 1949, contracted with War Assets Administration to purchase it. Another extrusion plant located at Grand Rapids, Michigan, was leased from War Assets Administration in June, 1946, and was purchased by Reynolds in April, 1949. This latter plant is not presently in operation and, in the past, has been only intermittently operated.

About 13% of Reynolds' fabrication capacity is devoted to the manufacture of rod, bar, shapes, and wire. The company's Annual Report for 1948 indicates that plans are being made to manufacture cable,

but so far as appears, the necessary equipment has not yet been installed. Facilities for the manufacture of the above products are located at Listerhill, Alabama, and Louisville, Kentucky.

Equipment for the production of aluminum foil constitutes approximately 8% of Reynolds' fabrication capacity. The company originally entered the industry as a foil producer, and right along has been the leader in this category. Foil plants are located at Richmond, Virginia, and Louisville, Kentucky.

The remaining 2% is devoted to production of aluminum powder and paste. The Louisville, Kentucky, plant also contains these facilities.

The evidence shows that Reynolds is without the ability to compete with Alcoa in the fields of castings, forgings, and cable. For the production of utensils, Reynolds is possessed of only an inconsequential facility at Lemont, Illinois.

*Kaiser:* The total fabrication capacity of this company can be estimated as about 515,000,000 pounds per year, and this quantity is approximately twice the total reduction capacity.

About 56% of the total fabrication capacity is designed to produce sheet. These facilities are located at Trentwood, Washington. This plant was built for the Government in 1941-2 by United Engineering & Foundry Company in collaboration with Alcoa; was leased by Kaiser in 1946, and purchased from War Assets Administration in July, 1949.

About 43% of Kaiser's fabrication capacity is equipped to produce rod, bar, shapes, wire and cable. These facilities are located at a plant in Newark, Ohio. This establishment was built by Alcoa for the Government, and purchased by Kaiser from War Assets Administration in June, 1949. There may be some additional capacity in the plant remaining from the wartime facilities, especially to produce large bar, but the evidence does not suggest that this equipment is ready for present use.

The remaining 1% of fabricating capacity is designed to produce aluminum foil. A mill for this purpose was constructed at Permanente, California, and has been operated since March, 1949.

The evidence does not show Kaiser to have capacity to produce extrusions and tubing, castings, forgings, powder and paste, or utensils. Mr. Rhoades, Kaiser's Vice President and General Manager, testified that the company is eager to expand into the extrusion field, but has no desire to go into castings.

*Conclusions:* The foregoing summaries indicate that neither Reynolds nor Kaiser has its fabrication operations so completely diversified as Alcoa. Roughly 60% of the total fabrication capacity of the three companies is composed of sheet rolling equipment. Of this total, Alcoa's share is some 45-50%.

In the extrusion and tubing field, Alcoa's competition from the other two integrated producers comes only from Reynolds. With respect to these products, Alcoa's advantage in capacity is probably somewhere just short of two to one.

With reference to castings, forgings, and utensils, Reynolds and Kaiser can offer Alcoa no substantial competition. In these fields alone, Alcoa's capacity exceeds 7% of the total of the combined fabricating capacities of the three producers.

In three areas of activity, Alcoa appears to be in a subordinate position to at least one of the other companies. Reynolds' capacity to produce foil, together with powder and paste, is from one and one-half to two times greater than the total of Alcoa's and Kaiser's. Significantly, however, in these items of manufacture the amount by which Reynolds' capacity to produce the same exceeds Alcoa's represents only about 1.5% of the total combined fabricating capacities of the three companies.

With reference to rod, bar, shapes, wire and cable, Kaiser's Newark, Ohio, plant alone probably contains a little more capacity than Alcoa presently possesses. Together, Kaiser and Reynolds have somewhat over one and one-half times the capacity of Alcoa. So far, the market effect of Kaiser's entry into this field cannot be estimated because the Newark plant had been in operation only a few months when the

record in this proceeding was closed. Nevertheless, the relatively equal distribution of capacity in this important fabricating department is a factor that favors effective competition.

Cost Data Relevant to Physical Resources: The foregoing recitation of the physical resources of the three producers will provide a foundation for understanding the differentials in the respective costs of production and marketing of the domestic companies, and which are implicit in the present distribution of the aluminum properties. Competitive cost advantages can derive from the ownership of more efficient, more abundant, or more diversified establishments; and, also, from the favorable location of particular facilities with reference both to the sources of materials used in their operation, and to the easy and economical distribution of their products.

The basic instrument for understanding comparative costs of the three producers is an analysis of their major expense items with respect to pig production. These figures can represent either "mill costs"—i. e., just the costs of materials, labor, and plant overhead directly bearing on the manufacturing processes—or they can include, in addition, the proportionate amount of overhead, reflecting general administrative expenses and like items, estimated to be applicable to pig production. For the purposes at hand, "mill costs" are the more indicative figures. They will more accurately disclose the cost advantages incident to the physical resources of each competitor, and will not be affected by variants in administrative organization which would be introduced by the inclusion of general overhead.

It is not suggested, nevertheless, that "mill costs" are either a full disclosure of the cost picture, or that they should be considered as a base upon which to compute the reasonableness of prices. For the moment, the purpose is to show that the present allocation of physical resources implies cost differentials which, for some time, can be expected to project themselves into the future. "Mill costs" summarize the items which account for these differentials, and these items are likely to be of a more permanent character and less easily adjusted than are the components of general overhead.

One might surmise that because Reynolds and Kaiser received the "cream" of the war surplus properties, their costs of pig production would evidence economies of operation unequaled by Alcoa's older facilities. It is all the more significant, therefore, that Alcoa's "mill costs" are still the lowest of the domestic producers of primary aluminum. This fact is just one more resource, though an important one, which goes to prove Alcoa's present superior ability to survive and to expand.

The "mill costs" of the three producers, subdivided into three categories, for 1947, 1948, and the first nine months of 1949, appear in Table VII. These figures represent actual costs after deducting book profits on intracompany transfers, and without allowance for return on investment.

Table VII

Mill Costs (cents per pound of pig)

| | 1947 | | | 1948 | | | 1949 (first nine months) | | |
|---|---|---|---|---|---|---|---|---|---|
| | Alcoa | Reynolds | Kaiser | Alcoa | Reynolds | Kaiser | Alcoa | Reynolds | Kaiser |
| Raw Materials ........ | 3.71 | 3.03 | 4.93 | 3.87 | 3.34 | 4.97 | 4.00 | 3.71 | 5.18 |
| Power ................ | 1.73 | 2.17 | 1.90 | 1.79 | 2.60 | 1.93 | 1.78 | 2.32 | 1.81 |
| Manufacturing Costs... | 3.96 | 4.29 | 3.55 | 4.55 | 4.72 | 4.27 | 4.73 | 5.01 | 4.64 |
| TOTAL ............... | 9.40 | 9.49 | 10.38 | 10.21 | 10.66 | 11.17 | 10.51 | 11.04 | 11.63 |

*Raw Materials:* The differentials that here appear are largely explained by two circumstances previously considered: 1) Kaiser's contract with Alcoa for its bauxite supply; 2) The proximity of Reynolds' domestic bauxite fields to its alumina plant at Hurricane Creek.

1) Kaiser's costs for raw materials run well over a cent per pound of pig above that of the other two companies. The significance of this figure is apparent when it is observed that total raw material costs for Alcoa and Reynolds range between three and four cents per pound of pig. Part of this difference is the profit that accrues to Alcoa on sales to Kaiser, and on ocean transport. An additional factor is the long railroad haul that is required to carry bauxite from Baton Rouge, Louisiana, to Kaiser's reduction plants in the northwest. Together, these conditions account for cost disadvantages which Kaiser's economies in other categories are insufficient to overcome.

2) The proximity of Reynolds' bauxite fields to the Hurricane Creek alumina plant, and the Jones Mills reduction plant, all three in Arkansas, lessens Reynolds average transportation costs by about one cent per pound of pig as against those of Alcoa. But, certain other factors tend to diminish this initial economy. The result is that Reynolds' total raw material costs do not reflect so large an advantage as first appears.

In this connection, it is appropriate to note that Reynolds' favorable transportation conditions will not continue indefinitely. As already stated, the use of Jamaican bauxite should begin in a few years. This will, at least, raise Reynolds' raw material costs to a parity with those of Alcoa, and perhaps to a higher figure. While bauxite shipments from Jamaica will constitute shorter hauls than those from Alcoa's Dutch Guiana reserves, Reynolds will face the additional expense of transporting its raw material from a deep water port to its Arkansas plant. Reynolds' present advantage in raw material costs helps it to overcome certain deficiencies in its other departments, but the known impermanency of this advantage cannot be ignored.

*Power:* Though Alcoa has the lowest average power costs, it enjoys a substantial saving only over Reynolds. Both of Kaiser's reduction plants are furnished power by Bonneville Power Administration, at costs of about two mills per kilowatt hour. Kaiser's access to this inexpensive power probably offsets its disadvantage in having to ship alumina from Baton Rouge to the State of Washington.

Alcoa's low power costs come about, in part, from its ownership of generating facilities. This affects all plants now operated except that at Vancouver, Washington, which is supplied with inexpensive Bonneville electricity. Power costs at Alcoa plants are about two mills per kilowatt hour except at Badin, North Carolina, where they are only half as much. The new plant at Point Comfort, Texas, will receive direct current electricity at a cost of about three mills per kilowatt hour. This higher cost power will have the effect, however, of raising Alcoa's average power costs by only about one-tenth of a cent per pound of pig.

Reynolds' power costs average about six-tenths of a cent per pound of pig above Alcoa's. Only two of Reynolds' four reduction plants, those at Troutdale, Oregon, and Longview, Washington, are supplied with inexpensive Bonneville electricity. At the Listerhill, Alabama, plant, where power is purchased from TVA, costs run at least three mills per kilowatt hour. The same is true of the power cost for the two potlines presently in operation at Jones Mills, Arkansas. The contract price for electricity to be furnished the remaining two potlines at Jones Mills is also in the neighborhood of three mills and, thus, will not reduce Reynolds' average power costs.

Furthermore, the availability of power in the Jones Mills and Listerhill areas is definitely limited. The price of electricity beyond present contract commitments will be at considerably higher rates. Reynolds' disadvantage in power costs, however, avoids being a serious handicap competitively so long as it is counterbalanced by the company's favorable position with reference to raw material costs.

*Manufacturing costs:* The figures compiled in Table VII show that Alcoa oc-

cupies a middle position in this category. Its costs are slightly below Reynolds', and somewhat above Kaiser's. The Government claims, however, that Alcoa enjoys an advantage with regard to carbon electrodes, and that this results in the other producers having either higher costs or a decreased purity of pig. Since the electrodes are a component of manufacturing costs, this contention should now be examined.

Actually, the Government's argument has to do primarily with the different conditions existing at Kaiser's Mead and Tacoma reduction plants. At Tacoma, Soderberg pots are installed. These permit the continuous production of carbon anodes in the reduction pots, themselves, and while the electrolysis of alumina is in process. Here, apparently, the carbon problem is not present. On the other hand, the carbons used at Mead must be prebaked in separate furnaces, and the finished product inserted in the pots. Difficulties arise from insufficient baking facilities at Mead, and are responsible for the dilemma of increased expense from acquisition of carbon electrodes from outside sources, or decreased purity from stretching the use of available carbons. Reynolds, also, does not have extensive Soderberg installations, and it may be tempted to trim costs by the overuse of its carbons.

A glance at Table VII shows that Kaiser enjoys the lowest manufacturing costs and Reynolds' disadvantage is trifling. Accordingly, the matter assumes little importance unless these producers are reducing expenses by diminishing the purity of their pig output, and a substantial marketing handicap results from so doing.

The evidence discloses that, whereas the aluminum content of 80-85% of Alcoa's pig production is 99.7% or higher, only 38% of Reynolds' production is of this purity, and but 45% of Kaiser's. However, 62% of Reynolds' pig production, and 71% of Kaiser's pig, contain 99.6% of aluminum. The significance attributed to the purity of pig stems largely from the specification requirements established for the Government stockpile.

Originally, it was thought that the Government stockpile should be composed of Grade 5 pig, i. e., a minimum of 99.75% of aluminum, and maximum of .2% iron and .2% silicon. This specification was too high to enable Reynolds and Kaiser to supply this quality of metal from their inventories. Thereupon, the Munitions Board permitted these companies, in 1949, to contribute to the stockpile 36,000,000 pounds, and 24,000,000 pounds, respectively, of pig, containing a minimum of 99.5% of aluminum, and a maximum of .35% iron and .2% silicon. The Board then adopted, over the vigorous objections of Reynolds and Kaiser, a higher specification for additional purchases by the Government. This calls for a minimum of 99.6% aluminum and a maximum of .25% iron and .15% silicon, an analysis which was deemed necessary to meet all aluminum requirements that might develop. Among the domestic producers of primary, Alcoa, alone, favored this specification, and said it could easily furnish the material, notwithstanding that it was contemplated that the producers, other than Alcoa, would supply the stockpile.

It is apparent that, although the production of 99.7% pig might unduly burden Kaiser and Reynolds, the production of 99.6% pig is not nearly as difficult. If Reynolds and Kaiser were to concentrate primarily on an output of pig, having a purity of 99.5%, it may be that this would enable them some flexibility in the way of cutting costs. Nevertheless, the evidence on production of 99.6% pig, and overall manufacturing costs, show that the carbon deficiency of these producers does not prevent them from producing pig of this purity in quantities sufficient to avail themselves of the opportunity to contribute to the Government stockpile, and this without a substantial cost disadvantage incident thereto.

It may be, nonetheless, that high purity pig is much more desirable in producing certain products such as electrical conductor cable, and foil, and in making usable a lower purity scrap. However, the evidence fails to make explicit any significant disadvantage which Reynolds and Kaiser bear, as compared to Alcoa, on this score.

As a result, I find that, in the category of manufacturing costs, the integrated producers are about upon a parity, and that

whatever advantage Alcoa may possess with reference to carbon electrodes is of inconsequential effect on competition.

*"Mill costs" conclusions*: The evidence establishes that Kaiser's "mill costs" are some 10% higher than Alcoa's the difference being about one cent per pound of pig. For Kaiser, a differential of this magnitude represents expenditures for the items composing "mill costs" of some two and one-half million dollars a year above Alcoa's same expenses in producing an amount of aluminum equivalent to Kaiser's output. This is not an inconsiderable sum.

The 1948 and 1949 data shows Alcoa's advantage over Reynolds to be only half as great as that over Kaiser. Even this difference, however, amounts over the year to a one and one-half to two million dollar additional expense for these items which Reynolds bears in comparison to Alcoa's costs for a like output. The situation regarding Reynolds is further complicated by the probability that, in a few years, that company's raw material costs, as previously indicated, are going to equal, and possibly exceed, those of Alcoa, due to the use of Jamaican bauxite. Since no evidence suggests that any of the other factors will be altered so as to compensate for this anticipated increase in costs, it may be assumed that, in a relatively short time interval, Alcoa will also have "mill costs" about one cent lower per pound than Reynolds.

As for Kaiser, the record discloses that, if exploitation of its own bauxite holdings will provide cheaper costs than under the Alcoa contract, the development of those fields, and cancellation of the Alcoa commitments, will take place. Kaiser has made some moves toward development of its own reserves, but the testimony of Kaiser officials, in affirming the desirability in a competitive sense of the Alcoa contract, and the company's continued dependence upon that contract, casts doubt on the possibility of a substantial cost saving, in the near future, from the development of its own bauxite supply.

Thus, it is not foreseeable that the present "mill costs" disadvantage of Kaiser can soon be expected to diminish and, as already noted, the outlook for Reynolds is one of substantially increasing costs. But, even so, I cannot now conclude, under present market conditions, and such as are likely to prevail in the immediate future, that these "mill costs" differentials, by themselves, will prevent effective competition among the three producers. Nevertheless, they are highly relevant in evaluating present competition, and in anticipating future developments. As such, they prove only that in one more aspect of a vastly interrelated complex, Alcoa enjoys an advantage over its principal competitors.

The record is practically destitute of evidence which bears on the costs of the fabrication stages of aluminum production. It is a contention of the Government that the location of Reynolds' and Kaiser's plants with reference both to their integrated operations, and to their ultimate markets, leaves these producers with transportation costs of a higher level than those of Alcoa. Transportation cost differentials existing in the stages of production from the mining of bauxite, to the output of pig, having been considered under "mill costs", I shall here attempt a review of the remaining data which relates to transportation differentials.

The integrated operations of the three domestic producers of primary call, generally, for two major movements of pig, once the reduction process is completed. Pig is shipped from the reduction plant to a fabricating establishment, and fabricated products are then transported to the independent consumer. Of course, incidental transfers may occur within the producer's own system, e. g., if semi-fabricated aluminum is further processed into more finished forms, but the basic relationships are those existing between reduction plants and fabrication facilities, and between fabrication plants and the ultimate market. For purposes of simplicity, I shall separately discuss these two relationships cognizant, however, of their interconnection in that an advantage in one may more than compensate for a disadvantage in the other.

I. From the record it appears that Reynolds' costs of transporting pig to sheet mills averages over one-half cent per pound higher than those of Alcoa or Kaiser. Kaiser enjoys the lowest rates because of the

proximity of its northwest reduction plants to its Trentwood, Washington, sheet mill. Alcoa's rates are only slightly higher; the Alcoa, Tennessee, sheet mill being close by the reduction plant at the same location. However, a slight increase in average costs may be expected once the Davenport, Iowa, mill is utilized. Reynolds' higher costs undoubtedly stem from the shipment of pig from its northwest reduction plants to the McCook, Illinois, sheet mill, though its other sheet facility at Listerhill, Alabama, is well situated with respect to the Listerhill, and Jones Mills, Arkansas, reduction plants.

With regard to shipments from reduction plants to fabrication establishments other than sheet mills, the data is incomplete. This is so, as respects Kaiser, because its operations at the Newark, Ohio, rod, bar, and wire plant did not begin until the summer of 1949. However, some cost differential, unfavorable to Kaiser, will probably appear inasmuch as Alcoa's comparable facility at Massena, New York, is located next to a reduction plant (and the new Vancouver, Washington, plant is similarly situated), while Reynolds has both a rod, bar, and wire mill and a reduction plant at Listerhill, Alabama. On the other hand, all pig for Kaiser's Newark plant will have to be shipped from Washington to Ohio. As between Alcoa and Reynolds, the evidence shows that Alcoa's advantage in lower transportation costs from reduction plants to fabrication facilities other than sheet mills, is even greater than the advantage it has over Reynolds in transportation costs to sheet mills alone.

II. The record describes, only sketchily, the relationship between fabricating plants and ultimate consumers. The inferences depend entirely on the proximity of the fabrication facilities to the principal industrial areas in the United States.

The Government has asserted that Kaiser's only sheet mill, located at Trentwood, Washington, is particularly ill-placed, its location having been chosen as a wartime security expedient. It is true that, in shipments to eastern markets, this plant is at a disadvantage to the facilities of Alcoa and Reynolds, and that, at least in the case of Alcoa, this disadvantage is not compensated by Kaiser's low costs in shipping pig to the mill. Though the Trentwood plant is best located to supply west coast industry, not more than 10% of the national sheet market is located in this area. Undoubtedly, the advantage in the western market offsets to a large extent the greater costs incurred in selling in the east, but since Kaiser sells less than half of its sheet in the west, some burden remains.

The location of Alcoa's and Reynolds' sheet mills are about on a par, whatever advantage, if any, enjoyed by Reynolds not being sufficient to overcome its inferior position in regard to the shipment of pig to the sheet plants.

In regard to the location of the plants fabricating other products, Alcoa's establishments are all advantageously placed with reference to principal market. Reynolds' facilities are also well situated except, perhaps, for the extrusion mill at Phoenix, Arizona, the location of which was primarily determined, during the war, for security reasons. Kaiser's Newark, Ohio, plant is in the center of the eastern industrial region, and its foil mill in California is the only such plant west of St. Louis.

On the whole, of the three producers, Alcoa's fabrication plants are probably best located so as to reduce transportation costs. The advantage thus accruing, however, cannot be considered of great significance in view of the absence from the record of data bearing on other costs in the fabrication stage. Without these other costs, the weight to be accorded the transportation differential cannot be known, and since the differential, itself, has not been demonstrated to be startlingly large, reliance on it is inevitably precarious. Perhaps, its most significant value lies in the cumulative effect obtained from the successive negation of possible competitive advantages that might be advanced in favor of Reynolds or Kaiser.

In conclusion, I find that the abundance and diversity of Alcoa's physical resources provide that company with cost advantages considerably superior to those of its

integrated domestic competitors. The eradication of these differentials cannot be reasonably foreseen. In themselves, under present market conditions, they do not bar effective competition. Yet, they constitute an important element upon which the abilities of Reynolds and Kaiser to survive and expand may, at some time, depend.

## Financial Resources

In seeking a conclusion with respect to conditions which have an important bearing upon the question as to whether Reynolds and Kaiser are now, and hereafter will be, capable of offering effective competition to Alcoa, it is essential that the present financial position of the respective companies, together with their available monetary resources, be taken into account. The abilities of the companies to survive, and to expand, as the demands of a developing industry may require, are largely dependent upon the ease—as well as the cost—with and at which they can obtain funds for capital expenditures.

However, the task of making an appraisal of the financial resources of these three companies, is complicated by the necessity of bearing in mind the unique character of the method by which Reynolds and Kaiser, for the most part, obtained the wherewithal to become integrated aluminum producers. For this reason, something more is required than a mere comparison of the figures set forth in the balance sheets and earnings statements of the three organizations.

Such competition as presently exists in the domestic production of primary aluminum is due, almost entirely, to the disposal program of the War Assets Administration. Reynolds and Kaiser are the beneficiaries of the execution of that program, and their existing financial structures, together with their respective capacities for further development, must be viewed in the light of the governmental patrimony that has been showered upon them. But, so far as can now be seen, the source of the patrimony with which Reynolds and Kaiser were first endowed, is all but exhausted.

This is so inasmuch as all of the prime aluminum facilities formerly owned by the Government, have been sold by the War Assets Administration. Moreover, if it now appears that Reynolds and Kaiser hereafter will feel the need for further subsidies from the United States in order to continue in business, the propriety of the relief against Alcoa that is sought in this proceeding will be reasonably apparent.

The disposal program of the War Assets Administration has been of definite advantage to Reynolds and Kaiser in two distinct ways. First, the purchase prices agreed upon for the acquisition of the Government's plants by these companies are much less than the present fair value of the properties. Second, the terms under which the purchase prices are to be paid are remarkably liberal. The down payment for the major plants was but 5% of the purchase price. The balance thereof is payable over a twenty-five year period, with interest at 4% per annum. In addition, the companies have an option to furnish aluminum pig and ingot for the Government stockpile in the discharge of the sums still to be paid to the United States, together with interest thereon.

Obviously, the first of these benefits is not reflected in balance sheet data. The asset account of Kaiser apparently shows these acquisitions at their costs of purchase. The evidence does not disclose the accounting treatment Reynolds has accorded the plants purchased by it in December, 1949, inasmuch as this occurrence was several months subsequent to the date for which the latest financial statements of this company were available. In my estimation, however, the depreciated value of the six plants sold to Reynolds in 1949 was some $45,500,000 in excess of the purchase price of those facilities. Similarly, for Kaiser, the excess value of the four plants it acquired in 1949 was some $27,300,000. The other plants purchased by these companies from War Assets Administration, prior to 1949, do not present differentials which will materially alter these figures. These

estimates are independent of sums representing currently higher reproduction costs which would also be applicable to appreciate Alcoa's figures.

At the same time, the value of Alcoa's physical facilities, as shown by its books, is substantially less than their true worth. Under special provisions for the accelerated amortization of war emergency constructions, between 1940 and 1945, Alcoa wrote off some $225,000,000 worth of equipment that, following the year 1945, is not reflected in its asset account. During these years, by virtue of the special amortization allowances, Alcoa's income and excess profits taxes were reduced to the extent of about $139,000,000. By this means, a large part of the cost of wartime construction was defrayed. As a result, there is little doubt that the values presently accorded Alcoa's properties are less than their actual value by about $135,000,000.

The addition of this sum to Alcoa's asset account substantially nullifies, for comparative purposes, the excess values in Reynolds' and Kaiser's assets. It is true that Reynolds, and perhaps Kaiser, took advantage of the wartime amortization to some extent, but, since their constructions were on a very much smaller scale than Alcoa's, it does not appear that the addition of such amounts, even if calculable, would appreciably affect the comparative data.

The Government appraises the size of the respective producers by comparing their total assets. Inasmuch as this basis ignores the offsetting factor of liabilities, a conclusion drawn therefrom may prove deceptive. For example, during the periods in which many of the War Assets Administration's plants were leased by Reynolds and Kaiser, the asset accounts of these companies did not accurately reveal the true value of those facilities. However, the purchase agreements, consummated in 1949, have the effect of greatly enlarging those accounts whereas net worth, the difference between assets and liabilities, remains substantially unchanged. For these reasons, net worth would appear to provide the most stable grounds for an initial comparison of the resources of the three companies.

Actually, on a net worth basis, Alcoa's comparative strength appears greater than that shown in the Government's appraisal of the total assets of the three companies. Table VIII summarizes the relative positions of the companies with regard to net worth as found in their balance sheets. The marked superiority of Alcoa is immediately evident; its net worth being six times greater than that of Reynolds and nine times greater than that of Kaiser.

## Table VIII—Net Worth

Book Value

| | Dec. 31, 1947 | | Dec. 31, 1948 | | 1949 (September 30) | |
|---|---|---|---|---|---|---|
| | $/000 | % | $/000 | % | $/000 | % |
| Alcoa | 271,739 | 82.6 | 300,567 | 78.5 | 314,118 | 78.1 |
| Reynolds | 43,202 | 13.1 | 50,444 | 13.2 | 52,717 | 13.1 |
| Kaiser | 13,980 | 4.3 | 32,022 | 8.3 | 35,323 | 8.8 |

| | Appreciating the assets of the three companies | | Appreciating the assets only of Reynolds and Kaiser | |
|---|---|---|---|---|
| | 1949 (September 30) | | 1949 (September 30) | |
| Alcoa | 449,000 | 73.6 | 314,118 | 66.1 |
| Reynolds | 98,200 | 16.1 | 98,200 | 20.7 |
| Kaiser | 62,600 | 10.3 | 62,600 | 13.2 |

Even if the figures be revised for 1949 so as to reflect the unrecorded excess value of properties acquired by Reynolds and Kaiser in that year, the advantage of Alcoa is not substantially reduced. On this basis, when the present estimated value of Alcoa's amortized properties is included, its percentage portion of the total net worth of the three companies is 73.6%, and if Alcoa's assets are left unchanged from their book

value, and only Reynolds' and Kaiser's assets are appreciated, Alcoa still retains 66.1% of total net worth; over three times greater than Reynolds, and five times greater than Kaiser. The financial strength revealed by these figures is wholly disproportionate to Alcoa's percentage share, based on productive capacity alone.

This apparent financial strength of Alcoa is confirmed when the debt structures of the three companies are analyzed. On September 30, 1949, Alcoa's long term debt was 125.3 millions of dollars, its total assets (book value) were 516.7 millions, and its net worth 314.1 millions. Of this indebtedness, 40 millions are owed to the Metropolitan Life Insurance Company on notes maturing in 1967, bearing 2.55% interest; 2.5 millions of principal being due every year, starting with 1952. Another 60 millions, of which 55 millions are held by Metropolitan Life, and the other 5 millions by trustees of the Aluminum Company of America Employees' Retirement Plan, are represented by notes maturing in 1973, bearing 3% interest, the principal being repayable at the rate of 12 millions per year, starting in 1969. None of this debt is secured. The remaining 25.3 millions of long term obligations are not detailed in the record.

Although the latest complete financial data of Reynolds speaks as of September 30, 1949, the record has been enlarged to include its purchase from War Assets Administration in December, 1949, of five plants. The effect of this acquisition upon Reynolds' balance sheet can be estimated, with a fair degree of accuracy, and the following figures represent the September data as modified by the adjustments necessary to account for the outright purchases. These figures, however, do not reflect the loan contract with ECA for development of Jamaican bauxite reserves because the evidence does not indicate that advances under the agreement have actually been made. On the above basis, Reynolds has a long term debt of 96.8 millions of dollars, total assets (book value taking the December, 1949, acquisitions at cost) of 170.6 millions, and net worth of 52.7 millions.

Reynolds' long term indebtedness is subdivided among certain of its subsidiaries, and this permits isolation of specific properties for security purposes. The largest item is some 52 millions due on the five plants purchased in 1949. The obligation is that of Reynolds Aluminum Company, a wholly owned subsidiary of Reynolds Metals. The latter corporation has guaranteed the debt of its subsidiary up to 11.2 millions of dollars. The debt bears interest at 4%, and is secured by a lien on the plants. The principal is payable in gradually increasing installments over a twenty-five year period.

The second largest item is the 4% Serial First Mortgage Bonds of Reynolds Metals, held by the Reconstruction Finance Corporation. The long term principal amount outstanding in September, 1949, was 29.2 millions, of which 1.5 millions is due each year through 1959, and 15.7 millions are payable in 1960. It is secured by a lien on substantially all the physical assets of Reynolds Metals, and on the stock held by it in subsidiaries and affiliated companies. Reynolds Metals' other obligations include 2.3 millions of purchase money notes due 1950-1959, primarily secured by the Louisville and Grand Rapids fabricating plants, 3.8 millions of bank notes payable 1951 to 1953, secured by an assignment of customers' accounts payable; and .9 million 3½% debenture bonds due in 1951.

Reynolds Alloys Co., a wholly owned subsidiary of Reynolds Metals, owes 3.8 millions of dollars on a 4% note held by the British government. As security, Alloys has pledged all its real and tangible personal property. In addition, there is a purchase money mortgage on the Listerhill sheet mill of which the present long term principal indebtedness is 4.7 millions, payable 1950 to 1956. There are a few long term obligations of Reynolds Mining Co., another wholly owned subsidiary, but these aggregate only about .1 million dollars. The ECA advances, which may total close to 11 millions, when made, will constitute the debt of Reynolds Jamaica Mines, Ltd., still another wholly owned subsidiary of Reynolds Metals. It is evident that the debt structure of Reynolds is such as to encumber substantially all of its tangible assets.

Kaiser's long term debt as of September 30, 1949, amounted to 37.9 millions; its total assets (book value) were 87.4 millions, and its net worth 35.3 millions. Kaiser's obligations are all represented by purchase money notes and mortgages on the plants acquired from War Assets Administration. They all bear interest at 4%. The long term principal amount due on the Tacoma plant is 1.6 millions payable over a period extending through 1957. The long term obligation on the Newark plant is 3.8 millions payable over a twenty year period. On the remaining three plants purchased in 1949, the long term principal obligations outstanding are 32.5 millions, which are to be repaid in installments extending over a twenty-five year period. Thus, most of Kaiser's physical properties are also presently encumbered.

From the foregoing summary, the greatly superior credit position of Alcoa is unquestionable. In addition, the interest rates payable by Alcoa are less than those of Reynolds and Kaiser. In an expanding industry, such as is envisioned by all parties in this proceeding, ready access to substantial funds is a formidable factor in enabling one company to pre-empt new opportunities for development before they can be grasped by others. With reference to Reynolds' and Kaiser's present capital structures, their limits of financial expansion seem to have been reached whereas Alcoa has only partially borrowed on its equity. Alcoa's total assets are 4.1 times its long term debt—its net worth is 2.5 times greater than its long term debt. Reynolds' total assets are only 1.8 times its long-term debt, and its net worth is only 58% of that debt. Kaiser's assets are 2.3 times its debt, but its worth is only 93% of the debt. These relationships are not critically altered by using the fair value of assets rather than book value; in fact, they may act to augment Alcoa's superiority in that the additional asset worth would be reflected in unencumbered properties of Alcoa, whereas for Reynolds and Kaiser the appreciation must be applied to assets already pledged. It is true that if Alcoa were to negotiate additional loans and the same be secured, the company would also be required to secure equally the bulk of its outstanding notes. But, the equity of Alcoa is so vast in comparison to its two domestic competitors that, unless some serious offsetting factor is evident, it must be concluded that Alcoa is in such position that it alone can freely embrace new opportunities for development, and expand with the market.

The earnings of Alcoa, over the past three years, when compared to those of Reynolds and Kaiser, do nothing to impair Alcoa's superior credit position. Table IX contains figures for 1947, 1948, and the first nine months of 1949, representing earnings before taxes, after taxes, and after taxes and the payment of cash dividends.

### Table IX—Earnings Before Taxes

| | 1947 | | 1948 | | 1949 (first nine months) | |
|---|---|---|---|---|---|---|
| | $/000 | % | $/000 | % | $/000 | % |
| Alcoa | 50,708 | 75.4 | 68,283 | 66.8 | 38,826 | 70.8 |
| Reynolds | 6,136 | 9.1 | 14,218 | 13.9 | 5,969 | 10.9 |
| Kaiser | 10,452 | 15.5 | 19,709 | 19.3 | 10,009 | 18.3 |

### Earnings After Taxes

| | | | | | | |
|---|---|---|---|---|---|---|
| Alcoa | 30,528 | 76.1 | 41,083 | 65.9 | 22,744 | 69.9 |
| Reynolds | 3,297 | 8.2 | 9,037 | 14.5 | 3,371 | 10.4 |
| Kaiser | 6,294 | 15.7 | 12,200 | 19.6 | 6,421 | 19.7 |

### Earnings After Taxes and Cash Dividends

| | | | | | | |
|---|---|---|---|---|---|---|
| Alcoa | 18,274 | 72.5 | 28,827 | 62.5 | 13,552 | 71.0 |
| Reynolds | 1,999 | 7.9 | 7,243 | 15.7 | 2,237 | 11.7 |
| Kaiser | 4,944 | 19.6 | 10,069 | 21.8 | 3,301 | 17.3 |

Though Alcoa's share of earnings in 1948 fell to only about 65% of the total of the three companies, it rose in 1949 to 70%. This is a proportion not greatly inconsistent with its share of total net worth. However, the figures do reveal a certain financial handicap in Reynolds when compared to Kaiser. Though Reynolds' net worth is considerably more than Kaiser's, its earnings are substantially less. Kaiser's superiority stems partly from lower overhead costs, less interest expenses, and economies in marketing and advertising. Actually, Alcoa's earnings position is even stronger than the comparative figures indicate.

Alcoa admits that in 1948, $5,000,000 in profits were foregone in its effort to supply pig and ingot to the non-integrated fabricators rather than to make an additional profit incident to fabricating this metal and selling it in finished or semi-finished form. In the long run, Alcoa's move may prove of great advantage if it has succeeded in gaining and holding the good will of its customers.

Another element of importance is the sum by which Alcoa's earnings were reduced by expenditures on research and development. These amount to some 7 millions of dollars a year, more than ten times the sum that Reynolds or Kaiser spend for this purpose. Actually, research and development costs are something more than simple expense items. The results of such expenditures can mean greater economies, new processes and products, and possibly, such patent control as can legally repress present, and discourage potential, competition. It does not necessarily follow that the company which spends the most money will uncover the most successful improvements, but certainly, in view of the marked difference between Alcoa and its two competitors in the scope of operations along these lines, the chances are greatly in favor of Alcoa's success.

The maintenance of dividend payments is necessary to insure a stable credit position. Alcoa, alone, has a substantial amount of preferred stock outstanding upon which it must pay dividends before the common stock can share in earnings. Alcoa's obligation on preferred stock amounts to about 2.5 millions of dollars a year. However, Alcoa's earnings in recent years, as seen in Table IX, are sufficiently large to allow for the payment of liberal dividends on both its preferred and common stock, and leave substantial funds for further expansion.

In stating what has just been said, I do not mean to imply that Alcoa's earnings represent an excessive return on investment. Nor are Alcoa's earnings per dollar of net worth or per dollar of gross revenue nearly as favorable as Kaiser's. However, Kaiser's showing in the buyers' market, which began in the summer of 1949, is not likely to be quite as strong as in the previous sellers' market. The economies of marketing, incident to selling a single product—sheet—will not be available when the planned diversification of output is instituted. Nor will all products necessarily afford the same mark-up and high return enjoyed from sheet sales. And, the increased burden of newly purchased but unpaid for plants, plus the effect of past economies in research, marketing and advertising, may cause the comparative diminution of profits in the future. As for Reynolds, the earnings of that company have lagged significantly behind Kaiser's, and give slight encouragement to a credit picture that is none too bright. What is of prime importance is that Alcoa's high proportion of the dollar volume of total gross earnings, even after the payment of dividends, leaves that company with much greater reserves for ready reinvestment and expansion than are possessed by its competitors.

Of course, the possibility of new investment capital entering the industry to the benefit of Reynolds and Kaiser, may serve to offset Alcoa's apparent credit advantage. However, the growth of the post-war aluminum industry has been accomplished almost wholly without the influx of private investment capital. The only stock issue that has been floated was that of Kaiser, in 1948, which netted some

$8,000,000, of which more will shortly be said.

The reluctance of investment funds to enter into competition with Alcoa is evidenced by the extraordinarily liberal terms which were finally offered by War Assets Administration in disposing of its most desirable aluminum facilities. True, now that some competition has been generated, the restraint to investment in the industry may not be as great. But, the financial position of Kaiser, and particularly that of Reynolds, does not make them outstandingly attractive opportunities, and, in any event, Alcoa is in the market with a present potential that far outdistances each of them.

Indeed, the Government has even contended that only by Alcoa's aid was the stock issue of Kaiser, mentioned above, made possible. But, to my mind, the evidence wholly fails to sustain this somewhat startling allegation. The inference drawn by the Government is created by the fact that First Boston Corporation agreed to float the Kaiser stock issue, and that this same corporation has acted on behalf of Alcoa in the past, and has its largest block of shares in the hands of the Mellon family who also possess large holdings of Alcoa stock. However, the Mellon interest in First Boston is entirely non-voting, and there are no common officers or directors between Alcoa and First Boston. The evidence refutes the proposition that anyone connected with Alcoa discussed the underwriting with Kaiser or First Boston, and supports the conclusion that the latter company was brought into the transaction by Dean Witter & Co., a San Francisco investment house, which Kaiser first approached. Nor does the evidence establish any improper relationship between the underwriting and the contracts Kaiser had previously entered into with Alcoa regarding bauxite or patents. The Government's contentions in this regard are wholly without foundation.

Before passing from the subject of finances, it is desirable to discuss not only the indicia respecting the long-term expansion potential of each company, but also the ability of each to survive in times of temporary market recessions. The effect of difficulties of this nature are reflected in the experiences of Reynolds in 1946 and 1947. A temporary decline in orders reduced Reynolds' cash account from 17.2 millions of dollars in October, 1946, to 6.6 millions by June, 1947. The company was obliged to increase its bank loans, and even shut down the Longview reduction plant, because of insufficient working capital. Eventually, Reynolds sold for about $12,000,000 approximately 50% of its interest in its formerly wholly owned subsidiary, Robertshaw-Fulton Controls Company, to repay the loans. When demand for aluminum products suddenly rose again in the latter part of 1947, the shutdowns left Reynolds with insufficient metal to fully exploit its opportunities. As Mr. Reynolds testified, "We just got whipsawed that year."

Kaiser's experience during this period shows that its sales fell off considerably more than the average of the industry, but it shut down no plants. Alcoa seems to have weathered the crisis without any serious ill effects.

In the summer of 1949, the aluminum industry again experienced a decline in business. Diversification of products enabled Kaiser to maintain a proportionately greater share of the market than it had been able to do in 1947. Reynolds faced the additional problem of a strike at some of its plants at the end of the summer. As a result, the cash accounts of these companies, on September 30, 1949, had decreased some 43% of their December 31, 1948, totals. On the other hand, Alcoa's cash account increased some 60% in the same period.

Nevertheless, it is impossible to find that Reynolds and Kaiser are presently in financial danger as a result of a shortage of working capital. The working capital ratios of all three companies range from 2.5 to 3 and do not indicate a fatal weakness on the part of any one of the companies. Moreover, the provision permitting Rey-

nolds and Kaiser to pay part of their debt to the Government in aluminum pig or ingot is an important stabilizing factor. In periods of stress it permits the reduction of inventories and the conservation of cash. However, in regard to market position it is not so favorable. The Government stockpile cannot be considered truly a part of the market because metal so acquired cannot generally be disposed of without approval of Congress, and it is not releasable except on order of the President for purposes of common defense. 50 U.S.C.A. §§ 98b, 98d. To the extent that Reynolds and Kaiser divert metal to this purpose, Alcoa can strengthen its position in the ordinary consumer markets. Strong positions in that market, rather than reliance on the Government, seem to me to be something that effective competition requires. Under existing agreements, and with reference to current pig prices, an amount of pig representing some 11% of Reynolds', and 7% of Kaiser's, 1948 primary production might be disposed of to the Government in 1950. Of course, the demands of the stockpile might even exceed these amounts. In any event, it should be borne in mind that although the stockpiling privilege is a significant asset in the field of financing, the advantage for purposes of competitive activity may be largely diminished to the extent that it acts so as to reduce Reynolds' and Kaiser's operating strength in the consumer markets.

In concluding this subject, it is sufficient to say that the financial data before me show Reynolds and Kaiser to be capable of carrying on their operations with fair success under market conditions reasonably foreseeable. Nevertheless, Alcoa's financial strength is of a high order of superiority, and to the extent that the aluminum industry is considered an expanding one, the potentialities for Alcoa's growth outdistances any expectations which may be held for the other two companies.

### Patents

As appears in the record, the matter of patents, owned or controlled by a corporation, comprehends not only the existence of patents as a potential corporate resource, but also the manner by which the inventions are supplied to, or withheld from, the rest of an industry with the purpose or design of exploiting the same in order to improve the market position of the patent owner.

At this point, it will be enough to review the patent portfolios of the three integrated producers to determine the resource values which the nature of the respective portfolios suggests.

The manner in which Alcoa has allocated its patents among other producers is of some evidentiary value in the formation of judgment as to whether Alcoa is seeking to maintain its adjudicated monopoly. But this matter can be reserved until I have reviewed Alcoa's entire relations with War Assets Administration in regard to the disposal program, a subject upon which inferences pertaining to intent largely depend, and as to which patent disposition constitutes an integral part. In the discussion about to be had, I shall limit myself to general conclusions respecting the positions held by Reynolds and Kaiser as patent licensees of Alcoa. Any elaboration thereon will await, in part at least, my subsequent findings on the subject matter of intent.

The relative positions of the three producers in the patent field depend not only on the number of valid patents held by each company, but also on the competitive qualities of the particular patents involved.

As of September 30, 1949, Alcoa owned 775 patents; was exclusive licensee under 57 additional patents, and was a non-exclusive licensee of more than 125 others.

The chief patent counsel on Alcoa's legal staff was Andrew Schmeltz. At the time of trial he subdivided his company's patent portfolio into three categories. The first was denominated as pertaining to the basic industry. It includes patents bearing on the production of alumina, aluminum, and mill products, and those concerning aluminum base alloys. In the second class are patents on the production of end-products, together with miscellaneous patents, such

as those covering matters relating to the joinder of metal parts and the treatment of aluminum surfaces. The third category consists of patents relating to magnesium. On this basis, the evidence shows the use that Alcoa makes of its owned patents, its licensing policy, as well as the patents licensed exclusively to Alcoa.

| | Patents Owned | | | Patents Exclusively Licensed | | |
|---|---|---|---|---|---|---|
| | Total No. | No. Used by Alcoa or Someone Else | No. Licensed | Total No. | No. Used by Alcoa or Someone Else | No. Sub-licensed |
| Basic Industry | 321 | 76 | 50 | 2 | 1 | 1 |
| Peripheral Industry | 435 | 154 | 89 | 12 | 5 | 1 |
| Magnesium | 19 | 6 | 2 | 43 | 0 | 0 |
| Total | 775 | 236 | 141 | 57 | 6 | 2 |

Although only 10 of 179 aluminum base alloy patents (included in the basic industry category) are presently licensed, Alcoa is contractually obligated to license all but two to Reynolds and Kaiser.

The total number of licensees and sub-licensees of Alcoa is about 730, and the number paying royalties to Alcoa is some 500 or more. Very little appears in the record relating to Alcoa's policy in granting licenses. From the evidence at hand, it may be said that Alcoa does not discriminate among potential licensees. If a license on a particular patent is issued, other manufacturers performing functions in the industry similar to those of the original licensee are permitted to secure licenses on equivalent terms. On some patents, no licenses are granted, but these seem to relate exclusively to minor process improvements which Alcoa considers to be part of its operating knowledge.

The above table discloses that the bulk of Alcoa's patents are not presently in use. Because this fact might suggest that Alcoa, by means of patent domination, is engaged in obstructing the introduction of technological improvements in the industry, Schmeltz offered several explanations. These tend to show that this is a normal occurrence both because of the extensive nature of Alcoa's research operations, and because of the peculiarities inherent in the aluminum industry.

Alcoa's administrative organization is such that some 19 officials in charge of various departments are authorized to direct that patent applications be made. These men, to a large extent, must necessarily indulge in speculation as to the merits of particular discoveries and devices coming before them, and the safest course, even in doubtful cases, is to authorize the patent work. In some instances, applications are filed simply to encourage young inventors. Also, to insure freedom of action with respect to the company's own developments, applications are often filed before it can be known whether a patent would ultimately be warranted.

Moreover, in a mature industry like aluminum, patents are more apt to have a specific nature than a broad coverage, and, as such, quite likely to fall by the wayside because of the introduction of some other more desirable specific items. For the same reason—and especially among patents governing chemical processes and compositions of matter—it is sometimes necessary to file a great number of applications in order to cover what is really one laboratory development, in which event many consecutively numbered patents may issue, and of which only a small proportion will find use. Thus, of three sets of consecutively numbered Alcoa patents, totalling 64, only one is now employed. Some patents are alternatives, and others are outmoded design patents. Schmeltz testified that no patents were acquired to intimidate trade or competition, and cited for support the fact that only twenty-one patents were acquired by purchase from non-Alcoa inventors, in six of which an Alcoa employee held a joint interest.

As many as 51 of the 57 patents exclusively licensed to Alcoa are not currently in use. However, 43 of these are bare paper rights, being licenses which permit the application in the aluminum field of magnesium patents formerly owned by Alcoa, which rights were reserved as a routine matter when the patents were assigned. Of the remaining eight, one resulted from an interference, one resulted from a reservation in an assignment similar to the magnesium licenses, four came in packages along with other patents which Alcoa did desire to use, one was a design patent on an ashtray, and one was acquired in a grant-back under a clause requiring a licensee to grant to Alcoa an exclusive license on any improvements the licensee might patent. Schmeltz testified to the innocence of Alcoa's purpose in acquiring these exclusive licenses, and also pointed out that of the 57 patents so licensed, only two relate to the so-called basic industry.

The witness not only categorized Alcoa's portfolio as illustrated in the above table, but also asserted that only eleven of Alcoa's patents were competitively significant. His criteria of selection involved a two-fold standard—Alcoa must use the patent to the extent of five million pounds of aluminum per year, and the patent must be without an alternative providing a like result in quality and quantity at a comparable cost.

Schmeltz testified that there were an additional two patents satisfying the second, but not the first, standard. Of these eleven patents, four relate to the production of alumina, one to the production of aluminum fluoride which is used as a solvent in the reduction pot, three to mill products, and three to alloys. No doubt Schmeltz's first criterion serves so as to exclude patents upon which numerous small, non-integrated operators are dependent, and as licensees pay royalties. Accordingly, in evaluating Alcoa's patent resources, exclusive attention will not be focused on these eleven or thirteen patents. The remainder of Alcoa's large portfolio must likewise be considered. But, since these patents will frequently be mentioned in my subsequent recital of the disposition made of Alcoa's

patents which accompanies the examination into Alcoa's intent to maintain its monopoly power, I will set down here a brief statement of their nature and importance.

1 and 2) Combination process for extraction of alumina from ores and recovery of alumina, also known as lime-soda-sinter process, invented by Brown, Pat.Numbers 2,375,342 and 2,375,343, both expiring May 8, 1962. These patents are vital factors in the production of alumina from low-grade (high silica content) bauxite at competitive cost. Essentially, what is accomplished is the recovery of aluminum from the waste product of the Bayer process, the first stage in the production of alumina from any grade of bauxite. This patent was developed by Alcoa at a considerable research expenditure and results in a saving of approximately from $10 to $12 per ton of alumina produced from low-grade bauxite.

3) Continuous digestion process, invented by Turner et al., Pat. No. 2,107,919, expiring February 8, 1955. This process makes it possible to dissolve alumina out of bauxite continuously, rather than in batches, resulting in considerable economies.

4) Alumina recovery process, also known as the starch patent, invented by Brown, Pat. No. 2,280,998, expiring April 28, 1957. In the production of alumina, a sodium aluminate liquor is produced by the use of caustic soda. The waste component of that liquor is known as red mud, and this process makes it possible to remove the red mud much more rapidly than was heretofore possible, again resulting in marked savings.

5) Method of manufacturing fluoride materials, also known as fluoride patent, invented by Gitzen et al., Pat. No. 1,937,885, expiring December 5, 1950. This is a patent on a dry method of producing the aluminum fluoride required as a solvent in the reduction stage of aluminum production, as contrasted with the earlier wet method. Its advantages are higher quality and lower costs.

6) Direct chill casting process, invented by Ennor, Pat. No. 2,301,027, expiring November 3, 1959. In the casting of aluminum alloys the principal difficulty has always been that as ingot cooled the alloying

ingredients tended to separate themselves from the aluminum mass. The direct chill, or "D.C." process, as it is called, is a method whereby at the same time that the metal is cast it is cooled so rapidly that the metallurgical properties of the ingot remain constant and normal throughout. It was the first process to yield alloys sufficiently sound metallurgically to justify the use of rolling mills of relatively high speed and capacity, and it is especially important in the casting of large ingots.

7) Stabilizing treatment, invented by Nock et al., Pat. No. 2,137,624, expiring November 22, 1955. Cold rolling aluminum-magnesium alloys have a tendency to soften with age. This patented process prevents such softening, and thus assures the customer of uniform quality as to physical properties.

8) Clad product, invented by Brown, Pat. No. 1,997,165, expiring April 9, 1952. A clad product is in general one consisting of a base material, furnishing the shape and strength of the object, upon which is applied a coating of aluminum. There is a large market for such products where the cladding is of unalloyed aluminum, and such products are unpatented. This patent is directed to the sort of product in which aluminum alone will not serve as a good protective coating, but rather the base material requires cladding by a particular aluminum alloy. The whole field of alloying ingredients in connection with clad products is covered by the patent.

9 and 10) Two patents on free cutting alloys, one known as the 11S patent, the other as the R-317 patent, both invented by Kempf et al., Pat. No. 2,026,548, expiring January 7, 1953, and Pat. No. 2,047,873, expiring July 14, 1953. A free cutting alloy is one which does not have an undue number of hard spots which damage the edge of a cutting tool; when such an alloy is machined it comes off in chips which break up with reasonable ease and does not throw spirals that are likely to injure persons working nearby. These two alloys are produced by the addition of lead and bismuth, and are commercial alternatives.

11) Aluminum base alloy, invented by Stroup, Pat. No. 2,336,512, expiring December 14, 1960. Alloys of aluminum containing magnesium have a tendency to oxidize when molten. Such oxidation results in a loss of magnesium, and also creates a dross which adversely affects the quality of the alloy. This patent covers the addition of a small amount of beryllium to such alloys, and this greatly reduces the oxidation.

Schmeltz testified that the two patents he excluded because they did not meet the five million pound test were Dix and Kempf, Pat. No. 1,945,737, for the heat-treatment of aluminum-magnesium alloys, and Edwards, Pat. No. 2,084,327, for Duplex reflector sheet. The total 1948 production under these two patents was about four million pounds.

There is slight evidence that pertains to the validity of Alcoa's patents. It appears that none of them has been held valid and infringed by an appellate court of the United States, or held valid and infringed by a District Court of the United States after litigation of the issues of law and fact, and not reversed on appeal. This, of course, applies to the thirteen patents above discussed. Indeed, the last suit for infringement brought by Alcoa was in the year 1936. Bearing on validity, other evidence reveals the difficulty which Alcoa experienced before it convinced the Patent Office that its starch process was patentable, and Donald Rhoades, Kaiser's Vice President and General Manager, testified that he was surprised that this patent existed because he thought "the man on the street" knew about the effect of starch. In addition, at least some members of the War Assets Administration patent section believed that the D.C. and fluoride patents were invalid. Nevertheless, because of the absence of positive evidence to the contrary, all of Alcoa's patents are entitled to the presumption of validity.

Turning now to patents owned by other parties, it appears that Reynolds owns five patents which relate to alumina and aluminum production, these being "partly in use", and ten, relating to sheet and allied products, and of these only one is substan-

tially employed. Kaiser apparently owns no patents, and is exclusively licensed in the aluminum field under one patent, relating to a light deflector screen, which patent it uses. In addition, both Reynolds and Kaiser are licensed under such Alcoa patents as are presently needed in the operations of those companies.

The patents on Soderberg reduction pots are apparently the most important, if not the only important, grants in the industry that are not owned by Alcoa. The nature of this process, and its relation to high purity pig, have previously been considered under "mill costs". The basic Soderberg patents have expired, but a number of improvement patents, upon which competitive practice of the process depends, are now outstanding. All three producers have some Soderberg installations.

In 1924, Alcoa acquired shares representing a little more than a one-half interest in Det Norske Aktieselskab for Electrokemisk Industri, the Norwegian company which owned, and still owns, the controlling Soderberg patents. On the formation of Aluminium Limited of Canada, in 1928, and which took over the administration of Alcoa's foreign properties, the stock just mentioned was transferred to it. Limited sold all but 100 shares, which it inadvertently retained, in December, 1934, to Sejersted Bodtken, and subsequently the additional shares were also sold.

Alcoa at one time held an exclusive license under these patents, but in 1940 it was modified to become non-exclusive, and today both Reynolds and Kaiser are licensees thereof. Since 1941, Limited has been exclusive licensee for the Dominion of Canada. Electrokemisk has uniformly reserved the rights to any improvements discovered by the licensee, merely permitting use by the discoverer of such improvements during the term of the license. In all cases, subject to certain provisos, the basic royalty rate is one mill per pound of aluminum, except that Alcoa pays no royalty for its use of the process in the Alcoa, Tennessee, plant.

Some indication of the value of Alcoa's patent position may be found in the statistics detailing the royalties received and paid by Alcoa. The following table, constituting Defendant's Exhibit 174, supplies this information on a cash basis.

### Amount of Royalty Received and Paid by Alcoa

#### 1941 Through June 30, 1949.

| Year | Received | Paid |
|---|---|---|
| 1941 | $ 198,142.01 | $ 147,869.87 |
| 1942 | 290,823.90 | 215,643.86 |
| 1943 | 239,272.61 | 324,319.42 |
| 1944 | 277,323.48 | 433,919.30 |
| 1945 | 213,590.19 | 239,863.03 |
| 1946 | 194,373.76 | 438,515.85 |
| 1947 | 212,220.58 | 346,299.74 |
| 1948 | 371,480.16 | 376,701.15 |
| 6 months ending June 30, 1949 | 436,184.28* | 114,797.07 |
| Totals | $2,433,410.97 | $2,637,929.29 |

* Includes amount received in January, 1949, from Reynolds Metals Company on account of royalties accruing from December 1, 1947, to December 31, 1948, on licenses granted in 1948 effective December 1, 1947. The royalties payable by Reynolds Metals Company are shown on an accrual basis in Defendant's Exhibit 175.

In the years 1942 to 1948, Electrokemisk received an average payment from Alcoa of $88,500. per year.

Defense Exhibit 175, as follows, shows the royalties paid by Reynolds and Kaiser to Alcoa, on an accrual basis:

Patent Royalties Accruing to Alcoa
From
Reynolds and Kaiser
1947—June 30, 1949

1947

|  | Alumilite* | Alloy | Casting | Clad Products | Total |
|---|---|---|---|---|---|
| Reynolds | $ 2,505.78 | $   594.77 | $ 9,947.34 | $ 4,626.27 | $ 17,674.16 |
| Kaiser | — | 852.17 | 4,124.87 | 235.88 | 5,212.92 |
| Total | 2,505.78 | 1,446.94 | 14,072.21 | 4,862.15 | 22,887.08 |

1948

|  | Alumilite* | Alloy | Casting | Clad Products | Total |
|---|---|---|---|---|---|
| Reynolds | 7,710.33 | 13,999.26 | 101,829.89 | 102,344.38 | 225,883.86 |
| Kaiser | — | 16,026.00 | 53,123.55 | 2,675.93 | 71,825.48 |
| Total | 7,710.33 | 30,025.26 | 154,953.44 | 105,020.31 | 297,709.34 |

1949 to June 30

|  | Alumilite* | Alloy | Casting | Clad Products | Total |
|---|---|---|---|---|---|
| Reynolds | 945.80 | 5,719.79 | 77,688.37 | 23,792.30 | 108,146.26 |
| Kaiser | — | 4,072.82 | 38,243.30 | 2,452.56 | 44,768.68 |
| Total | 945.80 | 9,792.61 | 115,931.67 | 26,244.86 | 152,914.94 |

Total 1947—June 30, 1949

|  | Alumilite* | Alloy | Casting | Clad Products | Total |
|---|---|---|---|---|---|
| Reynolds | 11,161.91 | 20,313.82 | 189,465.60 | 130,762.95 | 351,704.28 |
| Kaiser | — | 20,950.99 | 95,491.72 | 5,364.37 | 121,807.08 |
| Total | $11,161.91 | $41,264.81 | $284,957.32 | $136,127.32 | $473,511.36 |

In addition to its receipt of royalties, certain Alcoa license agreements, wherein Reynolds or Kaiser are the licensees, require these companies to grant back to Alcoa licenses of any improvements which they may make and patent on the Alcoa patents. I propose to defer evaluation of the reasonableness of these provisions until discussion of Alcoa's intent with reference to the maintenance of its monopoly. The nature of the disposition of patents to Reynolds and Kaiser will there be more amply described.

From the standpoint of royalties alone, the advantage of Alcoa over Reynolds and Kaiser is not presently of competitively important dimensions. Of course, reve-nues received by Alcoa, which constitute cost items of its competitors, are of double import, but even so the amounts invloved are trifling. The income seems only to offset Alcoa's own royalty expense.

From the record before me, it is largely a matter of speculation to determine how great a deterrence to further competition the comparatively enormous patent portfolio of Alcoa actually is. As conditions now stand the burden imposed on Alcoa's competitors has not been shown to be unreasonably heavy. And, as to potential competitors, the matter assumes little importance because other more crucial factors, later to be analyzed, more effectively deter the entrance of new

* A process for surface treatment of aluminum.

firms into this industry. Nor from my examination of the number and nature of Alcoa's patents, or the operations of the aluminum industry in the period under review, can I find evidence that Alcoa's patents have served as a means of regimenting this industry. Accordingly, I conclude that Alcoa's dominating position in the patent field does not, at present, constitute a serious threat to effective competition.

On the other hand, I am more concerned with the implications incident to the comparatively large sums presently expended annually by Alcoa for research and development. The potential dangers to competition which this fact suggests have already been adverted to in my discussion of financial resources, and need not here be repeated. Of a similar nature, are the grant-back provisions contained in certain Alcoa licenses, the discussion of which awaits further elaboration of Alcoa's patent licensing program in the "intent" section.

### Aluminium Limited

The origin of Aluminium Limited has been briefly described in an earlier portion of this opinion. In the creation of that company out of Alcoa-owned properties, the stockholders of Alcoa received ratable shares in Limited, and this common ownership has continued, though to an ever-lessening degree, to the present day.

The history of Limited, as well as its relations with Alcoa, during 1928 to 1940, were meticulously set forth by Judge Caffey in United States v. Aluminum Co. of America, D.C.S.D.N.Y., 1941, 44 F.Supp. 97, 253-277. He found no improper relationship between the two corporations, and further, that the activities of neither of them were dominated, or even influenced, as the result of common stock control of the companies.

The Court of Appeals affirmed these findings, and denied plaintiff's prayer that those who own shares in both Alcoa and Limited should dispose of their holdings in one or the other. United States v. Al-

uminum Co. of America, 2 Cir., 1945, 148 F.2d 416, 441-42, 447.

Alcoa has contended that the law of the case is such as to preclude present consideration of the relationship of Alcoa and Limited. It is admitted, of course, that this would not be true if facts occurring since 1940 have substantially altered that relationship so that its effect on competition is more inhibitive than that which existed in 1940. If evidence to this effect existed, I could not ignore the occurrence of any such change in circumstance.

To a certain extent, as will subsequently appear, conditions have so changed as to make Limited an important factor in the domestic economy. Its competitive position constitutes a potential limitation on the growth and stability of both Reynolds and Kaiser.

The purview of my examination in this proceeding, in certain aspects, must be definitely broader than that which was demanded in prior phases of this litigation. The earlier hearings were concerned with what was legal and illegal in Alcoa's activities prior to 1940. Its relations with Limited were not held to be unlawful, but it was finally determined that Alcoa itself had monopolized the domestic ingot market in contravention of the Sherman Act. At that time, Alcoa was the only producer of primary aluminum in the United States, and its relationship, to Limited, a Canadian producer, was not then, a condition upon which the unlawfulness of Alcoa's position turned. Thus, all that the law of the case implies is that a conspiracy or understanding between Alcoa and Limited, which constituted an additional violation of law, was non-existent.

The function that devolves on me is to see to it that effective competition shall be established in the aluminum industry; not only for the present but for the foreseeable future as well. The legality of the past exercise of the Alcoa-Limited relationship does not, of itself, insure that it will continue indefinitely. It cannot be doubted that whatever power may exist in the hands of Alcoa or its stockhold-

ers to secure a sympathetic management of Limited is a resource which might well influence the market position of the two companies. The greater the assistance that Limited is capable of extending to Alcoa, if it be so disposed, the more potent the danger which overhangs the future development of Reynolds and Kaiser. If potential competition among them and Alcoa will be encouraged by the removal of this threat, it is a matter that cannot be disregarded. A community of interest between the two corporate enterprises is comparable, in some respects, to the existence of ties of blood between two closely related individuals.

■ Thus, I am required to appraise the resource value which is implicit in the Alcoa-Limited situation. Moreover, as previously indicated, the action of the Court of Appeals in not requiring stockholders of both Alcoa and Limited to dispose of their shares in one or the other of the companies, does not foreclose me from taking such action in the premises as circumstances require. If, in the first instance, the relationship between Alcoa and Limited had been proved to be unlawful, the liquidation of stock holdings could have been decreed immediately. Inasmuch as Alcoa's relations with Limited were not condemned, plaintiff's prayer for remedial action with respect to such stock holdings, was denied. The appellate court decided, only, that the relation between Alcoa and Limited did not then, in itself, warrant drastic action. But my province, I repeat, is to decide whether, under present conditions, Alcoa's monopoly has been destroyed, and if not, to take such steps as will nullify its continuance.

The Government contends that the stock control of Limited, which rests in the hands of Alcoa's stockholders, constitutes a threat to effective competition among Alcoa, Reynolds and Kaiser. It also claims that the intimacy between Limited and Alcoa has enabled the latter to secure advantages from Limited which are unavailable to Reynolds and Kaiser. In addition, it is alleged that the production of Limited has been used as a substitute for Alcoa's own output so as to reduce Alcoa's market position in order to forestall divestiture by this Court. These assertions require me to say whether they are sustained by the proof, and if so, to consider in what ways, if at all, the close association of the two companies has been, or easily may be, exploited.

Aluminium Limited is the largest producer of aluminum in the world. The major portion of its reduction facilities are located in Canada. It has additional establishments in Norway, Sweden, Italy and India. In 1948, the Canadian plants, though the year was one of unprecedented water shortage in Canada, produced 734,-131,800 pounds of primary aluminum. Nathanael V. Davis, President of Limited, estimated that the capacity of his company's Canadian installations, assuming the availability of power, is approximately 992,000,000 pounds per annum.

Unlike domestic production companies, Limited is essentially a supplier of ingot rather than a producer of semi-fabricated or fully fabricated articles. By weight, two-thirds of its total sales are of primary and alloy ingot, the remainder being mostly semi-fabricated products. Limited's largest fabrication facilities are in England, followed by Canada and Switzerland. Additional plants are to be found in Norway, France, Brazil, Mexico and South Africa. The principal bauxite reserves of Limited are in British Guiana, Jamaica, British West Indies, the Gold Coast of West Africa, and French West Africa.

The latest available financial data of Limited appears in the statements of that company for the calendar year 1948. These sums are given in Canadian dollars. As therein set out, the net worth of the company is 123.8 millions of dollars, its total assets 334.6 millions, and its long term indebtedness 141 millions. The ratio of current assets to current liabilities is 2.9. In 1948, Limited earned 47.8 millions before deductions for income taxes, 28.1 millions after such taxes, and 17.5 millions after deductions for both taxes and dividends. The company spends approximately 1.5 millions per annum for re-

394

search and development. This data clearly shows that Limited is in a relatively strong financial condition, and fully capable of carrying on extensive operations, and doing so effectively.

The dissemination of joint stockholdings in Alcoa and Limited, subsequent to the trial before Judge Caffey, has been an exceedingly slow process. Today, there reside in the hands of Arthur V. and Edward K. Davis, Roy A. Hunt, and six members of the Mellon family 46.43% of the outstanding common stock of Alcoa, and 44.65% of the outstanding common stock of Aluminium Limited. When the holdings of Doris Duke and the Trustees of the Duke Endowment are added to these percentages, it is seen that these eleven stockholders possess a majority of the shares in both companies. Considering only the interests of the Davis, Hunt, and Mellon families, it is obvious that their control over both Alcoa and Limited is complete. There are additional stock holdings of other members of the above families not included among the nine major stockholders. Moreover, the common stock of these companies is rather widely held—Alcoa having a total of 8,864 stockholders, and Limited 3,559. The companies have outstanding 4,890,733 and 3,722,050 shares respectively. Only 487,300 shares of Limited are held by Canadian residents. It would be naive to suggest that because the predominant nine shareholders do not have a majority of the stock in either company they lack the power to control either or both. In view of the long association of these interests and their close connection with the aluminum industry, together with the widespread distribution of the remaining stock interests, the concerted action of the nine, if occasion arises, may reasonably be anticipated, whereas concerted action on the part of other stockholders is unlikely. To permit this potential power to continue where it now resides, and thus supplement Alcoa's relatively large resources, may constitute a hazard of the utmost danger to the competitive efforts of Reynolds and Kaiser.

The competitive significance of Limited's presence in the domestic ingot market is incomparably greater than under the conditions which were reviewed by Judge Caffey. Throughout the ten year period from 1928 through 1937, it was only in the last of those years that Limited's "mill costs" to produce primary aluminum were lower than Alcoa's, and in that year the difference was less than a cent per pound. During the same period the tariff rate on aluminum ingot importations into the United States was five cents per pound until 1930, four cents per pound thereafter, and it was eventually reduced to three cents in November, 1938. Judge Caffey also found that it had long been the practice in the aluminum industry for the seller to prepay the tariff. United States v. Aluminum Co. of America, D.C.S.D.N.Y.1941, 44 F. Supp. 97, 262, 268. Accordingly, Limited's exports of ingot to the United States during most of this period were a negligible portion of its total sales. It is not surprising, therefore, in view of the substantial cost advantage Alcoa enjoyed in the United States, and the preferential tariffs accorded Limited within the British Empire, that Judge Caffey concluded that the United States was not a logical market for Limited's production.

Today, the situation is entirely different. The evidence relating to Limited's latest "mill costs" cover the first six months of 1949. Placing these figures on a basis believed comparable to those given for the three domestic producers in Table VII, I find that Limited's "mill costs" during the above period averaged 8.28 cents per pound. Although this figure reflects the cost to produce ingot, which is the form of most of Limited's output, and which involves an additional operation not reflected in the pig costs of the domestic producers, the additional expense is too trivial to be taken into account. Adding the current tariff on ingot, which is now two cents per pound, a one cent reduction having occurred in 1948, to the above mentioned "mill costs", a total of 10.28 cents per pound is obtained. This figure, which is below Alcoa's "mill costs", is three-quarters of a cent per pound below Reynolds' 1949 costs, and one and one-third cents below those of Kaiser. Limited's "mill costs"

for the prior two years are consistent with the 1949 differentials.

In addition, the Canadian plants enjoy the advantage of low transportation costs to the industrialized northeast portion of the United States. This places a serious handicap upon Kaiser, all of whose reduction plants are in the far northwest, and, to a lesser extent, burdens Reynolds and Alcoa who have only a part of their facilities so located. Moreover, the impact of Limited's competitive activities within the United States would no longer be solely directed at a company in which the majority shareholders of Limited likewise possess majority control, but also at two new organizations in whose preservation or success they presumably have no interest. The above conditions persuade me that the rationale which so well supported Judge Caffey's conclusions is no longer persuasive.

In order fully to appreciate the real import of Limited's competitive potentialities in the United States the disposition of that company's Canadian output should be examined. Out of an annual production of some 800 million pounds of aluminum products, only 110 million are consumed in Canada. In 1948, primary aluminum ingot shipments from Canada were consigned to 37 different countries. Nearly 160 million pounds were sold in the United States.

On the other hand, the exports of primary by domestic producers are more or less negligible. This is largely due to the favorable situation in which Limited finds itself. Thus, Limited enjoys a commanding position in markets abroad, and is possessed of the ability to undertake sizeable commitments within the United States. The record does not indicate to what extent overseas demand curtails the supplies Limited can allocate to the domestic market. However, it is reasonable to surmise that as economic recovery progresses in Europe and Asia, and as Limited's foreign plants increase production, more of the large Canadian production will become available for disposal in the United States.

The activity of Limited as a seller in the United States' market is a fact materially different from the situation that was presented to Judge Caffey. When he reviewed the evidence, Limited had no sales organization in this country. United States v. Aluminum Co. of America, D.C. S.D.N.Y.1941, 44 F.Supp. 97, 271. Today, Limited has a sales agency, the Aluminum Import Corporation, a New York company organized in 1944, which employs between 55 and 60 persons. This number is the result of substantial increases in personnel, occurring in 1947 and 1948. Although Nathanael V. Davis testified that the Import Corporation is vigorously prosecuting sales in the United States, the Government contends that the bulk of Canadian metal is acquired by Alcoa. Elaborating upon this premise, it says that Alcoa, by virtue of its intimate relationship with Limited, enjoys advantages in securing metal from that company that are unparalleled by its competitors. Indeed, the Government's argument is that Alcoa actually controls the distribution in the United States of aluminum from Canada.

The following chart, Table X, contains the sales made by the Aluminum Import Corporation in the United States from 1946 through September 1949.

Table X

## Aluminum Import Corporation
### New York

Sales of Virgin Aluminum Ingot and Pig to Customers in the United States, 1946 - 1948 and First Nine Months of 1949
in Pounds

| Year | Total Sales | Sales to Alcoa | Sales to Reynolds | Sales to Kaiser | Sales to Others |
|---|---|---|---|---|---|
| 1946 | 58,917,073(100%) | 6,000,000(10.2%) | 50,117,203(85.1%) | 0 | 2,799,870(4.7%) |
| 1947 | 24,475,924(100%) | 23,540,370(96.2%) | 54,763(.2%) | 24,670(.1%) | 856,121(3.5%) |
| 1948 | 159,575,433(100%) | 104,142,363(65.2%)* | 10,588,034(6.6%) | 5,251,857(3.3%) | 39,593,179(24.9%) |
| First nine mos.—1949 | 90,774,237(100%) | 71,078,881(78.3%) | 4,971,184(5.5%) | 3,889,536(4.2%) | 10,834,636(12%) |
| Total | 333,742,667(100%) | 204,761,614(61.4%) | 65,731,184(19.7%) | 9,166,063(2.7%) | 54,083,806(16.2%) |

* Including shipments in 1948 aggregating 4,564,386 lbs. to others than Alcoa which were made at Alcoa's direction and charged against the contract dated December 12, 1947 with Alcoa for the sale of 300,000,000 lbs.

In addition, within this country the Import Corporation sold some 41.5 million pounds of scrap during the same period. Of this quantity, Alcoa purchased approximately 92%, the remainder going to companies other than Reynolds and Kaiser.

The major deliveries of aluminum by Limited to Alcoa have occurred pursuant to an agreement between Aluminum Import Corporation and Alcoa entered into December 12, 1947. This contract called for the sale of 300 million pounds of virgin aluminum between April 1, 1948, and March 31, 1950, in approximately equal monthly deliveries. A subsequent agreement for the purchase of an additional 20 million pounds was cancelled after shipments of some 3 million pounds had been made pursuant to its terms. The original price was $.14 U. S. currency per pound, delivered, duty paid, f. o. b. cars, at plants at main United States' Great Lakes ports, or Edgewater, New Jersey. On all deliveries to other points to which the cost of transportation is $.0075 U. S. per pound or in excess thereof, an allowance of $.0075 U. S. per pound is made to Alcoa.

The Import Corporation reserved the right to raise the price on sixty days notice, Alcoa having the option to cancel the contract within thirty days of receipt of such notice. In addition, if the price were out of line with Alcoa's price for like material, Alcoa could request negotiation of an adjustment, and failing such adjustment, could cancel the contract. In fact, the price has been raised twice and is now $.16 U. S. currency per pound. Terms are net cash in New York thirty days from invoice, invoice to be dated per bill of lading. Apparently, also, in September, 1948, it was agreed that shipments to Alcoa would be accelerated on payment of a slight premium.

The proof indicates that Alcoa made the agreement because it anticipated a demand greater than that it could itself supply. Limited considered the contract large and advantageous, and in 1947, would have signed a similar contract with any other responsible purchaser. However, in the case of Reynolds, the credit position of that company might have warranted the inclusion of harsher terms.

On the whole, I cannot find that Alcoa enjoys more favorable terms under the above contract than are generally available. The price is no different than that on orders taken from others. While Limited has changed its policy somewhat with regard to transportation allowances, it had not been shown that new purchasers are substantially prejudiced in comparison to Alcoa. It is also observable that Limited's prices do not seem to depart materially from those of our domestic producers. My conclusion is that the purchase agreement was not the product of a deliberate effort by Limited to favor Alcoa, but more accurately, was the result of Limited having ingot to sell, and Alcoa being the most ready and dependable purchaser, and, I may add, an indifference on the part of Limited as to the gains Alcoa might derive therefrom in obtaining metal during a period of acute shortage.

In addition, the record includes evidence of other contracts between Alcoa and Limited in force during the period under review. The contracts relate primarily to sales of bauxite, and agreements for ocean transport. It has not been shown that Alcoa has received any undue benefits from Limited which would make suspect these otherwise normal commercial dealings. For this reason, I find it unnecessary further to discuss the nature of these transactions.

The outstanding feature of the foregoing recital is that Limited has large quantities of primary available for disposition in the United States. During the past few years, however, this metal has not contributed substantially toward fostering competitive conditions, because Alcoa has absorbed the lion's share. It is, I think, improper to draw an inference of favoritism from this fact alone. Nevertheless, I believe that in order properly to safeguard the public interest bespoken by the Sherman Act, it is highly expedient that there be no restraints whatever on the competitive potential which now exists from Canadian production.

It is idle to expect, as Alcoa itself suggests, that during the pendency of this litigation Alcoa would show its hand as a motivating agent in the activities of Limited. For this reason, and because so much credible testimony has been introduced in opposition, I cannot give weight to the statements in the Report of the Surplus Property Board (September 21, 1945), and reiterated elsewhere in the record, to the effect that the output of Limited was to be used as a supplement to Alcoa's own production in order that the latter should not exceed limits which would not be considered as violative of the anti-trust laws.

Nevertheless, since Limited is now a competitive factor in the domestic market, Alcoa's relationship to Limited jeopardizes the public interest to a degree not present when this case was tried before Judge Caffey. I think it too much to expect that the competition between Alcoa and Limited, now that they both participate in the same market, will be as keen and comprehensive as the Sherman Act demands. While there may be active rivalry between them for customers, since the controlling shareholders of these corporations may not prefer one of these companies over the other as the source of their dividends, it is doubtful that the stimulants to price competition and efficiency, from which the public benefits, can exist to the same degree as would be the case if these firms were wholly disassociated.

The sales contract which Alcoa executed at the end of 1947 is a case in point. The evidence discloses that the inventories of the three domestic producers had been steadily diminishing in the months preceding December, 1947. Meanwhile, the backlog of orders of these firms continued to increase. The outlook for 1948 was such that a serious shortage of aluminum in the United States could be anticipated. At this point, Alcoa was able to secure for itself the aforementioned large commitment on Canadian primary. As the year developed the producers enjoyed a seller's market, and aluminum metal was a scarce commodity among the non-integrated fabricators. It is not unreasonable to believe that Limited could evaluate trends as capably as any other producer, and, if so, it should have felt no pressing need to acquire a single purchaser of so much aluminum at the time it did. From this fact, it would seem appropriate that conditions be created whereby Limited will more closely scrutinize the possible effect of conferring benefits of this nature again on a presumably leading competitor.

Note must be taken of the fact that the president of Aluminium Limited, Nathanael V. Davis, a young man of 34 years, has occupied this position for almost two years. He is the son of Edward K. Davis, former president of Limited, now retired, and a nephew of Arthur V. Davis, Chairman of the Board of Alcoa, and its largest single stockholder. As a witness, the manner and ability of young Davis impressed me favorably. Nevertheless, since his own holdings in Limited are a mere 275 shares, and his uncle, Arthur V. Davis, is the largest single stockholder in Limited, owning almost ten times more shares in that company that Edward K. Davis, it is easy, and even natural, to suppose that family influences played some part in his elevation to office.

Now that Limited is a vital competitive factor in the domestic market, some cognizance of these family ties must be taken into account. Among normal individuals, blood is usually thicker than water. By this, I do not mean to impugn the integrity of any of the above named persons. Much less do I suggest that any officer of these corporations will act in the interest of only a part of the shareholders whom he serves. Experience, nevertheless, demonstrates that, while possible inpediments to competition between corporations, that are controlled by common interests, may benefit all their shareholders, such impediments may prove to be a distinct disservice to competitor companies, and the public as well. The Sherman Act is designed to prevent any such eventuality.

It has here been argued that the relationship between Alcoa and Limited is, of necessity, of an impermanent character in that some of the dominant stockholders are elderly, and that upon their deaths, wide distribution of their holdings will ensue.

The public interest cannot wait upon such contingencies. The post-war aluminum industry has not yet taken rigid form. It is most probable that, in the next few years, this industry will assume the structure and characteristics by which it will be marked for a long period of time. Reynolds and Kaiser are infants whose successful development in these formative years depends upon their ever-increasing ability to encroach upon Alcoa's long established position. This means they must be free to capitalize on such vicissitudes as may beset Alcoa, whether from strikes, droughts, or similar happenings not infrequent in this industry. If, upon such occasions, Alcoa exercises its power to secure metal from Limited and, thus supply and preserve its customers, the prospects of Reynolds and Kaiser can be obscured, if not wholly dissipated.

Alcoa need not even be the initiating agent, but rather Limited, itself, perceiving the disadvantageous circumstances which have overtaken Alcoa, may of its own accord divert a sufficient portion of its Canadian metal into the United States to frustrate the opportunities of Reynolds and Kaiser. If so, it may reap profits for its controlling shareholders that otherwise would be lost to them by virtue of the curtailed operations of Alcoa.

Together, Limited and Alcoa are in position, at any time, to restrain effectively the growth of Reynolds and Kaiser. Accordingly, inasmuch as irreparable harm can result from a delay in remedies, it is unwise for this Court to relinquish jurisdiction of this action until it is assured that the aluminum industry has been oriented in a lawful direction.

One must indulge the conviction that the control which may be exercised over Aluminium Limited by the controlling stockholders of Alcoa, is a resource of enormous importance. No matter how lawful the relations with Limited may have been in the past, were I now to ignore the potential power which resides in the nexus above described, my duties in this proceeding, as I understand them, would not be adequately discharged.

## Likelihood of Additional Producers Entering the Industry

In order to complete my review of existing competitive forces in the domestic aluminum industry, something should be said with respect to conditions which favor or inhibit the origin and development of American producers, in addition to those now occupying the field.

Occasion has heretofore been taken to note the necessity for access to a large and inexpensive power supply in order economically to accomplish the reduction of aluminum. The water power situation in this country, as presently developed, is such as to discourage the initiation of new facilities. Little, if any, additional domestic hydro-electric power is now available in the amounts, and at costs, permitting production of aluminum on a competitive basis with Alcoa, Reynolds and Kaiser.

For this reason, Alcoa's most recent plant, at Point Comfort, Texas, will depend on electrical energy generated from natural gas. Gradual increases of power, however, can be expected as scheduled developments on the Columbia River are completed by the Bonneville Power Administration. This power is lower in price than that now supplied by any other public agency. But because of the large demands made upon this supply of energy, it is estimated that some eight to ten years may elapse before more power from this source will be available for the reduction of aluminum. Alcoa controls a quantity of undeveloped hydro-electric power sites in North Carolina, but the amount that ultimately may be developed from these sources is distinctly limited.

Alcoa has made some inquiries as to the possibility of utilizing water power in Alaska. This would require the diversion of water from Canada, and officials of that country have expressed a sympathetic reaction to an arrangement of this nature. However, the problems incident to such an undertaking are so complex and numerous, that the project is of questionable feasibility. A considerable number of years would be required to complete the development. Furthermore, in order to be practicable, a

reduction plant in that locality would have to be capable of producing some 400 to 500 million pounds of aluminum.

Under these conditions, it is improbable that a new company would run the risk of engaging in an enterprise of such a speculative character. And, in this connection, one must ever remember that it is desireable that a reduction plant should not be too remote from the territories which will furnish it with an available market.

At present, it would appear that the use of natural gas as a source of power offers the more favorable prospects. Texas, Louisiana, and some localities in the Midwest are the most prolific sources of this important industrial resource. Nevertheless, the cost for power derived from natural gas is somewhat greater than that generated in the large hydro-electric developments. It may be, too, having in mind the constantly increasing demands that are daily being imposed upon our gas fields, that this source of power is not inexhaustible. Consequently, these oportunities can be attractive primarily to the present producers who can offset these higher costs with their present supplies of low priced power at other plants. A new producer would have to face many hazards seeking to compete with established facilities if he were required to rely solely upon the less economical power alternatives.

The problem of an adequate power supply has adversely affected the disposal program of the War Assets Administration. Aside from the plants successfully sold to Reynolds and Kaiser, and the St. Lawrence establishment committed to Alcoa, which is separately discussed elsewhere, the Government owned four additional reduction facilities which have not found use in the aluminum industry. One of them, at Torrance (Los Angeles), California, has been sold to the Columbia Steel Company. Its high cost of operations made it uneconomical for the post-war reduction of aluminum. The power, which was supplied it during the war, was obtained by enforcing a "brownout" in the area.

The remaining three plants are not good prospects for potential entrants into this industry. The plant at Maspeth, Long Island, New York, was turned over to the Navy for use in connection with operations of the Brooklyn Navy Yard. Practically all its equipment was removed and sold or scrapped.

Another plant at Burlington, New Jersey, was partially dismantled, but one potline apparently is still retained in stand-by condition. The rest of the facility is used as a warehouse.

The third plant, at Riverbank, California, is practically intact, inasmuch as the equipment is retained in stand-by condition. However, some pots have been moved to one side to permit the plant to be used as a warehouse. In 1948, Reynolds considered purchasing the equipment for installation in its Troutdale, Oregon, plant, but apparently abandoned the idea upon learning that additional power would not be available from the Bonneville development to supply the new facilities.

Though some equipment has been retained in these plants, the purpose of this is to provide against a possible emergency in future need for aluminum. During the war, the Maspeth and Riverbank plants were supplied fuel-generated power from local utilities. The cost was about 6.5 mills per kilowatt hour, a prohibitive expense for successsful competitive activity in a normal market. Since it was the Government's right of allocation which secured their power supply during the war, it is questionable if regardless of price, power could or would be made available to any of these three plants.

There are other factors which militate against the probability that a new domestic producer of aluminum will dare enter the field. In view of the existing structure of this industry, it is reasonably obvious that in order successfully to compete here and abroad, the new firm would require the economies which follow upon the integration of operations from the extraction of ore through the manufacture of semi-fabricated products. To build an industrial establishment of this size, at present construction costs, would necessitate a huge investment. Such firm would have to compete with Reynolds and Kaiser who have acquired choice facilities at "give-away"

prices with minor capital outlays, and with Alcoa, some of whose more recent facilities are completely amortized. Inasmuch as I am a federal judge, and not a financier of industrial projects, I can speak with no assurance of accuracy. But with such knowledge as I possess, I doubt very much that funds for the development of a new integrated aluminum company could readily be found. The present producers have pre-empted the field.

Alcoa has taken the position that if a separate integrated operator were carved out of Alcoa's present establishment, and such facilities paid for at their true value, "the newcomer would face bankruptcy almost from the day it started."

This conclusion does not stem from the inefficiency of Alcoa equipment, but rather from the disproportionate capital investment which would be required. If this be conceded, then certainly, a company which had to construct its own plants, and then attempt to compete against all the capacity now found in the industry, would have even less chance of survival.

To my mind it must be concluded that there is no likelihood of domestic competition arising in the aluminum industry, as now constituted, to challenge the present three producers. Directly, this result may have been caused by the operation of the Government's disposal program in establishing two highly favored producers, but indirectly, it arises from the difficulties encountered in restoring competition to a field so long occupied by a single firm. The very effort which was directed at making Reynolds and Kaiser competitive with Alcoa, now limits the division which might be made of Alcoa itself, inasmuch as it must be provided that each of the parts created from its establishment would be capable of competing effectively with those two firms. An assurance of such competition is hard to come by in the dismemberment of a closely integrated organism. For this reason, the status of Aluminium Limited assumes augmented importance because in that company resides a competitive potential of a magnitude greater than that which might feasibly be generated within the United States.

## Resources—Conclusions

After reviewing the respective resources of the three domestic aluminum producers, I am brought to a realization of the impressive industrial power of Alcoa. Its properties are far more extensive than those of Reynolds or Kaiser. Its financial strength enables it, if such be its desire, to take advantage of trade opportunities and expand disproportionately to its current share of the market. It ties to Aluminium Limited endow it with the ability, if it so wills, to stifle the growth of Reynolds and Kaiser, and even to impair the present stability of those companies.

In view of such circumstances, the propriety of remedial action to curtail Alcoa's monopoly potential has been established. The extent of relief necessary to guarantee effective competition poses problems of another and equally difficult character. Alcoa is a company whose efficiency is creditable, and its service to the American people, in many ways, has been outstanding. The development of Alcoa coincides with the ever-growing commercial utilization of aluminum which it has fostered, and made possible. By its efforts, this metal has continually supplanted other materials so as to provide products of superior properties. Today, the military need for aluminum makes its assured supply of critical importance to the United States.

Numerous witnesses, among them General Brehon B. Somervell, wartime Commander of the Army Service Forces, and Admiral Ben Moreell, former Chief of the Bureau of Yards and Docks and of the Civil Engineers of the Navy, have cautioned that a great disservice would be rendered the economy and security of this country if the efficiency and productivity of this industry were to be impaired. The Government, no doubt, will claim that where the mandate of the law is clear, such considerations are for the Congress and not the federal courts. But in this proceeding, in which equitable relief is sought, I am invested with broad powers and discretion, and in the absence of a clear conviction that Alcoa is, as it were, operating unlawfully, these call for an open recognition of the perils that might result from

the serious impairment of Alcoa's industrial potential in these times of international tension.

The Government contends, however, that Alcoa has continued to demonstrate such an inveterate purpose to dominate the industry as to require the application of drastic remedial measures. Since such a course may conflict with the countervailing public interest above described, it is necessary now to examine Alcoa's overt behavior so as to determine whether an "innate proclivity" to monopoly has been manifested.

### Intention

The major portion of the evidence upon this phase of the case relates to Alcoa's activities with reference to the wartime expansion of production; the post-war plant disposal; and particularly, to Alcoa's cooperation or lack of cooperation with the federal agencies responsible for the administration of those programs.

This relationship covers a period of eight crowded years, and bears on five distinct matters: (1) the war construction program; (2) cancellation of the war leases; (3) preparation of a disposal plan; (4) disposition of the St. Lawrence plant; and (5) allocation of patents. It will be more convenient to discuss the St. Lawrence matters separately, after detailing the other subjects in chronological presentation.

Before undertaking this discussion, I should say that Alcoa's manner of patent distribution has relevance to two contentions of the Government in addition to that of "intent." It has been claimed that Kaiser was able to secure financing as a result of its acquiescence in certain of Alcoa's licensing provisions. As to this, I have already stated an opinion to the contrary. Moreover, it is contended that various terms exacted by Alcoa from its licensees constitute, in themselves, improper restraints of trade. Because a particular fact may bear upon more than one of these issues, I shall first set out so much of the history of Alcoa's activities as is relevant, and then consider the implications and inferences which arise therefrom.

### (1) The Wartime Construction Program.

The heavy burden of equipping this country with sufficient aluminum facilities to satisfy the greatly expanded wartime needs fell upon Alcoa. It was not impossible for Alcoa to have done the work that devolved upon it in such manner that hindrances would exist to the development of post-war competition. For this reason, the war production program, as it comprehended Alcoa and the aluminum industry, should be examined.

In May, 1941, Alcoa responded to a request of the Office of Production Management, that it suggest a plan for providing 300 million pounds of aluminum, in addition to the 200 million pounds Alcoa believed had been, or could be, obtained by the Government from Aluminium Limited. Alcoa made the following proposals: (i) that it enlarge, as its own expense, its Alcoa, Tennessee, and Massena, New York, plants to produce an additional 100 million pounds of aluminum per annum, the Government to arrange for an adequate power supply; (ii) that the Government build and operate a reduction plant with a capacity of 200 million pounds per annum, using Bonneville power; Alcoa to construct the plant for the Government, and to manage it pursuant to a twenty-year contract. This proposed arrangement was to provide, among other things, that "if operated after the present emergency, the production from the Government plant will not be prejudicial to the privately owned plants then engaged in the industry"; (iii) that Alcoa, with the aid of a Government loan, construct, operate, and eventually own, alumina facilities sufficient to supply the new aluminum capacity, such equipment to be built either as extensions of its existing plants, or as a new establishment in the Arkansas bauxite district; and (iv) that Alcoa, by means of Government loans, undertake a substantial program for increasing its fabrication facilities.

Subsequently, on August 19, 1941, Alcoa and Defense Plant Corporation entered into a contract looking toward the construction of new facilities capable of producing, yearly, 400 million pounds of alu-

mina, and 340 million pounds of aluminum. The agreement specified that Alcoa should select sites, acquire land, and build the plants, funds being provided by, and title vesting in, the Defense Corporation. Upon completion, the plants were to be leased to Alcoa. All Alcoa's plans were subject to the approval of the Governmental body.

Without setting forth all the details of the above contract, it suffices to say that the agreement received severe criticism from the Truman Committee, because, as that group stated, "it contained few, if any, safeguards to the Government, and was entirely too favorable to Alcoa." Senate Report No. 480, Part 5, 77th Congress, 2d Session, p. 16 (1942).

As a result, a subsequent agreement dated December 12, 1941, besides increasing the capacity of the proposed plants to one billion pounds of alumina, and 512 million pounds of aluminum per year, amended several provisions of the earlier agreement. These served to remove the necessity of obtaining Alcoa's consent to certain activities of the Defense Corporation with respect to furnishing bauxite supplies, and the regulation of the production and disposition of alumina.

It might be thought that because of Alcoa's responsibility in connection with the wartime construction program, the uneconomic location of at least some of the Government reduction plants might have been dictated by Alcoa's desire to avoid post-war competition. However, I believe the evidence in refutation of this suggestion is clear and convincing. The record establishes that plant sites were determined after the investigation and report of Governmental agencies, and that the location of reduction plants was influenced primarily by the availability of adequate power.

It remains to be said, concerning the Government plants, that Alcoa's actual work, in building and operating the wartime facilities, affords not only no ground for criticism, but redounds instead to the credit of the company. The eventual plant constructions undertaken by Alcoa, on behalf of the Government, vastly exceeded the early estimates, and are detailed in Table I, of this opinion. Alcoa expanded its own production, at its own expense, from 350 million pounds to 830 pounds per annum. The Truman Committee then took occasion to commend Alcoa on the expedition with which the Government constructions were accomplished. Senate Report No. 10, Part 16, 78th Congress, 2d Session, p. 66 (1944). Moreover, Alcoa has never claimed, and has never received, any compensation for the Government's use of its patents during the war.

(2) Plant Disposal and Cancellation of Leases.

The Surplus Property Act of 1944 had as some of its objectives the orderly disposal of such properties so as to discourage monopolistic practices, encourage the development of new independent enterprises, strengthen the competitive position of small business concerns, and accomplish the disposals "as promptly as feasible without fostering monopoly or restraint of trade." 58 Stat. 766, 50 U.S.C.A.Appendix, § 1611.

The Act required that the Surplus Property Board submit to Congress a report describing the property involved and a plan for its disposition. 58 Stat. 774, 50 U.S.C.A. Appendix, § 1628. One of the officials associated in the task of formulating the Government disposal program was Gordon W. Reed. While Alcoa did not seek to press directly upon W. Stuart Symington, the Administrator, its own idea of a proper disposal program, it did convey to Reed, for transmission to the Board, its satisfaction with a plan worked out by him after consultation with Alcoa officials.

This program, which was later summarized in the Report to Congress by the Surplus Property Board, dated September 21, 1945, was as follows: high power cost reduction plants to be maintained in stand-by condition; the St. Lawrence reduction plant to be sold to Alcoa, and Alcoa's own reduction plant at Massena to be junked or held in stand-by in an equivalent capacity; Alcoa to operate each of its reduction plants at the same percentage of capacity over an annual period; Alcoa was to release its leases on the Troutdale and Mead reduction plants, Mead to be leased to any operator the Government could find, Alcoa to purchase Troutdale if no experi-

enced operator could be obtained in six months; the Jones Mills reduction plant to be sold to Alcoa; the Hurricane Creek alumina plant to be leased to Alcoa with Alcoa agreeing to supply alumina to any purchaser at a government-fixed price; Alcoa to purchase the Baton Rouge alumina plant, and remove it to the northwest; the Tacoma reduction plant to be sold to the American Smelting and Refining Company or the Swiss Aluminum Company, or a combination of both; the disposal agency to recommend to the President that the tariff on alumina and bauxite be cut in half; and lastly, that the disposal agency recommend to Judge Caffey that no violation of the Sherman Act be found if Alcoa did not produce more than 75% of the domestic aluminum supply.

Consistent with the foregoing proposals, on July 24, 1945, Alcoa offered to purchase the Arkansas facilities at Jones Mills and Hurricane Creek, upon settlement of mutually satisfactory terms. On September 11, 1945, in reply to the Board's inquiry concerning the anti-trust aspects of disposals to Alcoa, the Department of Justice advised that, although the Department's policy was only to give advice on specific proposals, it could be said as a general rule that any disposal to Alcoa would be violative of the anti-trust laws.

In addition to the requirement of submitting a report another circumstance made necessary the formulation of a policy for the aluminum industry in the summer of 1945. The lease agreement under which Alcoa operated the reduction plants at Jones Mills, Arkansas; Los Angeles (Torrance), California; Massena (St. Lawrence), New York; Spokane (Mead), Washington; and Troutdale, Oregon; and alumina plants at Hurricane Creek, Arkansas; and Baton Rouge, Louisiana; provided that if in any six months period average production was less than 40% of aggregate productive capacity the agreement could be terminated upon sixty days notice. Production for the six months ending July 31, 1945, was slightly below the 40% figure and the Government had an opportunity to cancel all the leases. Failing the exercise of the option to cancel, the leases upon the respective plants would not have expired until various dates late in 1947, and through 1948.

The Government desired to avoid unemployment for the workers in these plants, and to keep them in operating condition for the benefit of such new operators as might eventually take over these properties. At the same time, the Government did not wish to delay, and perhaps seriously prejudice, its disposal program by waiting until the natural expiration dates of the leases. Inasmuch as Symington considered that his attempt to discuss the matter with Arthur V. Davis had proved fruitless, the Government served Alcoa with notice of termination dated August 30, 1945. Nevertheless, it expressed its desire to negotiate a temporary arrangement for the continued operation of the plants, and suggested one-year leases on all plants with a right in either party to cancel on sixty days notice. Alcoa rejected this offer on the ground that it would place the company in an "impracticable operating position", a belief which apparently extended to most any form of temporary adjustment. Accordingly, the leases were cancelled, Alcoa cooperating by its willingness to permit the equipment and materials within the plants to remain undisturbed, as requested by the Government.

Finally, on September 21, 1945, the Surplus Property Board submitted its Report to Congress. The program acceptable to Alcoa was rejected on the ground that it would increase rather than decrease Alcoa's monopoly position, and thereby prevent the expansion of production and employment that would result from more competition. The Report also stated that the plan assumed that competition would be forthcoming from Canada. The Board took the position that this would not be satisfactory for the reason that the Canadian aluminum industry is within the control, if exercised, of Alcoa's principal stockholders, and also because such an arrangement would deprive American workers of the opportunity for employment in the aluminum industry. Indeed, it was the understanding of the Board that Alcoa planned to have Limited export to the United States the amount of primary alu-

minum which would reduce Alcoa's market share below any level that the court might fix to constitute a violation of the anti-trust law.

Thereafter, on October 15, 1945, Alcoa sent to the Administrator, and released to the press, a 45-page "letter of protest" against the Report. The theme of this document was that the Board had grossly exaggerated Alcoa's competitive strength, and consequently, with a view to destroying Alcoa, had proposed a "cradle to the grave" subsidy program for the industry which, once entered upon, could never be terminated. From the intemperate wording of the letter, its many misstatements, and its misrepresentation of the Report by quotations improperly abstracted from their contexts, it is hard to believe that it was not a deliberate attempt to set a gloss upon the Board's work.

Subsequently, on October 17, 1945, Alcoa submitted a detailed offer to lease Hurricane Creek, the terms being financially more advantageous to the Government than those subsequently obtained from Reynolds. The Board sought the advice of the Department of Justice on this proposal, and was told that, inasmuch as Alcoa's monopoly would be reinforced, instead of eliminated, it could not see how the offer could be entertained.

On January 6, 1946, Symington wrote to Senator O'Mahoney, Chairman of the Senate Subcommittee on Surplus Property, and released for publication a letter, with an accompanying report, replying to the Alcoa protest. The report effectively corrected the misstatements and misrepresentations of the Alcoa attack on the alleged subsidy program.

The report and letter set out what are described as efforts by Alcoa to prevent the accomplishment of the statutory aims of the disposal program, referring among other things to the plan acceptable to Alcoa, as well as the company's behavior in the matter of lease cancellation. Symington also complained of Alcoa's attitude with regard to Hurricane Creek, stating that the company's failure to permit the American Smelting and Refining Company to inspect records of Alcoa's experience at that plant resulted in the former's refusal to further consider entering into the aluminum industry. In addition, it was said that Alcoa refused to clarify the patent situation at that plant. Alcoa, Symington wrote, "is using its patents to obstruct the Reynolds transaction [regarding Hurricane Creek] despite the fact that it has hitherto publicly assured both your subcommittee and the Senate Committee on Small Business that its patents would not prevent or hinder the disposal of Government plants to competitors. Although the Government understood that the plants constructed for it by Alcoa were to be capable of independent operation, now for the first time Alcoa suggests that the Hurricane Creek plant can be sold as an effective operating unit to a competitor of Alcoa only if we accept the terms and conditions that Alcoa may dictate."

(3) Allocation of Patents.

Upon the publication of Symington's letter and report, Alcoa made its first positive contribution to the creation of post-war competition. At a conference held January 9, 1946, the Government requested royalty-free licenses on the alumina patents embodied in, and required for the Hurricane Creek plant, and by letter dated January 10, 1946, A. V. Davis tendered such an offer. It was conditioned as follows:

"As a term of the license, the Reconstruction Finance Corporation and any sub-licensee will grant the Aluminum Company of America a non-exclusive royalty-free license, with right to sub-license, under any patents used at the Hurricane Creek alumina plant by the Reconstruction Finance Corporation or a sub-licensee which are improvements upon the alumina patents and which are owned or controlled either by the Reconstruction Finance Corporation or such sub-licensee or under which either has a right to sub-license others."

Thereafter, Alcoa was showered with encomiums by Symington, by Senator O'Mahoney, and by the then Attorney General. But all such statements, press releases and press conferences failed to make mention of the grant-back to Alcoa of improvement patents upon which Davis had conditioned his offer. Indeed, at the press conference,

Symington stressed that there was no *quid pro quo*.

At about the same time, Alcoa appears to have expressed interest in the Government's fabricating facilities, particularly the McCook sheet mill in Illinois. The Board sought the opinion of the Justice Department, and in response, was advised against such a disposition, although it was stated that changed conditions in the industry arising out of a successful disposal program might call for a different conclusion in the future.

In April, 1946, the Government leased the Hurricane Creek plant to Reynolds, and agreed to indemnify the lessee against any claims that might be made for patent infringement, including Alcoa's fluoride facilities which were part of the plant. In August, 1946, Alcoa consented to grant royalty-free licenses to the Government on the patents necessary to the operation of the Baton Rouge alumina plant on terms similar to those, of the previous January, covering Hurricane Creek.

Both Reynolds and Kaiser assumed that the burden was on the Government to obtain from Alcoa the patents necessary for the economic operation of the plants which they had leased or bought from the Government. They were concerned not only with the patents required for the production of alumina, but also with patents covering the direct chill process, alloys, and certain other equipment which had been built into the Alcoa-constructed plants. The original position of the War Assets Administration was that all these patents should be licensed royalty-free. Alcoa, as already noted, was willing to accede to such an arrangement on the alumina processes conditioned upon the grant-back of improvement patents, but refused to tender similar licenses under the other patents.

Wilson testified that this position was taken both because these patents were assets of the corporation's stockholders which the management did not feel free to give away, and because the morale of Alcoa's research workers would be adversely affected if their accomplishments were not used to Alcoa's advantage. Instead, Alcoa's proposals were that the Government pay $125,000 as a lump sum royalty on all Alcoa's patents on machines installed in the various plants, and that licenses be issued providing for a royalty of $1 per ton on the D. C. process, $15 per ton on the fluoride patent at Hurricane Creek, and ¼ cent per pound on certain of the alloy patents, and suggested that royalties on certain other patents be fixed in negotiation.

The War Assets Administration staff estimated that the proposed D. C. process rate would yield Alcoa approximately $827,700 per year, for 12 years, from the Government plants alone, and that the proposed fluoride license would require a royalty payment of some $300,000 per year, which would have the practical effect of forcing the Government to abandon its investment in these facilities.

It is not clear how actively the matter was negotiated before the final settlement was reached in October, 1948. It does appear, that at various times, War Assets Administration took the position that the royalties suggested were too high, that the patents had already been licensed by implication because the equipment had been built into the Government plants, and that the D. C. patent was invalid. Staff memoranda of War Assets Administration in evidence show that there was also opinion that the fluoride patent was invalid, and that, regardless of invalidity, Alcoa could not claim any royalties because the Government was the bona fide purchaser of the patented articles, thus acquiring absolute title therein without restriction. Licenses were not signed for the alumina patents, Alcoa contending that an agreement had been reached on the grant-back, while the Government denied there had been agreement and refused to accept such a provision.

In November, 1947, Alcoa and Kaiser entered into license agreements, effective December 1, 1947, covering all the patents then necessary to the latter company's operations. The royalty rates were fixed at $.50 per ton for the D. C. process, with a provision that after 80% of the year's royalty equaled $35,000, the rate was to fall to $.10 per ton; and ¼ cent per pound on the alloy patents. Kaiser agreed to

pay a lump sum royalty of $42,891.66 for the use of the so-called machine patents on equipment built into the Government plants. Certain fabrication and miscellaneous patents, and the alumina patents necessary for the operation at Baton Rouge were licensed royalty-free, the latter containing the grant-back provision on the continuous digestion and starch processes.

At this time, it also appears that Alcoa was willing to license its patents on the Hurricane Creek fluoride facilities at a royalty of $7.50 per ton. The Government does not argue that the royalties in the Kaiser agreement were unreasonable, but suggests that every dollar paid to Alcoa by Kaiser serves to increase its costs, while correspondingly augmenting Alcoa's income.

The Government does contend that these licenses to Kaiser were unfair and restrictive in a number of ways. (i) The assertion is made that the licenses betray a purpose to confine Kaiser to its then-existing facilities, and to prevent its expansion. Both the alumina and casting licenses applied only to Kaiser's establishment as it was then constituted.

Mr. Schmeltz testified that there was no such intention. He said the alumina license was thus restricted because the Baton Rouge capacity exceeded anything Kaiser anticipated needing for a long time. He also testified regarding the casting license that at just that time Alcoa had submitted a proposal for an industry ceiling on royalties from the D. C. patent, and that Alcoa "did not want to confuse and make the matter more difficult by trying to set a monetary ceiling applicable solely to Permanente [Kaiser] on the basis not only of the plants that they already had but any plants they might later acquire. Consequently, this was an interim sort of limitation and was understood as such by both parties."

This explanation is not wholly convincing, in view of the provision in the license, also referred to by Schmeltz, that the ceiling should be proportionally increased to the extent that Kaiser within its existing plants increased the number of casting units employing the patented process.

Alcoa's counsel stated in court that the limitation was included because "the royalty agreement in effect at that time was a compromise in amount, and we did not want a wide open license at that time at that amount."

(ii) The Government also claims a restraint in a provision of the alloy license permitting the licensee only to make, use, and sell in the United States, its territories and possessions. This, it is argued, excludes Kaiser from the export trade in these commodities. Cf. United States v. General Electric Co., D.C.D.N.J.1949, 82 F.Supp. 753. Mr. Schmeltz testified that no limitation was created or intended by this language, the license granting all that the statute invests in the patentee. Alcoa's counsel stated he thought the restriction reasonable, because the patents licensed were optional, and not at all necessary to Kaiser's operations.

(iii) Restraint is also said to exist in the absence from the Baton Rouge license of the right to make or have made apparatus covered by the patent, the agreement merely permitting the licensee to use and replace the apparatus or to have it replaced. As to this, Mr. Schmeltz stated that the omission was pure inadvertence, that no one had ever raised the point before, and that the company was quite willing to correct it.

A similar limitation was contained in the machine license. Schmeltz testified that the omission exists because all parties understood that all these patents were purely alternative, and that the licensee could replace these machines by others available on the open market, although if it were desired to install additional units of the same type another license from Alcoa would be required.

(iv) The casting license contains a provision to the effect that "Within the scope of the license granted, Licensee will not, directly or indirectly, during the life of this Agreement, question or deny the validity of any patent under which a license is hereby granted, and will not aid or abet others in so doing."

The Government claims this is directed against the questioning of validity by the

Government. Alcoa's counsel stated that the clause "impressed us as an entirely reasonable imposition", and Schmeltz characterized the provision as "boiler plate" in the license, not aimed at the Government, or at any one else in particular.

(v) Finally, the Government relies on the grant-back of improvement patents in the Baton Rouge license to illustrate Alcoa's purpose to dominate the trade. This matter will require more extended discussion at a later point.

In addition, concerning the licenses to Kaiser, it is to be noted that the parties agreed that the licenses would be modified to conform to, or be superseded by, any agreement Alcoa might reach with the Government on the same subject, and which would be no less favorable to the licensee.

Both the Department of Justice and War Assets Administration specifically disapproved the execution of the Kaiser license agreement, after copies thereof had been forwarded by Alcoa for consideration by the Government. Objection was made to a clause in the alumina license which extended only a limited right to the licensee to contest validity as falling short of protecting the public interest, and further, that the other licenses "contain restrictions, terms and provisions which appear to work against the establishment of a competitive aluminum industry."

In the summer of 1948, Jess Larson, then War Assets Administrator, concluded that Alcoa and the Government should strive to compromise all matters then at issue between them. He testified that his decision was impelled by reasons relating to national defense, and to the need for competition in the industry. Accordingly, a conference was held in Washington, D. C., between representatives of War Assets Administration and Alcoa, culminating in the so-called 10-point agreement of October 29, 1948. The first point related to the sale of the St. Lawrence plant to Alcoa, a matter which will be discussed hereafter. The second point provided for the sale to Alcoa of equipment from the Burlington carbon plant for $175,105, the highest bid re-

ceived for these facilities. The remaining eight points relate to patents.

Both Larson, and the Alcoa witnesses, Wilson and Schmeltz, testified that neither the St. Lawrence plant, the Burlington equipment, nor patent rights were traded off one for another, but that each section of the agreement stood on its own feet, all these matters being included in the one document because the parties wished once and for all to settle their outstanding differences. The ten points of this contract did constitute a single agreement in one sense, in that there was a recital therein that it represented a "single undertaking", and that if either party were unable to perform any of its obligations by December 31, 1948, the other would have the privilege of termination. The Government, for reasons hereafter recited, has never delivered the deed to the St. Lawrence plant, but, Alcoa, on March 21, 1949, formally waived its right to cancel any licenses under this clause, and indeed the licenses have in fact issued, those bearing royalites becoming effective as of December 1, 1947.

Reynolds and Kaiser representatives were consulted by War Assets Administration during the negotiation of the 10-point contract. It was at Reynolds' suggestion that Alcoa agreed to license all of its then existing alloy patents. Immediately prior to the execution of the agreement, Larson obtained from both companies their approval of the proposed terms.

The 10-point contract established eight forms of licenses denominated, respectively, machine, casting, alloy, fabrication-miscellaneous, Baton Rouge-alumina, Hurricane Creek-alumina, Hurricane Creek-aluminum, fluoride, and clad products. The subject matter of the first five licenses is the same as that of the similarly named ones previously entered into with Kaiser, except that the new machine license covered all Alcoa's machine patents in each of the war-built plants. Also, the new alloy license included patents not in the original Kaiser alloy license. The clad products license was concerned with the Brown patent, described above as one of the eleven that are competitively significant. The titles of the

Hurricane Creek licenses are sufficiently descriptive.

The Hurricane Creek, Baton Rouge, and machine licenses designated War Assets Administration as licensee with the right to sublicense. As to the other four licenses, it was agreed that Alcoa would issue such a license "to any operator of any aluminum plant or facility" at the request of War Assets Administration.

Concerning royalty provisions, four are royalty-free, these being the three alumina plant and the fabrication-miscellaneous licenses. These royalty-free licenses cover six of the eleven patents listed as competitively significant—the four alumina production patents, the fluoride patent, and the stabilizing process for cold rolling aluminum-magnesium alloys.

Mr. Schmeltz testified that Alcoa agreed to a royalty-free fluoride license upon the frank request of War Assets Administration to "bail them out" of the provision in the Hurricane Creek lease by which War Assets Administration agreed to indemnify Reynolds against infringement of Alcoa patents involved in the operation of that plant. The machine license issued on a lump sum payment of $115,000 by the Government, this payment releasing Kaiser's obligation to pay $42,891.66 under the machine license which that company formerly held.

The casting and alloy royalty rates were both fixed as in the Kaiser licenses at $.50 per ton and 1/4 cent per pound, respectively, with provision for substantial reductions when production in the industry exceeded certain ceilings ($100,000 for casting, 20 million pounds for alloys), the arrangement being such that small as well as large producers would receive the advantage of such reduction. The clad products royalty was fixed at 1/10 of a cent per pound, except that emergency or wartime use of Alclad 75S, important in aircraft production, would be royalty-free. In addition, Alcoa waived its right to compensation based on use by the Government or its operators of the patented processes, equipment, or products prior to the effective dates of the licenses.

The new licenses removed most of the restraints which the Government asserts were present in the earlier ones to Kaiser. The restriction of the casting and alumina licenses to then existing facilities was deleted. In the same licenses, broader protection was given the licensee to contest the validity of the patents involved. The alloy license was no longer limited to the United States, its territories and possessions.

However, it is still true that no right exists to make, or have made, any equipment under the alumina and machine licenses. As to the former, the very fact that it remains unchanged supports the conclusion that the omission was inadvertent and, in any event, Alcoa is willing to correct it. And as to the latter, I am not persuaded that any improper restraint was intended or is imposed. I may add that certain other alleged restrictions to which the Government points in its brief, as being unreasonable restraints, do not so impress me.

The retention of the grant-back provisions, however, presents a graver issue. The original Baton Rouge license to Kaiser, and the 1948 replacement, are substantially the same. In the first license, the grant-back requires, *inter alia*, that the licensee grant to the licensor a royalty-free, non-exclusive right and license to make, use and sell, and the right similarly to sublicense others, on any improvements which Kaiser may patent on the starch and continuous digestion processes. The new license was identical, except that the Government was licensee, and obligated it and its sublicensees under this clause. The Hurricane Creek alumina license had a provision similar to that in the new Baton Rouge license, except that it extended to the two combination process patents which are used at that plant to convert low-grade bauxite, as well as the continuous digestion and starch processes. The Hurricane Creek fluoride license also contains the grant-back clause.

In response to the Government claim that these clauses show an intent to dominate, Alcoa says that they are entirely reasonable, considering that the original licenses are royalty-free, and that the grant-back is

of a non-exclusive license. It is further stated that the provisions are only defensive steps to preserve the value of Alcoa's basic discoveries. Mr. Rhoades testified that the Baton Rouge license improved the competitive position of the Kaiser Company. Mr. Schmeltz deposed that, in drafting the licenses, he did not have in mind the possible invalidity of the Alcoa patents, and that Alcoa would feel that if any of the licensed patents were adjudicated invalid, the grant-back obligation would be deemed to have terminated.

Nevertheless, it appears that if improvements were licensed to Alcoa, and if then, the basic Alcoa patent were held invalid, Alcoa would retain its licensed right. Mr. Wilson said that Alcoa thought a grant-back on the combination patents perfectly proper, although Alcoa is not at present using those patents, because the basic rights are Alcoa's, and Alcoa may in the future have occasion to employ both the basic and any improvement patents. It must be remembered, however, that all the Alcoa patents may be considered the "fruits" of Alcoa's past monopoly, in the sense that the attendant research dates back to the time when that company was the sole domestic producer of primary aluminum.

After careful study of the problem, I have concluded that the grant-back provisions, in the peculiar context of this industry, constitute a potential restraint on the restoration of lawful competitive conditions to such an extent as to require appropriate remedial action. The patented processes involved are basic to the economical manufacture of alumina. In speaking of the combination process, the record completely supports the statement in Alcoa's brief that "This process literally revolutionized the industry, for it made possible the use of low-grade Arkansas bauxite on a basis fully competitive with high-grade bauxite obtainable elsewhere. * * *" Though not presently commercially feasible, the technological structure of this industry, even at the present time, includes processes for the extraction of alumina from clay. To my mind, the refinement of these processes, which may only represent improvements on the processes presently utilized in the plants, constitutes an important avenue, if not the major avenue, of development in this industry. The elimination of the need for foreign bauxite supplies could easily provide the initiator of a successful process with a tremendous cost advantage, and would contribute greatly to our national security by vastly enlarging the domestic reserves of usable aluminum material.

With regard to this crucial technological matter, Alcoa, by virtue of the grant-back, enjoys a marked advantage over its competitors. It will have exclusive control of its own improvements. It will also have free use of any improvements made by Reynolds or Kaiser, whereas, as between the latter two firms, only the inventing company will stand to benefit. Thus, the efforts of either Reynolds or Kaiser may serve to improve Alcoa's position, and do harm to one of the other two concerns. Moreover, because an improvement by Reynolds or Kaiser can never injure Alcoa, their major competitor, it appears to me that the smaller companies will likely be discouraged from pursuing, with fullest vigor, technological investigation in the possibilities of the future. This helps to explain, perhaps, why Alcoa's research department had 762 employees in 1949, while Reynolds and Kaiser combined had but about 88.

In my opinion, it is a vital necessity that there be effective competition among the companies in research and development, as well as in market trade. The consuming public has much to gain from technological improvements, and the security of the country, as well as national prosperity, are largely dependent upon continued scientific advances. And market competition, itself, can be readily impaired if a single company secures patent control of the industry. For these reasons, and upon these facts, I hold that because the grant-back provisions are inconsistent with the existence of "effective competition" in the aluminum trade, they should be decreed to be unenforceable.

In reaching the above conclusion, I have taken note that in each license which contains a grant-back clause, the following provision appears: "Neither the execution of this Agreement nor any of its provisions

shall in any way be deemed or construed as a limitation of the right of the Government to apply to the U. S. District Court for the Southern District of New York, or any other court, for a determination, and a decree consistent therewith, that dissolution of the Aluminum Company of America is necessary and appropriate to create competition in the aluminum industry *or that the public interest requires other relief."* (Emphasis added.)

In my opinion, the royalty provisions in the various licenses are not abusive, but reasonable, and have no serious effect on competition. As a result, it is unnecessary to examine into the authority of this Court to order royalty-free licensing.

█ In this connection, it may be that Alcoa will contend that, inasmuch as the patent licenses which contain grant-back provisions are royalty-free, the grant-back clause should be considered to be the moving consideration for the license, and that if the grant-back provisions be invalidated without permitting Alcoa to exact royalties, it would in effect be a confiscation of Alcoa's property. Without passing upon the constitutionality of such confiscation if it be alleged, a question which was specifically left open in United States v. National Lead Co., 1947, 332 U.S. 319, 338, 349, 67 S.Ct. 1634, 91 L.Ed. 2077, it is my present judgment that any such contention upon the part of Alcoa would be without substance. It is to be observed that Alcoa has argued that the grant-back provisions of the patent licenses are of small importance because of the fact that the opportunities for improvements upon the patents are extremely limited. Furthermore, Alcoa has not hesitated to claim that its action in granting free licenses was responsible, in part at least, for the successful execution of the disposal program. If Alcoa were now to see fit to assert that the grant-back provisions are of great value and, thus, put aside the generous spirit heretofore manifested, it would, I believe, be hard put to overcome the effect of some of its past actions which have not at all times been completely commendable.

(4) Disposition of the St. Lawrence Plant.

As has already been noted, Alcoa owns an aluminum reduction plant at Massena, New York, near the Canadian border. During the war, Alcoa built and operated for the Government a new reduction plant at Massena, the St. Lawrence plant, with a rated capacity of 108 million pounds per year.

The Government charges that Alcoa's efforts to acquire this latter facility were motivated by a design to take this capacity off the market, and that this illustrates Alcoa's inveterate purpose to dominate the aluminum industry.

The Surplus Property Report to Congress dated September 21, 1945, contains the following recommendation: "Massena [St. Lawrence] will be offered on lease to Alcoa, subject to approval of the Attorney General, upon terms that confer no advantage over competitors. This plant will be held by the Government until possibilities are determined for disposal to others when a low-cost power supply becomes available." Id. at p. 52.

It was said that the lease to Alcoa should carry a rental that would be compensatory for the advantage of the low cost operation which the new plant has over Alcoa's older facility at that location. Id. at pages 34–5. The first supplementary report of the War Assets Administration to Congress dated February 12, 1947, summarized the recommendation in these terms: "The disposal program specified that Massena be offered to Alcoa, subject to the approval of the Attorney General, and it is possible that in the future Alcoa may be interested in acquiring this plant." Id. at p. 6.

Wartime operation of the St. Lawrence plant ceased in 1944. So far as appears, the disposal agencies made no effort to lease or sell the plant until early 1947, when proposals were sent to a number of possible bidders. The only responsible concern showing serious interest in the acquisition was Alcoa. On February 20, 1947, Alcoa wrote to War Assets Administration and expressed the view that a lease of this plant would be unworkable for the reason that low cost power in adequate quantities

was not available, and that between two and three and one-half million dollars would be required for its renovation, and the removal of some equipment.

Alcoa also stated that this plant could not be evaluated on a construction cost basis in that such costs had been unusually high ($19,953,000), and because the plant had suffered serious depreciation, and excess carbon facilities were no longer available. Alcoa's offer for the establishment was $5,000,000 cash.

War Assets Administration requested and obtained an appraisal, together with an engineer's report, with respect to the property. Both of these set the fair value of the plant at $13,485,166. After studying these reports, and giving consideration to the expenses and time required to rehabilitate the plant, War Assets Administration offered the property for sale at a price of $8,153,000. The parties then entered into a series of bargaining discussions.

Larson testified that about March, 1948, he began to feel that his responsibility under the Surplus Property Act of 1944 required him to pay increasing attention to the military value of future property disposals and, perhaps, to de-emphasize the encouragement of competition so far as that factor might militate against the country's security needs.

In June, 1948, War Assets Administration requested advice from the Department of Justice as to the anti-trust aspects of the sale of St. Lawrence to Alcoa, and in August, the Department replied that, in its opinion, such a disposition would constitute a violation of existing statutes. Thereafter, on September 15, the War Assets Administration asked the Attorney General to reconsider his conclusion upon the ground that there was a shortage of aluminum for the "projected defense program." Larson testified, however, that he believed that the Surplus Property Act required him to do nothing more than obtain the opinion of the Attorney General, and that he was not necessarily bound thereby. See 58 Stat. 775, 50 U.S.C.A.Appendix, § 1629.

In October, Larson addressed letters to the Munitions Board and the National Security Resources Board, inquiring as to the adequacy of aluminum supplies for military purposes. He received responses to the effect that there was a critical shortage, and that maximum production was needed. Following this, on October 18, Larson wrote Alcoa that its offer of $5,000,000 was accepted. Two days later, the Justice Department reaffirmed its view that the sale was violative of the anti-trust statutes.

The agreement on St. Lawrence was incorporated as the first item in the 10-point contract of October 29, 1948. The record contains statements by both Reynolds and Kaiser, in response to inquiries from Larson, that they did not object to this disposition of the St. Lawrence plant. In addition, Alcoa agreed to waive any estoppel that might be claimed against the Government on the basis of this sale, and also agreed to a national security clause, recommended by the Munitions Board, by which equivalent capacity in the old Massena plant was to be maintained in a stand-by or operating condition until 1963.

In November, 1948, Alcoa entered into possession of the plant, but on the request of the Attorney General, War Assets Administration declined to receive payment of the purchase price, and refused to tender a deed to the property. That same month, further conferences were had between the Department of Justice and Larson, and finally, in December, it was decided to postpone delivery of the deed.

During the course of this trial, the parties agreed that conveyance of title would be temporarily withheld, but that War Assets Administration would promptly execute the deed if my opinion were consistent therewith. Meanwhile, Alcoa remains in possession of the property but is not making substantial expenditures for maintenance and, of course, is not operating this plant.

Mr. Wilson testified that if Alcoa is permitted to purchase the St. Lawrence facilities, it plans to operate but two of the three potlines there installed, and at slightly less than full capacity. The purchase agreement requires that for five years an equivalent capacity would be shut down at the old Massena plant. The resulting annual

production would be about 70 million pounds at St. Lawrence, and 48 million at the Massena plant, a total of 118 million pounds, as compared to the present capacity of 115 million pounds at the one plant. Mr. Wilson also testified that it would be of advantage to national defense to consummate the sale. In his opinion, the plant is rapidly deteriorating, and in another few years, if left idle, will not be an efficient stand-by facility. On the other hand, if purchased by Alcoa, the plant will be placed in operating condition, and the shut-down capacity in the old Massena plant maintained in stand-by condition.

Inasmuch as the low cost power available in the Massena area is distinctly limited, it appears that the acquisition of the St. Lawrence plant by Alcoa will have the effect of increasing Alcoa's total output by only some 3 million pounds per year. No other operator was shown to be in a position to undertake production at the plant. While I am hesitant to take any action which will result in an increase of Alcoa's productive potential, the record is clear that any advantage accruing to Alcoa will be of narrow dimensions, whereas national security, in the event of an emergency, will be disproportionately improved. The absence of a feasible alternative to the sale of this plant to Alcoa forces me to the conclusion that the agreement between War Assets Administration and Alcoa should be fully executed.

Before ending my discussion of the factual data relevant to an evaluation of Alcoa's "intention", a few post-war occurrences have been suggested as bearing on this subject. These relate to transactions that Alcoa has had with Reynolds and Kaiser, some allegedly indicating a desire to help the competitive efforts of these companies, and another purportedly demonstrating an opposite purpose.

(1) *The transactions allegedly to Alcoa's credit:*

In late 1946, a marked shortage developed in the supply of soda ash, a material essential to the production of alumina. Kaiser and Reynolds were seriously affected. This was so to such an extent that Kaiser immediately commenced the construction of a soda ash plant of its own. It was completed within 67 days. Alcoa was also short of soda ash. Notwithstanding, and at the urgent request of the Civil Production Administration, Alcoa sold to Kaiser 10,-800,000 pounds of alumina for delivery in January and February, 1947. Kaiser promised to return a like amount in four or five months, and, as an alternative, sold to Alcoa in May, at the then market price, an amount of aluminum (5,600,000 pounds) equivalent to that which could be manufactured from the quantity of alumina Kaiser had received. Alcoa further assisted Kaiser's initial operations by acceding to the Government's request to purchase alumina inventories remaining in the leased reduction plants upon the cancellation of the Alcoa leases. Kaiser acquired 43,200,-000 pounds of alumina from such inventories at Mead. In addition, because Kaiser was in a position to operate the Trentwood sheet mill before all the necessary primary metal could be produced at Mead and Tacoma, Alcoa, at Kaiser's request, made sales of aluminum to Kaiser beginning in June, 1946, to the extent of 13,906,000 pounds.

In order to alleviate Reynolds' soda ash shortage, Alcoa shipped that company in November, 1946, over 11 million pounds of alumina. Reynolds returned this material pound for pound some four or five months later. Reynolds also acquired 19,250,000 pounds of alumina inventory that Alcoa had left at Troutdale, and in 1946, bought from Alcoa some 25,300,000 pounds of pig and a quarter of a million pounds of alloy ingot. This was done in order that Reynolds could more rapidly get its post-war fabrication operations under way.

Further, Reynolds' Hurricane Creek plant was shut down part of the summer of 1949, because of a strike. In order to assist the company to maintain in operation the reduction plants at which there were no strikes, Alcoa shipped 7,300,000 pounds of alumina in August, and contracted to deliver an additional 41 million pounds in September and October.

It should be added here that Mr. Rhoades stated in testifying as to his experiences

as an official of the Kaiser Company that, to his knowledge, Alcoa had never employed unfair methods of competition, had never undercut, or used subterfuge. Neither had it given rebates, nor made threats to Kaiser's customers.

(2) *The alleged discreditable transaction:*

The Government contends that Alcoa's refusal to come to Reynolds' assistance during the 1947 slump, when inventories of the latter company were unhappily accumulating, and at a time when it could have done so at no cost to itself, is nothing less than a demonstration of Alcoa's purpose to dominate the industry.

In May, 1947, Reynolds sought to induce Alcoa to purchase 25 million pounds of virgin metal at the current market price. Alcoa apparently considered it commercially desirable to undertake the purchase. However, on the advice of counsel that such a transaction might be embarrassing in the pending anti-trust proceedings, it was obliged to refuse the request.

Reynolds then offered to obtain clearance of this transaction from both the Department of Justice, and this Court. At first, Alcoa declined the suggestion, but shortly thereafter changed its position, and stated that it would reconsider the proposal if consent in due form could be obtained from the Government. Thereupon, Reynolds addressed an appropriate inquiry to the Attorney General. At this time, Kaiser was likewise interested in consummating a similar transaction. Two weeks after the Reynolds' inquiry, the Attorney General's office notified Alcoa that it would refuse approval until it was supplied with certain information relating to the terms of sale and proposed use of the metal. From the nature of the Department's inquiries, it would appear that it was suspicious of the bona-fides of the proposed transactions.

Alcoa waited over a week to reply. Its letter, when sent, was an attempt to correct the misapprehensions of the Department of Justice. Alcoa stated that it was not anxious to make the purchase, but would undertake negotiations appertaining thereto in order to improve the competitive situation upon the appropriate consent of the Department. However, it did not furnish the information that had been requested. After a lapse of two weeks, the Government curtly acknowledged Alcoa's letter, noting the company's failure to respond to its inquiries and its inability to render an opinion without such information. The correspondence lapsed, with no decision having been reached, and without execution of the proposed sales.

*Conclusion:* An accurate appraisal of Alcoa's "intention" during these eventful years is not an easy task. The entire case is tempered by a consideration of the uniquely difficult position which was imposed on Alcoa by the decision of the Court of Appeals in March, 1945. Prior to that event, Alcoa had been cleared of the charge of violating the Sherman Act. During this period it constructed an aluminum empire for the Government with which it has since been forced to compete. True, some of these facilities have not been capable of adaptation to post-war competitive use, but the actual responsibility for this fact has not successfully been attributed to Alcoa. Much less, has it been shown that Alcoa deliberately undertook to achieve such a result. In fact, it has not been established that Alcoa did not believe it might eventually fall heir to some of these properties.

The opinion of the Court of Appeals, coming at a time when the disposal program was ripe for consideration, placed Alcoa in a perplexing dilemma. That decision, by postponing remedial action until the results of the disposal program were known, forced Alcoa into the unenviable situation of having to co-operate with the disposal agency in its effort to attenuate the strength, power and trade position of the defendant now at bar. It wished, of course, to forestall dismemberment by judicial decree. While under this strain, it is not surprising that Alcoa became restless, and alarmed, and gave voice to vigorous protests.

No business enterprise can really be expected to be a willing and happy agency in bringing about a serious diminution of its own resources. The responsibilities of the officers of a corporation to the stockholders whom they represent are not conducive to

a cheerful and charitable attitude towards the possibilities that Alcoa's management was required to face.

Thus, in analyzing the character of Alcoa's behavior, the facts exhibit a definite pattern. Alcoa did not eagerly abandon its dominance, but yielded to insistent demands made upon it. And sometimes, it yielded more than was actually required in order to avert the chance that it might be subjected to more onerous conditions.

In arriving at an opinion upon the significance to be ascribed to such behavior, I am bound to remember that a desire for the preservation of power is not an abnormal sentiment, even though determined efforts to maintain a monopoly position may well be unlawful. But the delineation between the legal and the illegal in the anti-trust field is not so clear as to have accurately informed Alcoa as to the extent to which it must eventually be reduced, in order not to come within the condemnation of the Sherman Act.

The Government has argued that: "Perhaps the most revealing manifestation of Alcoa's abiding purpose to dominate this industry is its petition filed in this Court on March 31, 1947. Alcoa asserted then that competitive conditions had been established and that it was entitled to a judgment that it no longer had a monopoly. * * * it seems clear that Alcoa's petition was premature and can be explained only by a purpose to defeat the jurisdiction of this Court upon a mere showing of distribution of plant capacities."

The inescapable logic of this contention, it would appear, is such as would lead me even to condemn the vigorous defense that Alcoa has here interposed to the Government's action upon the ground that it constitutes evidence of Alcoa's unlawful purposes. All I can say is that when theories of law begin to lose touch with the realities of normal behavior, it is highly desirable that the theories undergo a bit of modification.

Even in dealing with a violation of the Sherman Act de novo, the status of "intent" is surrounded by peculiar difficulties. The Act requires that business enterprises compete actively, but not unfairly, with each other. In the course of so doing, it may happen that a single firm by skill and industry may succeed to such power as will, when coupled with the requisite purpose or intent, offend against the law. And to find this "purpose or intent," the controlling precedents indicate that it is not necessary that the firm indulge in unfair competitive practices. It is enough that its strength developed as a consequence of competitive activity of a kind that, at its inception, was entirely lawful. This rule exempts from liability only the monopolist whose power is accidentally thrust upon it by some unprecedented and unforeseeable market occurrence; and as to whose power its own efforts could, in no way, be said to contribute.

The plain implication of this doctrine is to suggest that incidents of normal competitive activity, such as is required by law, may eventually be employed as material elements in proving the existence of an unlawful monopoly. I hardly think, however, that normal competitive activity can be used to show an inveterate purpose to dominate an industry, and thus serve to enlarge the remedies which would otherwise be applicable to the mere existence of monopoly power. Any such theory, in my judgment, might lead to the vengeful imposition of a penalty upon conduct that is compelled by law. In order to prompt a magnification of remedies, I believe the evidence must clearly show that the monopoly was a product of abusive or predatory trade practices, which are beyond the bounds of lawful competition.

No instances of unfair competition by Alcoa have been presented on this record as occurring since Judge Caffey's findings. The most that can be said is that Alcoa yielded its unlawful market position reluctantly. But it did not subvert the disposal plan, and it was not unscrupulous and uncompromising in its opposition to that program. In the end, its contributions were of aid in making possible whatever success has been achieved. The force of the Sherman Act is not weakened by my failure to deal harshly with Alcoa because of its futile efforts to minimize the unpleasantness of

what, to it, was an extremely disagreeable situation.

And so, I conclude that the activities of Alcoa, since 1940, have not created a need for all the remedial action that the Government demands. Neither do they prompt me to enlarge or diminish remedies beyond the necessities of seeing to it that competitive conditions in this industry be assured. On the other hand, Alcoa's conduct has so far failed to overcome wholly the effects of the adjudication of monopoly that has gone against it. I feel that, in order to safeguard the public interest, further appropriate action in the premises will have to be taken.

### Conclusions—Appropriate Remedy

From the foregoing analyses, it is reasonably apparent that the evidence in this proceeding is insufficient to give me a well founded assurance that, in future years, competitive conditions of an effective and lawful nature will be certain to prevail in the domestic aluminum industry. The Government insists that such assurance cannot possibly be had unless Alcoa be divested of the ownership and control of some of its properties.

While I am firmly convinced that the Government is entitled to some relief, I am as strongly persuaded that, for the present at least, the organization of Alcoa's physical properties should not be disturbed. These conclusions are supported by several considerations.

In the first place, it is my considered and firm judgment that a strong and resourceful domestic aluminum industry is a vital necessity, not alone from the standpoint of national security, but also for the peacetime welfare of the general public. By this I mean that the future development of the industry depends upon its being composed of financially sound and well-integrated organizations. One must constantly remember that aluminum products are in fierce rivalry with articles composed of other materials, and which are manufactured and sold by concerns that, in size, are fully equal to Alcoa. Indeed, in some instances, the resources of such competing firms far exceed those of all three domestic aluminum producers.

If the aluminum industry is to develop fully, and be able to satisfy the tremendous demands to which, in the natural course of events, it will be subjected, it must not be reduced to a state of relative impotence. On the contrary, the industry, if its present stature is to be maintained, must carry on a continuous process of encroachment upon the preserves of other industries whose products are manufactured by corporations that will not abjectly surrender the trade positions they now hold. The success of any such effort to encroach upon fields of endeavor that are now occupied by strongly entrenched competitors can be achieved only by companies that are rich in resources, and which are capable of undertaking extensive scientific and market experimentations. At the present juncture, the weakening of any aluminum producer would lessen the buoyancy of the industry as a whole. Rightly or wrongly, from an economic and social standpoint, big business in many industries is an actuality, and if such enterprises are to be subjected to effective competition, their trade rivals must be of somewhat comparable strength.

This situation imposes a minimum effective size on any aluminum producer if it be a real contributor to the growth of the industry, and be, as well, a lively competitor with the producers of other metals. Unless fully persuaded—as I am not—that a divestiture of Alcoa's properties should take place, I am most reluctant to attempt to tamper unnecessarily with economic and industrial forces from which the public has reaped substantial benefits, and from which, also, it can continue to be served, and without detriment, in my opinion, to the national welfare.

The vertical divestiture of an integrated concern so as to create, at a minimum, another fully integrated and effective competitor would be, in its nature, a highly speculative—and even hazardous—venture. A corporation, designed to operate effectively as a single entity, cannot readily be dismembered of parts of its various operations without a marked loss of efficiency. And, to be sure that the segmented portions, when

combined in a new organization, will be able to cohere successfully, it may be necessary that they be provided with compensatory advantages. These, of course, can take various forms; for example, in favoring a single stage of operation, or by furnishing the new producer with a generally ideal geographical allocation of resources. Such dispositions eventually may subvert the functioning of overall competition between the resulting firms. These inherent difficulties are considerably magnified in the present context.

To the extent that Alcoa possesses duplicate and comparable facilities, the problem of divestiture would be less troublesome. But, in an extremely important stage of production, a major impediment to a successful divestiture is to be found. Alcoa has two alumina plants. The one located at Mobile, Alabama, is its only facility economically comparable to the alumina plants of Reynolds and Kaiser. In order to produce alumina at East St. Louis (Alcoa's other plant), at costs that approach the competitive level, the use of domestic bauxite would be required. The diminution of these already scarce reserves, under readily imaginable circumstances, might possibly take on the proportions of a calamity. Similar unequal concentrations by Alcoa of particular productive operations, at a single plant, likewise exist in certain fields of fabrication.

The insurance of successful competition by any dissociated portion of Alcoa would depend upon the ability of the new corporation to supply itself with efficient and experienced management. Since Alcoa, for so long, was the only domestic producer of aluminum, there is but a limited number of persons outside of its staff, and the officialdom of Reynolds and Kaiser, of which a large part was trained in the Alcoa organization, who are able efficiently to function as executives and managers in this industry. Thus, although the independence of the new firm would be the purpose for its creation, it could not, in the first instance, completely sever its ties with Alcoa.

When account is taken of the personnel and equipment presently employed in research, an equally grave problem must be faced. It would be a singular disservice to the public if the skill and technique of Alcoa's research department were impaired. Any divestiture which would extend to this activity, almost surely, would have a baneful effect upon the future of the industry. Nor would independence be fostered by tying two firms to the same research department. Yet, to recruit, outfit and finance a research organization which would not be under a serious disadvantage to that of Alcoa would, indeed, be close to an impossible task.

Furthermore, serious problems are created as a result of the financial benefits that were received by Reynolds and Kaiser under the Government's disposal program. The capital structure of a new company would have to be consistent with the low investment bases of these two producers. Otherwise, a disproportionate strain might soon wreck the competitive opportunities of the newcomer. For these reasons, the new concern would have to be so outfitted that additional constructions, at costs now much higher than formerly prevailed, would not be needed until such time as they would be justified by business success. To carve from Alcoa's establishment a combination which could satisfy all these criteria for effective competition, while perhaps not impossible, is such a perilous undertaking as to call for both caution and restraint.

Two alternative divestiture plans proposed by the Government have had my attention. Each of them provides for the creation of one other company which would have fewer physical resources, and less capacity, than Kaiser. The plans contemplate that the newcomer, at an early date, would have to construct efficient alumina facilities, and eventually, diversify its fabrication equipment which, at the outset, would be concentrated on the production of sheet aluminum.

To my mind, these alternative plans fail adequately to solve the problems heretofore described. Each of the Government's proposals calls for the creation of a single other operator, and a comparatively weak one, whose likelihood of successful growth is more presumed than rationally explained. And yet, the Government rightly exhibits

restraint in its proposals; namely, it does not wish to deprive Alcoa of such strength as would fatally impair that company's efforts and efficiency.

If divestiture really be called for, a less hazardous plan could possibly be devised. But this would involve something more than the selection of a few of Alcoa's properties which superficially appear to be combinable into an effective unit. To state the matter differently, there is little guarantee that the creation of one new aluminum company, in the presence of a still strong Alcoa, would materially change the competitive situation that now exists. The potential benefits which may thus derive from the Government's plans hardly justify the risk that the new producer created thereunder would soon wither and die.

Actually, any type of plan that would carry greater assurances for the success and independence of the new concern, and, at the same time, of necessity, be more crippling to Alcoa, is unnecessary in view of present competitive conditions, and the availability of other forms of relief. The Reynolds and Kaiser organizations are operating successfully and profitably, and there is little or no reason to think that either of them will be unable, under existing trade circumstances, to continue to thrive, and even to prosper. The Government disposal program has launched them with excellent properties, low investments, and safeguards for their future stability. The effective future competitive efforts of these two companies will be greatly enhanced if the shadow that now hangs over them in Alcoa's potential control of Aluminium Limited be removed.

It is inevitable that investments are deterred, expansion retarded, and stability impaired by the power in Alcoa's controlling stockholders, if they choose to exercise it, to overwhelm, and put to naught, the best efforts of both Reynolds and Kaiser. Such power, whether or not exercised, and whether or not likely of execution, is omnipresent.

Moreover, if the common control of Alcoa and Limited be eliminated, it is fairly possible, and even probable, that there will be introduced into the domestic market, a rival that is fully worthy of Alcoa's steel. The competitive potential of Limited could not be duplicated in this country by the organization of an additional producer, except at the risk of serious danger and disruption to the present effectiveness of the industry. Today, the United States provides a natural and ample market for part of the huge surplus of metal produced in Canada. The activities of Limited can furnish a supplement to present competitive efforts in offering stimulants to efficiency and lowered prices, from which the general public will gain, and this, of course, is one purpose of the anti-trust laws.

However, there are a number of possible future developments which could subvert the accomplishment of the above desirable results, and which cannot now fully be anticipated. For example, the competition of Limited in the domestic market may prove so severe as to diminish the prospects not only of Alcoa, but also of Reynolds and Kaiser. In such event, the competitive situation may be found to be impaired rather than improved. Or it may happen that, in fear of the above eventuality, any one or all of these companies could succeed in having aluminum tariff rates increased, and thus preclude Canadian competition. This might, perhaps, create a need for additional remedies to strengthen competition among the domestic producers.

These possibilities, plus the fact that there has been such a short time over which the operations of Reynolds and Kaiser are open to appraisal, require that, for another five years, jurisdiction of this case shall be retained by the Court. Within that period, note can be taken of the progress—or otherwise—of Reynolds and Kaiser. If, for any reason, it should appear that their competition with Alcoa is feeble, uncertain and ineffective, appropriate action, in addition to that now about to be accorded the Government, will be in order.

My present conclusion is that, in addition to the relief to the respective parties that is indicated in the "Intention" section of this opinion with reference to patent grant-backs and the disposition of the St. Lawrence Plant, the shareholders of Alcoa

be required to dispose of their stock interests either in Limited or in Alcoa.

The parties are requested to proceed to prepare plans, to be approved by the Court, to carry this decision into effect. Tentatively, such proposed plan may include provisions for a liberal time period in which sale of the shares in one or the other of the two companies shall be consummated in order to prevent undue loss of property values. Also, the plan may allow an exemption to any Alcoa stockholder, present or prospective, who may possess only a limited quantity of shares, the number to be determined, in either of the corporations, and may set up a trusteeship for the voting and holding of stock pending its disposition. Of course, such other provisions as the parties may think appropriate should be contained therein.

A final order should now be entered dismissing Alcoa's petition; and the relief for which the Government has petitioned, except to the extent hereinbefore set forth, should be presently denied. Nevertheless, the Government, for a period of five years, if conditions so warrant, may petition the Court for further and more complete relief.